# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **NOVARTIS PHARMACEUTICALS CORPORATION,** | : | |
| *Plaintiff*, | : | |
| | : | |
| **v.** | : | **C.A. No.: 1:25-cv-00387-JJM-AEM** |
| | : | |
| | : | |
| **PETER F. NERONHA, in his official capacity as ATTORNEY GENERAL OF RHODE ISLAND, *et al.,*** | : | |
| *Defendants,* | : | |

## DEFENDANTS' MEMORANDUM IN OBJECTION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

   I.   Federal Statutory Background ................................................................... 4

   II.   The Purpose of the 340B Program is to Increase Patient Access to Care ........... 6

   III.   Contextualizing Recent Challenges to 340B Access ..................................... 8

   IV.   Rhode Island's Affordable Drugs Act ....................................................... 10

ARGUMENT ................................................................................................................. 15

   I.   Standard of Review ............................................................................... 15

   II.   Novartis fails to establish a likelihood of success on the merits ........................ 16

      A.   Novartis Fails to Overcome the Presumption Against Preemption as Chapter 288 is a Lawful Exercise of the State's Historic Police Powers ............................ 16

         1.   Section 340B does not preempt Chapter 288 under field preemption ........... 17

         2.   Section 340B does not preempt Chapter 288 under conflict preemption ......... 21

            a.   *No Expansion of Transactions Triggering 340B Pricing* ..................... 24

            b.   *No Conflicting Enforcement Procedures* ........................................ 30

            c.   *No Frustration of Claims Data Collection* ..................................... 34

      B.   Chapter 288 Does Not Violate the Dormant Commerce Clause ..................... 39

         1.   Chapter 288 Only Regulates the Delivery of 340B Drugs in Rhode Island ...... 40

         2.   Chapter 288 does not discriminate against Out-of-State Drug Manufacturers ..... 44

         3.   Chapter 288 does not excessively burden Interstate Commerce ................. 46

   III.   Novartis Fails to Demonstrate the Remaining Preliminary Injunction Factors ........... 49

      A.   No Irreparable Injury ......................................................................... 50

      B.   The Balance of the Equities and the Public Interest Heavily Favor Defendants ......... 53

CONCLUSION ................................................................................................................. 57

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*AbbVie Inc. v. Fitch*, No. 1:24-cv-184-HSO-BWR,
    2024 WL 3503965 (S.D. Miss. July 22, 2024) ...................................................... 25, 27, 32, 43

*AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519,
    2025 WL 1805271 (M.D. Tenn. June 30, 2025) ................................................................ passim

*Alharbi v. Beck*, 62 F. Supp. 3d 209 (D. Mass. 2014) ................................................................ 18

*Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022) ..................................................................... 10

*American Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*,
    123 F.4th 27 (1st Cir. 2024) ................................................................................................. 28, 50

*Anvar v. Dwyer*, 82 F.4th 1 (1st Cir. 2023) ................................................................................ 44

*Aoude v. Mobil Oil Corp.*, 862 F.2d 890 (1st Cir. 1988) ............................................................ 59

*Arizona v. United States*, 567 U.S. 387 (2012) .......................................................................... 21

*Association for Accessible Meds. v. Ellison*, 2023 WL 8374586 (D. Minn.) .............................. 48

*Association for Accessible Meds. v. Frosh*, 887 F.3d 664 (4th Cir. 2018) ................................. 48

*Association to Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40 (1st Cir. 2025) ..... 49, 51

*Astra USA Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011) ........................................................ 25

*AstraZeneca Pharms. LP v. Beccera*, 543 F.Supp.3d 47 (D. Del. 2021) ................................... 24

*AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024) .................................. 8

*AstraZeneca v. Becerra*, 543 F. Supp. 3d ................................................................................. 30

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) ............................................................... 37

*Boos v. Barry*, 485 U.S. 312 (1988) ........................................................................................... 46

*California v. ARC America Corp.*, 490 U.S. 93 (1989) .......................................................... 26, 36

*Capron v. Attorney Gen.*, 944 F.3d 9 (1st Cir. 2019) .............................................. 21, 26, 32, 34

*Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011) ........................................... 28, 34

*Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140 (1988) .............................................................. 37

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000) ..................................................................... 14

*Coderre v. Travelers' Ins. Co.*, 136 A. 305 (R.I. 1927) .............................................................. 45

*Comptroller of the Treasury of Md. v. Wynne*, 575 U.S. 542 (2015) .......................................... 51

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) ......................................................... 31

*Department of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) .................................................... 44

*DiBiase v. SPX Corp*, 872 F.3d 224 (4th Cir. 2017) ................................................................... 56

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ........................................................................... 60

*Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025) ........ 42

*English v. General Electric Co.*, 496 U.S. 72 (1990) .............................................................. 36, 43

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978) ..................................................... 49

*Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1 (1st Cir. 2010) ........................................ 44, 49

*Farrell v. Employers' Liability Assur. Corp.*, 168 A. 911 (R.I. 1933) ........................................ 45

*Figueroa v. Foster*, 864 F.3d 222 (2d Cir. 2017) ....................................................................... 21

*General Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ................................................................ 49

*Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312 (D.S.C. 2023) ............................... 26

*Gent v. Mutual Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) ................................................ 18

*Golden v. Zwickler,* 394 U.S. 103 (1969) ........................................................ 57

*Grant's Dairy-Maine, LLC v. Commissioner of Maine Dep't of Agric.,*
232 F.3d 8 (1st Cir. 2000) ..................................................... 20, 26, 44

*Hanson v. D.C.,* 120 F.4th 223 (D.C. Cir. 2024) ......................................... 59

*Harris v. Wall,* 217 F. Supp. 3d 541 (D.R.I. 2016) ...................................... 58

*Haywood v. Drown,* 556 U.S. 729 (2009) ................................................... 37

*Hillsborough Cnty. v. Automated Med. Labs., Inc.,* 471 U.S. 707 (1985) .................. 23

*Hines v. Davidowitz,* 312 U.S. 52 (1941) .................................................. 26

*Hughes v. Oklahoma,* 441 U.S. 322 (1979) .................................................. 49

*Huron Portland Cement Co.* 362 U.S ............................................... 44,51

*In re Kyle S.,* 692 A.2d 329 (R.I. 1997) ................................................. 45

*In re Pharm. Indus. Average Wholesale Price Litig.,* 582 F.3d 156 (1st Cir. 2009) ............. *passim*

*Johnson,* 102 F.4th 452 ............................................................. *passim*

*Jordache Enters., Inc. v. Levi Strauss & Co.,* 841 F. Supp. 506 (S.D.N.Y. 1993) .............. 58

*Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. 108 (2013) ............................... 45

*Kroske v. U.S. Bank Corp.,* 432 F.3d 976 (9th Cir. 2005) ................................. 21

*Laccinole v. Appriss, Inc.,* 453 F.Supp.3d 499, 502 n.2 (D.R.I. 2020) ........................ 18

*Maryland v. King,* 567 U.S. 1301 (2012) ................................................... 58

*Maryland v. Louisiana,* 451 U.S. 725 (1981) .............................................. 31

*Mass. Med. Soc. v. Dukakis,* 815 F.2d 790 (1st Cir. 1987) ................................ 21

*Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996) ............................................ 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop,* 839 F. Supp. 68 (D. Me. 1993)............ 55

*Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992) ............................. 28, 57

*National Pork Producers Council v. Ross,* 598 U.S. 356 (2023) ............................ *passim*

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1 (1st Cir. 2002) ................. 20

*New Hampshire Motor Transp. Ass'n v. Flynn,* 751 F.2d 43 (1st Cir. 1984) ................ 51

*New Motor Vehicle Bd. of Col. v. Orrin W. Fox Co.,* 434 U.S. 1345 (1977) ................. 59

*Nken v. Holder,* 556 U.S. 418 (2009) ....................................................... 20

*Novartis Parhm. Corp. v. Espinosa,* No. 21-cv-1479, 2021 WL 5161783 .................... 30

*Novartis Pharm. Corp. v. Bailey,* No. 2:24-cv-04131,
2025 WL 489881 (W.D. Mo. Feb. 24, 2025) ........................................... 8

*Novartis Pharms. Corp. v. Fitch,* 738 F. Supp. 3d 737 (S.D. Miss. 2024) ................. *passim*

*Novartis Pharms. Corp. v. Johnson,* 102 F.4th 452  (D.C. Cir. 2024). ...................... *passim*

*Ocean State Tactical, LLC v. Rhode Island,* 646 F. Supp. 3d 368 (D.R.I. 2022) ............... 55

*OfficeMax Inc. v. County Qwick Print, Inc.,* 709 F. Supp. 2d 100 (D. Me. 2010) ................ 55

*Oneok, Inc. v. Learjet, Inc.,* 575 U.S. 373 (2015) ....................................... 26

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
461 U.S. 190 (1983) ...................................................................... 51

*Parker v. Brown,* 317 U.S. 341 (1943) .................................................... 52

*Peoples Fed. Sav. Bank v. People's United Bank,* 672 F.3d 1 (1st Cir. 2012) ............. 19, 62

*Pharm. Care Mgmt. Ass'n v. Wehbi,* 18 F. 4th 956 (8th Cir. 2021) ........................ 20

*PhRMA v. Concannon,* 249 F.3d 66 (1st Cir. 2001) ........................................ 22

*PhRMA v. Fitch,* No. 1:24-cv-160, 2024 WL 3277365 (S.D. Miss. July 1, 2024) ................ 8

*PhRMA v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) ................................ *passim* 8

*PhRMA v. Morrissey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024) ................................... 8

*PhRMA v. Murrill*, No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) ............. 8, 32

*PhRMA v. Walsh*, 538 U.S. 644 (2003) ............................................... 22, 26

*Public Service Co. of N.H. v. Town of West Newbury*, 835 F.2d 380 (1st Cir. 1987).................. 55

*Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974)............................... 58

*Rhode Island Coalition Against Domestic Violence v. Bondi*, No. 25-279,
    2025 WL 2271867 (D.R.I. Aug. 8, 2025) ........................................ 20

*Rhode Island Truck Ctr., LLC v. Daimler Trucks N. Am., LLC,* 338 A.3d 1056 (R.I. 2025) .. 45, 52

*Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 (1947)...................................... 22, 24

*Riding v. Travelers' Ins. Co.,* 138 A. 186 (R.I. 1927) .................................... 45

*Rushia v. Town of Ashburnham*, 701 F.2d 7 (1st Cir. 1983)................................ 55, 57

*Ryan v. U.S. Immigration & Customs Enforcement,* 974 F.3d 9 (1st Cir. 2020).................. 20, 54

*Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023) .......................... *passim*

*Schafer v. Am. Cyanamid Co.*, 20 F.3d 1 (1st Cir. 1994) .................................... 31

*Semaphore Entertainment Group Sports Corp. v. Gonzalez*, 919 F. Supp. 543 (D.P.R. 1996)..... 56

*South Dakota v. Wayfair,* 585 U.S. 162  (2018) ........................................... 49

*Stasiukevich v. Nicolls,* 168 F.2d 474(1st Cir. 1948)...................................... 18

*Steir v. Girl Scouts of the USA*, 383 F.3d 7 (1st Cir. 2004)............................... 57

*Tafflin v. Levitt*, 493 U.S. 455 (1990).................................................... 37

*Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82 (1st Cir. 2022)......................... 19, 56

*Verizon New England, Inc. v. Maine Pub. Utils. Comm'n*, 509 F.3d 1 (1st Cir. 2007)............... 32

*Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019) .................................. 31, 46, 51

*Wine & Spirits Retailers, Inc. v. Rhode Island & Providence Plantations*,
    364 F. Supp.2d 172 (D.R.I. 2005)............................................ 58

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................ 19

*Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597 (1991)................................ 24

*Wyeth v. Levine*, 555 U.S. 555 (2009) .................................................. 20, 23

## Statutes

42 U.S.C. § 256(b) .......................................................................... 34

42 U.S.C. § 256b(a)(1) ................................................................ 5, 10

42 U.S.C. § 256b(a)(4)....................................................................... 9

42 U.S.C. § 256b(a)(5)(B) ..............................................................11, 12, 14

42 U.S.C. §1396r-8(a)(1) .................................................................... 9

Ark. Code Ann. § 23-92-604(c) (2021) ....................................................... 15

La. Rev. Stat. Ann. § 40:2884-2885 (2023) .................................................. 15

Md. Code Ann. § 12-6C-09.1 (2024)........................................................... 15

Minn. Stat. Ann. § 62J.96 (2024)............................................................. 15

Miss. Code Ann. § 41-149-7 (2024)........................................................... 15

Mo. Ann. Stat. § 376.414 (2024)............................................................. 15

R.I. Gen Laws § 5-19.3.-3(a)(5) ............................................................. 16

R.I. Gen Laws § 5-19.3-1.................................................................... 15

R.I.G.L. § 5-19.3-2(1) ............................................................................. 34

R.I. Gen. Laws § 5-19.3-5(a) ............................................................. 25, 48

R.I. Gen. Laws § 5-19.3-6 ...................................................................... 40

R.I. Gen. Laws § 5-19.3-8 ...................................................................... 36

R.I. Gen. Laws § 5-19.3-9(b) ................................................................. 36

R.I. Gen. Laws § 5-19.3-3 .............................................................. *passim*

R.I. Gen. Laws§ 6-13.1 ............................................................. 16, 36, 57

S.B. 28, 2023-2024 Leg., Reg. Sess. (Kan. 2024) .................................. 15

W. Va. Code § 60A-8-6a(b)(1) (2024) ................................................... 15

## **Regulations**

42 C.F.R. § 10.21(a)(2) ........................................................................... 39

61 Fed. Reg. 43 ....................................................................................... 13

61 Fed. Reg. 55 (Oct. 24, 1996) ............................................................. 11

61 Fed. Reg. 65 ................................................................................ 12, 39

75 Fed. Reg. 10  (March 5, 2010) ..................................................... 12, 13

89 Fed. Reg. 28 ....................................................................................... 12

90 Fed. Reg. 36  (August 1, 2025) .................................................... 41, 43

# INTRODUCTION

Every year, drug manufacturers like Plaintiff Novartis Pharmaceuticals Corporation ("Novartis") voluntarily agree to participate in Medicare and Medicaid to receive billions of dollars in federal funds through the sales of their products. Congress has attached conditions to that lucrative arrangement, including requiring that manufacturers also participate in the 340B Drug Discount Program ("340B Program"), *see* 42 U.S.C. § 256b(a)(1), which "incentivizes pharmaceutical manufacturers to provide qualified health care providers, referred to as 'covered entities,' with pricing discounts on certain drugs prescribed to individuals and families whose incomes fall below the federal poverty level." *Pharmaceutical. Research. & Mfrs. of Am. (PhRMA) v. McClain*, 95 F.4th 1136, 1139 (8th Cir.), *cert. denied*, 145 S. Ct. 768 (2024). In turn, the savings from those discounted prices enable covered entities, many of which are safety-net hospitals that operate on razor-thin margins, to maintain or expand access to programs and services targeted at the unique needs of the patients and communities they serve.

Since the 340B Program began, "covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs." *Id.* Because many (perhaps most) covered entities cannot afford to establish and operate in-house pharmacies, contract pharmacies are an essential part of the Section 340B Program. *See id.* And by utilizing multiple contract pharmacy locations, covered entities enable "drug dispensation closer to where low-income patients reside." *Id.*

For years, pharmaceutical manufacturers, including Novartis, honored covered entities' requests that the drugs they purchased through the 340B Program be delivered to the contract pharmacy locations of the covered entities' choice. But in 2020, Novartis (and other

1

manufacturers) abruptly changed course, and have since imposed strict limitations on covered entities' ability to contract with outside pharmacies to deliver 340B drugs to patients. In the manufacturers' view, they have "a nearly unfettered ability" to "impose[] their own contractual terms on providers," including "limits on the number of pharmacies to which they will make shipments." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455, 459 (D.C. Cir. 2024).

Those policy changes directly "caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *McClain*, 95 F.4th at 1139. The Department of Health and Human Services ("HHS") responded by attempting to prohibit pharmaceutical manufacturers from unilaterally imposing restrictions on covered entities' ability to have the drugs they ordered under the 340B program delivered to contract pharmacies; in turn, the manufacturers sued HHS, and two federal courts held that HHS had no authority to adopt such a prohibition because Section 340B does not explicitly mention delivery conditions or contract pharmacies. *See Johnson*, 102 F.4th at 460; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023). As one court put it, Section 340B is "silent about delivery conditions," and that statutory silence "did not impliedly prohibit otherwise lawful conduct" as a matter of federal law. *Johnson*, 102 F.4th at 460. Manufacturers' unilateral exploitation of this gap has caused health centers and hospitals in Rhode Island to cut staff and lose access to savings they rely on to fund essential health programs in the state. *See, e.g.*, D. McGowan, *Layoffs hit Thundermist Health Center, salaries slashed for remaining staff*, Boston Globe (Sept 13, 2024), https://www.bostonglobe.com/2024/09/13/metro/layoffs-thundermist-community-health-center-rhode-island-healthcare/; Ex. 4 (Letter from Merrill Thomas, President & CEO of Providence Community Health Centers).

Exercising their historic police powers over health and safety, multiple states, now including Rhode Island, have stepped in "to fill [that] 'silence'" through legislation designed to protect covered entities' ability to continue delivering 340B drugs to contract pharmacies for distribution to patients. *AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519, 2025 WL 1805271, at *4 (M.D. Tenn. June 30, 2025). After considering extensive testimony from Rhode Island's covered entities regarding the devasting impact that drug manufacturers' recent policy changes have had on their ability to provide much-needed services to low-income Rhode Islanders, Rhode Island's General Assembly enacted the Defending Affordable Prescription Drug Costs Act as Chapter 288 of the 2025 Public Laws ("Chapter 288" or the "Act"), which prohibits "certain discriminatory actions related to reimbursement of 340B covered entities and 340B contract pharmacies" and "certain discriminatory actions by a pharmaceutical manufacturer, agent, or affiliate of such manufacturer related to 340B entities." R.I. Gen. Laws §§ 5-19.3-3, -5. By its terms, the Act will go into effect on October 1, 2025; on August 12, 2025, Novartis filed this suit against Defendants, Peter Neronha in his Official Capacity as Attorney General of Rhode Island (the "Attorney General"), and David Bergantino in his Official Capacity as Auditor General of Rhode Island (the "Auditor General"; collectively with the Attorney General, "Defendants"). Through its Motion for a Preliminary Injunction ("Motion"), Novartis now asks this Court to enjoin the Defendants from enforcing the Act against it. *See* ECF 3-1.

Given the overwhelming weight of recent authority against the arguments Novartis attempts to resurrect in this Court, Novartis cannot discharge its burden of demonstrating a likelihood of success on the merits of its federal preemption or commerce clause claims. Multiple federal courts confronting challenges to similar state laws have rejected the same legal arguments

Novartis presents in support of its Motion.[1] Additionally, Novartis fails to demonstrate any risk of irreparable harm attributable to Chapter 288's scheduled implementation on or after October 1, 2025. And any risk of potential harm is heavily outweighed by the public interest in ensuring that 340B covered entities caring for underserved communities in Rhode Island have the necessary resources to maintain their vital programs and services.

# BACKGROUND

## I.    Federal Statutory Background

In 1992, Congress established the 340B Program through the Veteran's Health Care Act (Pub. L. 102-585) with the purpose of supporting our nation's critical safety net facilities.  *See* H.R. Rept. No. 102–384(II), at 12 (1992) ("In giving these 'covered entities' access to price reductions, the Committee intends to enable these entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."). The 340B Program achieves this purpose by lowering the cost of covered outpatient drugs ("CODs")

---

[1] *See, e.g.*, *McClain*, 95 F.4th at 1143-46 (rejecting manufacturer's federal preemption claim); *Skrmetti*, 2025 WL 1805271, at **11-18, n.8 and **22-23 (denying preliminary injunction based on manufacturer's failure to demonstrate likelihood of success on constitutional claims); *Novartis Pharm. Corp. v. Bailey*, No. 2:24-cv-04131, 2025 WL 489881 (W.D. Mo. Feb. 24, 2025) (same), *appeal filed*, (8th Cir. Mar. 28, 2025); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657,660 (S.D. Miss. 2024) (same); *PhRMA v. Murrill*, No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (granting state's motion for summary judgment on manufacturer's federal preemption and other constitutional claims); *AbbVie Inc. v. Fitch*, No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) (denying preliminary injunction based on manufacturer's failure to demonstrate likelihood of success on constitutional claims); *PhRMA v. Fitch*, No. 1:24-cv-160, 2024 WL 3277365 (S.D. Miss. July 1, 2024) (same), *appeal filed*, (5th Cir. July 5, 2024); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 753 (S.D. Miss. 2024) (same); *PhRMA v. McClain*, 645 F. Supp. 3d 890, 901 (E.D. Ark. 2022) (granting state's motion for summary judgment on manufacturer's federal preemption claim), *aff'd*, 95 F. 4th 1136 (8th Cir.), *cert. denied.*, 145 S. Ct. 768 (2024).  The one exception is *PhRMA v. Morrissey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024), *appeal filed*, (4th Cir. Jan. 16, 2025), an outlier that rests on questionable reasoning, and which other District Courts have expressly declined to follow.  *See Skrmetti*, 2025 WL 1805271, at *18, n. 11; *Fitch*, 766 F. Supp. 3d at 668.

that qualifying facilities and clinics purchase from drug manufacturers. Section 340B defines "covered entities" to consist of a limited category of facilities and clinics, including federally qualified health centers and Ryan White HIV-AIDS clinics that tend to be reliant on federal grant funding, children's hospitals and critical access hospitals, and certain hospitals that are government- or non-profit owned and that serve a disproportionate share of Medicare/Medicaid patients or contract with state or local governments to provide services to low-income individuals not eligible for Medicare/Medicaid. *See* 42 U.S.C. § 256b(a)(4).

Drug manufacturers are not obligated to participate in the 340B Program – manufacturers are only required to participate in the 340B Program if they want their CODs reimbursed by Medicaid and Medicare Part B. *See Sanofi*, 58 F.4th at 699 (3d Cir. 2023) ("The federal government ... uses that market power to get drug makers to subsidize healthcare"); 42 U.S.C. §§ 1396r-8(a)(1), (5). In this sense, a manufacturer's participation in the 340B Program is part of the calculus they make when deciding they want to market their products to federally insured patients.

HHS operationalizes the 340B Program by requiring manufacturers to execute a Pharmaceutical Pricing Agreement ("PPA"), which requires "that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price." 42 U.S.C. § 256b(a)(1). The statute applies this "340B ceiling price" to "covered outpatient drugs . . . purchased by a covered entity." 42 U.S.C. § 256b(a)(1). The standard terms of the PPA mirror these statutory provisions, making the 340B ceiling price available to covered entities and outlining a series of "manufacturer responsibilities," including the manufacturer's obligation to "to charge covered entities a price for each unit of the drug that does not exceed an amount equal to [the 340B ceiling price]." *See* HRSA, PPA Example, Article II, Section (a), https://www.hrsa.gov/sites/default/files/hrsa/opa/pharmaceutical-pricing-agreement-example.pdf.

Importantly, neither Section 340B nor the PPA address the delivery of drugs or the method by which covered entities may acquire drugs subject to the 340B ceiling price. *See McClain,* 95 F.4th at 1143 ("[T]he text of 340B 'is silent about delivery' of drugs to patients.") (quoting *Sanofi,* 58 F.4th at 703).

## II.    The Purpose of the 340B Program is to Increase Patient Access to Care

The 340B Program provides vital benefits to Rhode Island patients through the covered entities that are eligible to receive 340B pricing. By reducing the exorbitant cost of acquiring drugs for 340B-eligible patients, covered entities can use the savings to maintain or expand access to programs and services, or to cover the costs of uncompensated or undercompensated care. *See Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 739 (2022) (striking down revised hospital payment rates that would have "eliminate[d] the federal subsidy that has helped keep 340B hospitals afloat"); H.R. Rep. No. 102-384(II), at 11 (observing an increase in outpatient drug prices in the run-up to enactment of Section 340B and noting that these increases had "reduced the level of services and the number of individuals that these hospitals and clinics are able to provide with the same level of resources"). As a class, covered entities share one essential trait: they tend to treat needier communities, such as "low-income and rural communities," *id.* at 739, and focus their services on historically underserved populations. *See* A. Dobson et al., 340B DSH Hospitals Serve Higher Share of Patients with Low Incomes, at (Sept. 26, 2022), https://www.340bhealth.org/files/340B_and_Low_Income_Populations_Report_2022_FINAL.pdf ("[T]he low-income share for 340B DSH hospitals in 2020 was 55.0% higher than the low-income share for non-340B hospitals.").

Rather than being divorced from patients as Novartis claims, 340B discount eligibility is based on the identity of the patient because covered entities can only claim 340B discounts for dispenses to individuals who are "patients of the entity." 42 U.S.C. § 256b(a)(5)(B) ("[w]ith respect

to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity"); *see also* HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility ("1996 Guidance"), 61 Fed. Reg. 55,156, 55,157-58 (Oct. 24, 1996) (defining eligible 340B "patients" based on a three-part test).[2] Contrary to Novartis' portrayal of the 340B Program as unbounded absent its own unilaterally imposed restrictions, covered entities are required to ensure that 340B discounts are only claimed for qualifying "patients of the [covered] entity,"[3] and HRSA has acknowledged that covered entities' ability to use contract pharmacies can play an important role in promoting patient access to the medications they need. *See* HRSA, Notice

---

[2] HRSA's 1996 guidance defining "patient" for 340B purposes states that an individual is a "patient" of the covered entity only if all of the following three prongs are satisfied: "(1) the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and (2) the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g. referral for consultation) such that responsibility for the care provided remains with the covered entity; and (3) the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally-qualified health center look-alike status has been provided to the entity. Disproportionate share hospitals are exempt from this [third] requirement." 61 Fed. Reg. 55,156, 55,157-58.

[3] Covered entities are subject to potential enforcement action from HRSA, including removal from the program, if they are found to have diverted 340B discounts or claimed duplicative discounts. *See* 42 U.S.C. § 256b(a)(5)(B) (defining diversion as "resell[ing] or otherwise transfer[ing] the drug to a person who is not a patient of the entity"); *id.* § 256b(a)(5)(A)(i). HRSA is authorized to audit covered entities for compliance with these provisions. *Id.* § 256b(a)(5)(C); 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024) ("On average, HRSA conducts 200 covered entity audits each fiscal year including child/associate sites and contract pharmacies associated with the covered entities."). Manufacturers may also utilize HRSA's administrative dispute resolution (ADR) process to contest compliance with 340B Program requirements, provided they first audit the covered entity. *Id.* § 256b(d)(3)(B)(iv). To initiate an audit, the manufacturer "must set forth a clear description of why it has reasonable cause to believe that a violation of section 340B(a)(5) (A) or (B) has occurred, along with sufficient facts and evidence in support of the belief;" HRSA then reviews this documentation and, if the agency finds "there is reasonable cause," it "will not intervene" in the audit. *See* Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996).

Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,273 (March 5, 2010) (observing that, because of obstacles to filling prescriptions, such as transportation barriers, "[i]t would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities"). In short, impeding 340B-eligible patients' ability to fill their medications at pharmacies that have contracted with the covered entity for this purpose can have a very real adverse impact on patients – including burdening patients with having to travel to different pharmacies to receive their medications.

### III.    Contextualizing Recent Challenges to 340B Access

The arc of Section 340B caselaw shows that manufacturers have sought to chip away at the scope of the 340B Program, first by challenging federal agencies' authority to administer the program, then reversing course and complaining when states began using their traditional police powers to fill the gaps in the 340B statute exploited by manufacturers. 340B contract pharmacies provide a key example.

As the 340B statute makes no reference to pharmacies, HHS's longstanding policy in the face of this statutory silence has required manufacturers to offer the 340B ceiling price to a covered entity even when the covered entity fills the prescription through a contract pharmacy. In 1996, HRSA issued its first guidance on the use of contract pharmacies. *See* HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549 (Aug. 23, 1996). Observing that most covered entities had to rely on outside pharmacies to dispense the drugs ordered or prescribed to their patients, and that covered entities already had "an existing right ... under State law" to "contract with retail pharmacies for the purpose of dispensing 340B drugs[,]" HRSA endorsed covered entities' use of contract pharmacies as a mechanism to

ensure access to 340B-discounted drugs. *Id.* at 43,550.[4] In 2010, HRSA reaffirmed its longstanding position on contract pharmacies, expressly authorizing a covered entity's existing right to choose multiple contract pharmacies to dispense its medications. *See* HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,273 (March 5, 2010). HRSA noted that "[i]t would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities. This would permit covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients served." *Id.*

But drug makers participating in the 340B Program have unilaterally sought to restrict covered entities' right to contract with and use contract pharmacies, thereby blocking health care providers' access to revenue associated with "patients of the [covered] entity", 42 U.S.C. § 256b(a)(5)(B), based solely on which pharmacy fills a script. Starting in 2020, manufacturers including Novartis began to impose limitations on covered entities' use of contract pharmacies. *See Johnson*, 102 F.4th at 458. Manufacturers sued HHS in response to its advisory opinion and enforcement letters against manufacturers requiring the delivery of drugs to any contract pharmacy with which the covered entity chooses to partner. *See Johnson,* 102 F.4th 452; *Sanofi,* 58 F.4th 696.

_____

[4] HRSA's 1996 contract pharmacy guidance was also partly justified by allusion to covered entities' preexisting rights under state law to engage contracted pharmacies, which HRSA agreed provided a legal foundation subject only to the federal law's restrictions on diversion and duplication. *See* 61 Fed. Reg. 43,550 ("*Comment*: As a matter of law, entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients . . .. By issuing guidelines in this area, [HRSA's Office of Drug Pricing] is not seeking to create a new right but rather is simply recognizing an existing right that covered entities enjoy under State law. *Response*: We agree. However, entities, under any distribution system, must comply with the statutory prohibition against diversion of 340B drugs to individuals who are not patients of the covered entities. Further, the dispensing of drugs, purchased with a 340B discount, must not result in the generation of a Medicaid rebate.").

Two Courts of Appeals decisions later, they succeeded in forcing HHS/HRSA to abandon its guidance requiring manufacturers to honor covered entities' contract pharmacy arrangements. *Id.* Importantly, these decisions do not address preemption of state law, nor any of Plaintiff's other legal claims here; rather, these decisions merely speak to what federal law does <u>not</u> do – prohibit manufacturers from adopting reasonable limitations on the use of contract pharmacies. *See Johnson*, 102 F.4th at 464 ("In sum, we hold that section 340B does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities. . . We do not foreclose the possibility that other, more onerous conditions might violate the statute."); *Sanofi*, 58 F.4th at 704 ("Unless Section 340B '*prohibits*' drug makers from adopting their policies, HHS cannot show that they have violated Section 340B. . . . Because Section 340B 'contains no such prohibition,' the drug makers' policies are lawful.") (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)). Yet, as discussed below, Novartis attempts to convert Section 340B's silence into an affirmative authorization under federal law to restrict the use of contract pharmacies or impose data-submission requirements on covered entities as a condition of accessing 340B drugs.

## IV.    Rhode Island's Affordable Drugs Act

Following the *Johnson* and *Sanofi* decisions, states began enacting their own legislation prohibiting pharmaceutical manufacturers from restricting a covered entity's reliance on contract pharmacies to dispense 340B drugs to patients.[5]   Rhode Island is the most recent state to enact such legislation.   On June 27, 2025, Governor Daniel McKee signed the Defending Affordable Prescriptions Drug Costs Act into law.   2025 R.I. Pub. Laws ch. 288 (to be codified at R.I. Gen

---

[5] *See e.g.,* Ark. Code Ann. § 23-92-604(c) (2021); S.B. 28, 2023-2024 Leg., Reg. Sess. (Kan. 2024); La. Rev. Stat. Ann. §§ 40:2884-2885 (2023); Md. Code Ann. § 12-6C-09.1 (2024); Minn. Stat. Ann. § 62J.96 (2024); Miss. Code Ann. § 41-149-7 (2024); Mo. Ann. Stat. § 376.414 (2024); W. Va. Code § 60A-8-6a(b)(1) (2024).

Laws §§ 5-19.3-1 through 5-19.3-9). Like legislation enacted in other states, Chapter 288 provides

that a manufacturer "shall not . . . [i]nterfere with, or limit, a 340B covered entity's choice to use a

contract pharmacy for drug distribution or dispensing." *Id.* § 5-19.3-3(a)(7). Section 5-19.3-5(a)

further states that:

> A pharmaceutical manufacturer, agent, or affiliate of such manufacturer shall not
> deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the
> acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is
> under contract with a 340B covered entity and is authorized under such contract to
> receive and dispense 340B drugs on behalf of the covered entity unless such receipt
> is prohibited by the United States department of health and human services.

Chapter 288 also prohibits manufacturers or their agents and affiliates from "impos[ing] additional

terms or limitations not required by federal law as a condition of 340B participation." *Id.* § 5-19.3-

5(c). Among other things, a manufacturer may not "require the submission of claims-level data or

documentation that identifies 340B drugs as a condition of reimbursement or pricing, unless it is

required by the Centers for Medicare and Medicaid Services." *Id.* § 5-19.3.-3(a)(5).

   To ensure compliance with the new law, covered entities must submit annual reports to

state officials, including the Auditor General, detailing the "covered entity's participation in the

program during the previous calendar year." *Id.* § 5-19.3.-6. The Auditor General may

"[i]nvestigate complaints and take appropriate actions to ensure compliance" with Chapter 288, as

well as promulgate any necessary rules and regulations. *Id.* § 5-19.3.-7. Violations of Chapter 288

constitute "unfair sales practices" under Rhode Island's Deceptive Trade Practices Act ("DTPA"),

R.I. Gen. Laws§ 6-13.1. The new law, which is scheduled to take effect on October 1, 2025, further

specifies that "[n]othing in this chapter is to be construed or applied to be less restrictive than

federal law for a person or entity regulated by this chapter," and "[n]othing in this chapter is to be

construed or applied to be in conflict with . . . [a]pplicable federal law and related regulations." *Id.*
§§ 5-19.3-9(a), (b).

Chapter 288 is part of a broader spate of bills that shore up Rhode Island's health care
system by reducing administrative burdens associated with prior authorization, increasing
Medicaid reimbursement for primary care and for the state's safety net facilities, and expanding
the state's primary care workforce. *See* J. Williams, *Four changes coming to health care in Rhode
Island from the General Assembly*, Prov. J. (June 24, 2025),
https://www.providencejournal.com/story/news/healthcare/2025/06/24/changes-to-health-care-
in-rhode-island-from-the-general-assembly/84323451007/. During floor debate on the legislation
and in committee, testimony by members of the Rhode Island House and Senate as well as
community stakeholders focused on the importance of allowing 340B covered entities the freedom
to contract with contract pharmacies of their choice to conveniently deliver drugs to patients:

> We used to have a broad network of pharmacies, from Walgreens, Stop & Shop,
> and CVS. Through these [manufacturer-imposed contract pharmacy] restrictions,
> we have to select one pharmacy . . .. [T]he patients in our discount pharmacy
> prescription program can only go to one of those pharmacies. So, we had to pick
> one that was 'centralized.' Well, if you think where is there a central pharmacy
> between Burrillville and North Kingstown and Scituate and Foster, we ended up
> going to the pharmacy in Chepachet. Our patients from North Kingstown are not
> driving to Chepachet to get their $5 prescription, so that's one of the impacts.

Testimony of Peter Bancroft, CEO, WellOne Primary Medical and Dental Care, Regarding House
Bill 5634, Before the House Committee on Health and Human Services (April 10, 2025), available
at https://capitoltvri.cablecast.tv/show/11123?seekto=6911&site=1.

> These restrictions have not only limited our ability to expand federal dollars, which
> was the intent [of the 340B statute], we have had to cut positions and lay off staff.
> . .. [We have] 85,000 patients in Providence. We take care of about half of the city.
> 70% of those are Medicaid.

12

Testimony of Merrill Thomas, President/CEO, Providence Community Health Centers, Regarding House Bill 5634, Before the House Committee on Health and Human Services (April 10, 2025), available at https://capitoltvri.cablecast.tv/show/11123?seekto=6911&site=1.

> [I]t is the 340B program and the savings therefrom that allow [Landmark Medical Center in Woonsocket, RI] to not only continue providing that uncompensated care but to provide neonatal services, to provide psychiatric services – services that would otherwise be unavailable.

Floor Testimony of Rep. Jon Brien, 2025-H 5634 Sub A (June 18, 2025), available at https://capitoltvri.cablecast.tv/show/11464?seekto=3004&site=1.

The legislative record is replete with other examples of how pharmaceutical manufacturers' efforts to unilaterally restrict the use of contract pharmacies for drug delivery have detrimentally impacted covered entities providing medical services to some of Rhode Island's most vulnerable residents.[6] *See, e.g.*, Senate Health and Human Services Subcommittee, S0114, Agenda Date: March 20, 2025, https://www.rilegislature.gov/senators/SenateComDocs/Pages/Health%20and%20Human%20Serv%202025.aspx. Brown University Health ("BUH"), for instance, noted that these restrictions have resulted in an "immediate $20 million loss" resulting in "direct adverse impacts to patient care." Ex. 1 at 1 (Letter from Christine Collins, SVP, Pharmacy and PeriOp Services, Brown University Health). This puts at risk the expansion of BUH's "healthy weight and nutrition

---

[6] Judicial notice is properly taken of matters of public record, including material maintained on government websites, such as, the legislative record found on the General Assembly's website. *Gent v. Mutual Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010); *Laccinole v. Appriss, Inc.*, 453 F.Supp.3d 499, 502 n.2 (D.R.I. 2020); *see also Alharbi v. Beck*, 62 F. Supp. 3d 202, 209 (D. Mass. 2014) ("a legislative report is a public record properly subject to judicial notice") (citing *Stasiukevich v. Nicolls,* 168 F.2d 474, 479 (1st Cir. 1948)); 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2409 (3d ed.) (discussing judicial notice of legislative record).

programs, cardiac health, adult psychiatry, diabetes, early intervention for children and health education programs, and free naloxone for opioid overdose management." *Id.*

The Hospital Association of Rhode Island ("HARI") similarly noted that savings generated by the 340B Program enabled Rhode Island hospitals to offer "diverse programs and services directly benefiting patients, such as medication therapy management, diabetes education, behavioral health services, opioid treatment, and access to free or discounted drugs." Ex. 2 at 1 (Letter from Lisa P. Tomasso, Senior Vice President, HARI). Pharmaceutical manufacturers' restrictions on the use of contract pharmacies "undermine the program's purpose, resulting in more than $30 million in financial losses for hospitals and health centers." *Id.*

East Bay Community Action Program ("EBCAP") likewise observed that "limiting the number of pharmacies eligible to disburse prescribed medications to our patients" has had a "devastating financial impact on EBCAP, resulting in a revenue loss of more than $3 million over the last three years." Ex. 3 at 1 (Letter from Rilwan K. Feyisitan Jr. President & CEO, EBCAP). This loss of 340B savings threatens EBCAP's ability to "reinvest savings into essential clinical services, including primary care, behavioral health, and substance use treatment." *Id.*

Other community health providers have been forced to reduce staff. Providence Community Health Centers ("PCHC"), for instance, "incurred over $9 million in financial losses from the 340B program" due to restrictions imposed by pharmaceutical manufacturers like Novartis. Ex. 4 at 1 (Letter from Merrill Thomas, President & CEO, PCHC). This required PCHC to "reduce staff" and scale back programs for "free medication access for our most at-risk patients, a consequence that directly affects the health and well-being of our community." Chapter 288 aims to prohibit manufacturers from arbitrarily limiting 340B savings to a single pharmacy when a

covered entity's patients need to fill prescriptions at other contract pharmacies, thereby enabling covered entities to fund needed investments in care throughout Rhode Island.

## ARGUMENT

### I.  Standard of Review

The issuance of a preliminary injunction is "an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The last two factors "merge when, as here, the Government is the opposing party." *Rhode Island Coalition Against Domestic Violence v. Bondi*, No. 25-279, 2025 WL 2271867, *10 (D.R.I. Aug. 8, 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Likelihood of success "weighs most heavily in the preliminary injunction calculus." *Ryan v. U.S. Immigration & Customs Enforcement,* 974 F.3d 9, 18 (1st Cir. 2020). "If the movant 'cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity.'" *Id.* (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

## II.    Novartis fails to establish a likelihood of success on the merits

Novartis' request for a preliminary injunction enjoining Rhode Island from enforcing Chapter 288 should be denied because it fails to demonstrate any likelihood of success on the merits of its federal preemption and dormant Commerce Clause claims.

### A.  Novartis Fails to Overcome the Presumption Against Preemption as Chapter 288 is a Lawful Exercise of the State's Historic Police Powers

"Congressional intent is the touchstone of preemption analysis." *Grant's Dairy-Maine, LLC v. Commissioner of Maine Dep't of Agric.*, 232 F.3d 8, 14–15 (1st Cir. 2000). Moreover, "in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 173 (1st Cir. 2009) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). That presumption against preemption applies with full force in this case because "the practice of pharmacy is an area traditionally left to state regulation." *McClain*, 95 F. 4th at 1143 (quoting *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F. 4th 956, 972 (8th Cir. 2021)); *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (recognizing "the historic primacy of state regulation of matters of health and safety"); *see also Wyeth*, 555 U.S at 578-79 ("In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation ... [and] long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation."). "[T]he regulation of medicine and its associated costs also 'seems by tradition to be one of state concern.'" *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 177 n.14 (1st Cir. 2009) (quoting *Mass. Med. Soc. v. Dukakis*, 815 F.2d 790, 791 (1st Cir. 1987)); *see Mass. Med. Soc.*, 815 F.2d at 791 ("The field of medical

16

fee regulation seems by tradition to be one of state concern."). "A state's passage and enforcement of laws that prohibit discrimination is [also] an exercise of a state's historic police powers." *Figueroa v. Foster*, 864 F.3d 222, 232 (2d Cir. 2017); *see Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 981 (9th Cir. 2005), *as amended* (Feb. 13, 2006) ("[A]lthough we recognize that there is a significant federal presence in the regulation of national banks, ... [the state law] was enacted pursuant to the State's historic police powers to prohibit discrimination on specified grounds. ... Thus, we begin with the presumption that Congress did not intend the National Bank Act to preempt the [state law].")

Novartis, as the party alleging preemption, has the burden to overcome the presumption. *See Capron v. Attorney Gen.*, 944 F.3d 9, 21 (1st Cir. 2019). Here, Section 340B contains no explicit clause preempting state law, so Novartis must show either: (1) field preemption, where federal legislation pervasively occupies a regulatory field, or (2) conflict preemption, where a federal statute conflict with state law. *Arizona v. United States,* 567 U.S. 387, 399-400 (2012). As demonstrated in subsections 1 and 2 below, Novartis fails to demonstrate a likelihood of success under either theory.

### 1. *Section 340B does not preempt Chapter 288 under field preemption*

Novartis' field preemption argument fails because it cannot show that Congress has enacted such comprehensive legislation through Section 340B that it has fully "occupied" the relevant field to the exclusion of Rhode Island's traditional police powers. *Arizona,* 567 U.S. at 401. Congress's intent to completely displace state law through field preemption can only be inferred from its enactment of a federal regulatory scheme "'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* at 399 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). Moreover, the presumption against

17

applying the "strong medicine" of federal preemption to displace the "historic police powers of the States" holds "especially true when the federal statute creates a program, such as Medicaid, that utilizes 'cooperative federalism': 'Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one.'" *PhRMA v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001), *aff'd sub nom*. *PhRMA v. Walsh*, 538 U.S. 644 (2003) (citations omitted).

Here Chapter 288 is plainly a health and safety regulation within Rhode Island's traditional police powers, that prevents Novartis from limiting covered entities' ability to work with contract pharmacies and, as such, is entitled to a presumption against preemption. And Congress's decision not to legislate the issue of pharmacy distribution indicates that the 340B Program is not so pervasive that there is no room for Rhode Island to supplement it. The silence of Congress with respect to distribution of 340B drugs should not be taken as an implied ban on further state regulation; this conclusion is confirmed by precedent, legislative history, and recent decisions of numerous federal courts.

"Pharmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted." *McClain*, 95 F.4th at 1144. Indeed, courts have long viewed federal law as a mere complement to the States' historic pharmaceutical regulation. *See Wyeth,* 555 U.S. 567 (2009) ("As it enlarged the FDA's powers to 'protect the public health' and 'assure the safety, effectiveness, and reliability of drugs,' Congress took care to preserve state law."). Novartis cannot avoid that presumption with its conclusory argument that "Federal law *created* the 340B Program, so the density of federal regulation is absolute." ECF 3-1 at 14 (emphasis in original). That level of myopic granularity, which fixates on federal law to the complete exclusion of States' police

18

powers and the rest of the broader context in which Congress legislated, has been soundly rejected by the Supreme Court. *See, e.g.*, *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 717-19 (1985) ("Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law.").

Pharmacies, pharmaceutical drugs, and the purchase and dispensation of drugs most certainly do not "owe[] [their] very existence to federal law[;]" nor are their "every interstitial detail … shaped by same[.]" ECF 3-1 at 17. And the 340B Program can hardly be described as "so pervasive . . . that Congress left no room for the States to supplement it," especially given that the statute "'is silent about delivery' of drugs to patients." *McClain*, 95 F.4th at 1143 (quoting *Sanofi*, 58 F.4th at 703) (other quotation marks and citation omitted). While federal law regulates the determination of *prices* on Section 340B drugs and provides robust enforcement mechanisms that ensure covered entities and manufacturers comply with those requirements, Congress has not precluded Rhode Island or any other state from enacting its own policy governing *delivery* of section 340B drugs, or the other terms and conditions on which drug manufacturers may contract with covered entities. *See Skrmetti*, 2025 WL 18095271, at *12-13 (collecting cases rejecting argument that state regulation of deliver of drugs was preempted because Section 340B is "silent about delivery").

In fact, HRSA's 1996 Guidance on contract pharmacy dispensation observes that "[d]uring the early months following enactment, it became clear that there were many gaps in the legislation." August 1996 Guidance at 43,549. Section 340B "'is silent about delivery' of drugs to patients." *McClain*, 95 F. 4th at 1143 (quoting *Sanofi*, 58 F.4th at 703). "[T]he absence of any reference to 'pharmacies' is a strong indication that the statute does not compel any particular

outcome with respect to covered entities' use of pharmacies." *AstraZeneca Pharms. LP v. Beccera,* 543 F.Supp.3d 47, 56 (D. Del. 2021). "Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 607 (1991) (citing *Rice,* 331 U.S. at 230) (finding a provision of the Federal Insecticide, Fungicide, and Rodenticide Act was "silent with reference to local governments.").

As multiple federal courts have now held, Congress's silence in Section 340B on distribution and delivery indicates that it did not intend to fully occupy the field. In *McClain*, the Eighth Circuit squarely held that "Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field." *McClain,* 95 F. 4th at 1143. Accordingly, the Eighth Circuit rejected a challenge to an Arkansas law that, like Chapter 288, prohibited "pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy," holding that the state law was not precluded because "the 340B Program is not so pervasive that Congress left no room for the States to supplement it." *Id.*

Similarly, in rejecting a drug manufacturer's attempt to enjoin enforcement of Mississippi's H.B. 728, the Southern District of Mississippi held that H.B. 728—which "requires manufacturers to deliver drugs ordered through the 340B program to for-profit pharmacies called 'contract pharmacies' with which covered entities have arrangements under which the pharmacy will dispense discounted 340B drugs to the covered entity's patients"—implicated "public health and welfare, a traditional area of state regulation, triggering the presumption against preemption" of the field. *AbbVie v. Fitch*, 2024 WL 3503965 at **1, 15; *see also Novartis Pharms. Corp. v. Fitch,* 738 F. Supp. 3d at 742, 748, 751 (same); *compare* H.B. 728 § 2(a) *with*. R.I. Gen. Laws § 5-19.3-5(a). Applying that presumption, the court held that Congress's silence regarding "how covered entities or manufacturers must deliver discounted drugs to patients of covered entities" meant that

"Section 340B contemplates concurrent state regulation." *AbbVie v. Fitch*, 2024 WL 3503965 at **1, 15.

Rather than addressing those cases and their reasoning, Novartis argues instead that field preemption is compelled by the Supreme Court's holding in *Astra USA Inc. v. Santa Clara Cnty.,* 563 U.S. 110 (2011). That argument is unavailing; in *Astra*, the Supreme Court held that covered entities cannot bring overcharging claims as third party beneficiaries to the price agreements signed by manufacturers and the federal government under section 340B. *Id.* at 117-19. The Supreme Court's rejection of a right of action, under federal law, for covered entities to enforce federal pricing agreements has little bearing on whether section 340B preempts States from enacting their own laws of the delivery of 340B drugs. Because *Astra* did not involve a state government regulating under its traditional police powers, the Supreme Court did not apply the presumption against preemption that is applicable here or even address preemption at all—as multiple federal courts have since recognized. *See Novartis v. Fitch*, 738 F. Supp. 3d at 752 ("The Supreme Court's rejection of a right of action for covered entities under [federal pricing agreements] has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs. And *Astra* did not apply any presumption in favor of such a right of action analogous to the presumption against preemption applicable here.").

### 2. *Section 340B does not preempt Chapter 288 under conflict preemption*

Novartis fares no better with its conflict preemption challenge to Chapter 288. Conflict preemption only arises "where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.,* 575 U.S. 373, 377 (2015) (quoting *California v. ARC America Corp.,* 490 U.S. 93, 100-01 (1989)). However, "[t]he presumption against federal pre-emption of a state statute designed to foster public health ... has special force when it appears,

21

and the [federal government] has not decided to the contrary, that the two governments are pursuing 'common purposes[.]'" *Walsh*, 538 U.S. at 666 (citations omitted). Because Novartis has not argued that compliance with both state and federal law is impossible, its arguments "concern only obstacle preemption." *Capron*, 944 F.3d at 26.

Divining the objectives underlying federal law is an inherently "contextual" inquiry, *Grant's Dairy*, 232 F.3d at 15 (citing *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941)), and historical context shows that the "purpose of the 340B program was to provide a means to make 340B entities profitable in order for those 340B entities to 'stretch scarce Federal resources as far as possible[,]'" thereby "reaching more eligible patients and providing more comprehensive services." *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023) (quoting H.R. Rep. No. 102-384(II) (1992) at 12). Indeed, "Congress enacted Section 340B in response to pharmaceutical manufacturers increasing prices of drugs to make up for lost revenue after Congress ... created the Medicaid Drug Rebate Program[,]" with the "goal" of "protect[ing] covered entities from such price increases because they 'reduced the level of services and the number of individuals that these hospitals and clinics" could serve. *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *2 (quoting H.R. Rep. No. 102-384(II) (1992) at 12; *see* H.R. Rep. No. 102-384(II) (1992) at 11 ("In the view of the Committee, the Federal government simply cannot continue to allow the [Department of Veterans Affairs], Federally-funded clinics, and their patients to remain unprotected against manufacturer price increases.").

Context further confirms that most of the covered entities that 340B was intended to aid must rely upon contract pharmacies to deliver pharmacy services to their patients. *See, e.g.*, *AbbVie v. Fitch*, 2024 WL 3503965 at *19 ("[W]hen Congress enacted Section 340B, ... the potential for contract pharmacy dispensation was foreseeable."); *id.* at *14 ("[P]harmaceuticals distribution

22

often relies on [drugs]' fungibility to facilitate efficiency.   So, Section 340B presumably contemplates that efficient distribution of fungible drugs to covered-entity patients might utilize a replenishment model."). As a result, and as HRSA explicitly recognized in 1996, "[i]t would defeat the purpose of the 340B program if [the] covered entities could not use their affiliated pharmacies in order to participate in the 340B program." 1996 Guidance, 61 Fed. Reg. at 43,550. And because many covered entities' "patients currently face transportation barriers or other obstacles that limit their ability to fill their prescriptions[,]" the "use of more easily accessible, multiple contract pharmacy arrangements by covered entities ... permit[s] covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities[.]" 2010 Guidance, 75 Fed. Reg. at 10,273.

Applying those principles, the Eighth Circuit upheld Arkansas' analogous state law against a conflict preemption challenge, finding that "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing create[d] no obstacle" to manufacturers' ability to comply with 340B. *McClain*, 95 F.4th at 1145. Like Chapter 288, the Arkansas law "d[id] not require manufacturers to provide 340B pricing discounts to contract pharmacies" and "d[id] not set or enforce discount pricing." *Id.* "Additionally, [both laws'] penalties are aimed at activity that falls outside the purview of 340B:" like Arkansas, Rhode Island "is simply deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements." *Id.* ("There is no obstacle for pharmaceutical manufacturers to comply with both Act 1103 and Section 340B."). In fact, as the Eighth Circuit observed, the Arkansas law "assist[ed] in fulfilling the purpose of 340B," in that it facilitated the distribution and dispensation of discounted 340B drugs and protected covered entities' ability to meaningfully participate in the 340B Program. *Id.; see id.* at 1139 ("Since the beginning, covered entities have contracted with outside pharmacies, referred

to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs. ... For 25 years, drug manufacturers ... distributed 340B drugs to covered entities' contract pharmacies."). The same is true for Chapter 288.

Against that backdrop, Novartis's trio of conflict preemption arguments falls woefully short.[7] *See Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) ("Our precedents 'establish that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.' ... That threshold is not met here.") (citation omitted).

### a. *No Expansion of Transactions Triggering 340B Pricing*

First, Novartis argues that Chapter 288 "interferes with federal law by requiring that manufacturers provide 340B pricing in situations where the federal statute does not"—specifically, by requiring "that manufacturers give *340B pricing* on acquisitions by an unlimited number of contract pharmacies" under what Novartis terms the "replenishment model[.]" ECF 3-1 at 18-19 (emphasis in original). However, the challenged provisions of Chapter 288 only come into play when covered entities purchase covered drugs, at predetermined prices, from drug manufacturers who have agreed to participate in the 340B program. *See* R.I. Gen. Laws § 5-19.3.2(1) (defining

---

[7] Novartis's conflict preemption arguments challenge separate substantive portions of Chapter 288; as such, if this Court agrees with Novartis that any particular provision is preempted (and that the other prerequisites for injunctive relief have been met), any injunction should be solely limited to the provision of Chapter 288 at issue. Severability "is a matter of state law[,]" and under Rhode Island law, "a court may sever an unconstitutional provision when it is not indispensable to the rest of the statute and can be severed without destroying legislative purpose and intent." *American Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 51 (1st Cir. 2024) (citations and quotation marks omitted). Here, that test is clearly met, as the various substantive prohibitions Novartis challenges represent distinct means by which the General Assembly hoped to advance the critical goal of protecting Rhode Island's covered entities, and Novartis cannot show that the General Assembly "would have forgone" Chapter 288 "altogether" if any single provision were removed. *Id.* at 52; *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382-83 (1992) (vacating multiple portions of an overbroad injunction against future enforcement of state laws).

24

"340B drug" and "340B covered entity" by reference to federal law); *id.* § 5-19.3.3 ("With respect to reimbursement to a 340B covered entity for 340B drugs, a ... manufacturer ... or its agent shall not do any of the following[.]"). Nothing in Chapter 288 changes the price of 340B drugs, which drugs are covered, or the covered entities that can obtain 340B pricing from manufacturers, all of which remain set by federal law. *See Skrmetti,* 2025 WL 1805271, at *12 ("The primary problem with the plaintiffs' position is that neither [their] policy nor [the challenged state law] says anything about the *pricing* of 340B drugs; both entirely concern the *delivery* of 340B drugs.") (emphasis in original).

What the Act *actually* provides is that manufacturers cannot restrict 340B transactions simply because covered entities ask that those drugs be delivered to multiple contract pharmacies. As HRSA recognized in 1996, the "use of contract services is *only* providing those covered entities (which would otherwise be unable to participate in the program) a process for accessing 340B pricing" but "does not in any way extend this pricing to entities which do not meet program eligibility" and thus does not constitute "an unauthorized expansion of the program." 1996 Guidance at 43,549-50 (emphasis in original). The same holds true for the use of multiple contract pharmacies. *See* 2010 Guidance at 10,273 ("Covered entities will be permitted to use multiple pharmacy arrangements as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition. … This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law.").

Novartis gets no further by asserting that "[m]ultiple courts have held that federal law does not require manufacturers to offer 340B prices on contract-pharmacy purchases without restriction." ECF 3-1 at (citing *Johnson*, 102 F.4th at 461; *Sanofi*, 58 F.4th at 703; *Novartis Parhm.*

*Corp. v. Espinosa*, No. 21-cv-1479, 2021 WL 5161783, at \*7 (D.D.C. Nov. 5, 2021); and *AstraZeneca v. Becerra*, 543 F. Supp. 3d at 61). What those cases actually held is that Section 340B is "silent about delivery" and thus does not empower HRSA to enforce, as a matter of federal law, a requirement that drug manufacturers honor particular distribution models. *Johnson*, 102 F. 4th at 462 (quoting *Sanofi*, 58 F.4th at 703).

Far from advancing Novartis's position, that statutory silence is fatal to Novartis's argument: although federal "statutory silence [does] not impliedly prohibit *otherwise* lawful conduct," *Johnson*, 102 F.4th at 460 (emphasis added), neither does it imply that "the clear and manifest purpose of Congress" was to render that private conduct totally immune from any regulation by the States. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 173. "Pre-emption law ... cautions us against finding that a congressional act pre-empts a state law through silence." *Schafer v. Am. Cyanamid Co.*, 20 F.3d 1, 6 (1st Cir. 1994) (Breyer, C.J.) (citing *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)); *see Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 791 (2019) (Ginsburg, J., concurring in the judgment) ("[Plaintiff] contends that [Virginia's] mining ban conflicts with the 'delicate balance' federal law has struck between promoting nuclear power and ensuring public safety. ... But the Federal Government does not regulate the radiological safety of conventional uranium mining on private land, so federal law struck *no* balance in this area.") (emphasis in original).

To the contrary, "and particularly in [cases] in which Congress has legislated in a field which the States have traditionally occupied," such as "medicine and its associated costs[,]" courts proceed on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act[.]" *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 173, 177 n.14; *see CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 86 (1987) ("The longstanding

26

prevalence of state regulation in this area suggests that, if Congress had intended to pre-empt all state laws … it would have said so explicitly."). That "negative presumption is even stronger when the state law at issue creates a remedy unavailable under federal law[,]" as Chapter 288 does here. *Schafer*, 20 F.3d at 6 (citations omitted).

Nothing in the text or history of Section 340B indicates that Congress intended to affirmatively authorize drug manufacturers—whose price increases had created the very problem that 340B was created to address—to unilaterally hinder covered entities' ability to obtain 340B pricing for the drugs they dispense through contract pharmacies. *See* H.R. Rep. 102-384(II) at 11 ("Those price increases have in turn reduced the level of services and the number of individuals that these hospitals and clinics are able to provide with the same level of resources. ... In the view of the Committee, the Federal government simply cannot continue to allow ... Federally-funded clinics, and their patients to remain unprotected against manufacturer price increases."). Instead, the fact that Section 340B "does not control how covered entities or manufacturers must deliver discounted drugs to patients of covered entities" shows that Congress intentionally left "room for states to impose their own regulations" addressing that conduct. *AbbVie Inc. v. Fitch*, 2024 WL 3503965 at * 15; *see Murrill*, 2024 WL 4361597, at *8 ("[I]f Section 340B does not address contract pharmacies or the relationship between covered entities and their contract pharmacies, a state statute that specifically addresses contract pharmacies cannot conflict with Section 340B.").

To show that Chapter 288 places impermissible obstacles in the 340B program's path, Novartis needs to offer much more than conjecture about the dangers of the "replenishment model" or conclusory assertions that protecting covered entities' ability to use multiple contract pharmacies "frustrates the objectives of federal law by abrogating [drug manufacturers'] discretion in contravention of Congressional intent." ECF 3-1 at 18-19. "[U]nfounded speculation about the

federal government's implicit intentions ... may not ground a finding of obstacle preemption." *Capron,* 944 F.3d at 27-28; *see id.* at 12, 27-28 (rejecting plaintiff's argument that federal "Au Pair Program" under which foreign nationals may provide in-home childcare services to their host families while they pursue post-secondary studies "set not only a federal regulatory floor on au pair participant wage and hour protections but also, implicitly, a federal regulatory ceiling that limits the wage and hour protections that states may provide to au pair participants").

Like *Capron*,[8] this is simply "not a case" where either the text or history of the federal law and its enforcement "provides support for drawing the inference that [Congress] had deliberately intended to set both a floor with which the private actors would have to comply and a ceiling on the additional regulatory burdens that a state could impose on them." *Id.* at 40. "Rather, neither the text nor the regulatory history affirmatively indicates that the federal government made such a deliberate, ceiling-setting choice, and, other provisions indicate the opposite." *Id.*

Recall "the historical context of section 340B, including the widespread use of contract pharmacies when that provision was enacted." *Johnson*, 102 F.4th at 462. As HRSA opined almost 30 years ago, statutory silence as to drug distribution makes "clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities[,]" especially given that, "[a]s a matter of State law," covered entities already "possessed the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients." 1996 Guidance at 43,549-50; *see McClain*, 95 F.4th at 1141

---

[8] Novartis relies instead on *Verizon New England, Inc. v. Maine Pub. Utils. Comm'n*, 509 F.3d 1 (1st Cir. 2007), which is plainly distinguishable. That case involved the preemptive effect of a specific FCC order that expressly determined that lower "TELRIC" rates could not be imposed on telecommunications providers, such that state regulation "requir[ing] the lower TELRIC rates directly conflict[ed] with, and undercuts, the FCC's orders." *Verizon*, 509 F.3d at 9. *Verizon* thus presented a clearcut instance of conflict preemption between a federal action and a state action addressing the identical issue; nothing remotely comparable exists here.

("Since the beginning, covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs."). Recall, too, that since 2010 HRSA has "opined that covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies" and recognized "that contract pharmacies enable covered entities to 'create wider patient access by having more inclusive arrangements in their communities.'" *Johnson*, 102 F.4th at 462; *see* 1996 Guidance at 43,550 ("[B]ecause the delivery of pharmacy services is central to the mission of (and a legal mandate in some instances for) these providers, they rely on outside pharmacies to fill the need.  It would defeat the purpose of the 340B program if these covered entities could not use their affiliated pharmacies in order to participate in the 340B program."). Nothing in Section 340B prohibits covered entities from using multiple contract pharmacies, as long as they comply with the actual requirements imposed by federal law "to prevent diversion of covered drugs" or "situations in which a drug is subject to both the 340B discount and a Medicaid Rebate Claim." 2010 Guidance at 10273. And nothing in Chapter 288 relieves covered entities of their obligations to comply with Section 340B's prohibitions against diversion and discount duplication.

"In such circumstance[s], speculation about future impacts" of Chapter 288 or unsubstantiated allegations that the replenishment model fosters illegal diversion or duplicate discounts "cannot satisfy [Novartis's] burden to show the requisite -- implicit -- preemptive intent." *Capron,* 944 F.3d at 40; *see Fitch*, 738 F. Supp. 3d at 750 ("The Court is not prepared to find Section 340B likely preempts [Mississippi's law] on a theory that Congress's remedial scheme under Section 340B is inadequate to deter violations of federal law."). And by asking the Court "to infer a ceiling-setting [Congressional] intent on the basis of only speculative predictions about the future effects ... of the application of state laws," Novartis is "necessarily asking [the Court] to

29

engage in precisely the sort of 'freewheeling judicial inquiry'" courts "are supposed to avoid in evaluating an obstacle preemption claim."[9] *Capron,* 944 F.3d at 39 (quoting *Whiting*, 563 U.S. at 607).

### b. *No Conflicting Enforcement Procedures*

Next, Novartis recycles another argument it unsuccessfully raised in a previous action, asserting that Chapter 288 "attempts to wrest control away from HHS and supplement the federal enforcement process with an enforcement scheme all its own." ECF 3-1 at 21; *cf. Fitch,* 738 F. Supp. 3d at 751 (addressing argument that "H.B. 728 erects a substantial obstacle to [the] centralized federal process" for enforcing Section 340B's requirements "by creating its own enforcement pathway before state administrative agencies"). In *Fitch,* the Southern District of Mississippi disagreed, correctly holding that "H.B. 728 addresses delivery and Section 340B does not, so adjudications under H.B. 728 will not interfere with federal enforcement of Section 340B's compliance mechanisms." 738 F. Supp. 3d at 751.

Novartis makes no attempt to identify any legal error in that analysis or distinguish Chapter 288 from Mississippi's H.B. 728. Nor could it: yet again, Novartis's argument rests on a blatant misreading of Chapter 288. Proceedings to enforce Chapter 288's "*state law*" prohibition on interference with contract pharmacy arrangements would not be attempts to "enforce federal law[.]" ECF 3-1 at 22 (emphasis in original); *see In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 177-78 ("[W]e disagree with AstraZeneca's characterization of the plaintiffs' claims: fairly interpreted, those claims … sound not in federal law, but in state consumer protection law.").

---

[9] Federal law does, of course, set a "ceiling" on the *prices* of covered 340B drugs; again, the state law does nothing to change those prices. 42 U.S.C. § 256(b); *cf.* R.I.G.L. § 5-19.3-2(1).

As multiple courts have recognized, state laws such as Chapter 288 do not alter the contents of the federal 340B program; instead, they create separate and complementary state law obligations. *See, e.g.*, *Fitch*, 738 F. Supp. 3d at 751 ("[Mississippi's law] addresses delivery and Section 340B does not, so adjudications under [Mississippi's law] will not interfere with federal enforcement of Section 340B's compliance mechanisms."); *McClain*, 645 F. Supp. 3d at 901, affirmed, 95 F.4th 1136 ("[T]he penalties that may be assessed for violations of [Arkansas' law] relate to activities outside the scope of the 340(B) Program's enforcement procedures[.]"). Under our federal system of dual sovereignty, that is entirely permissible. "Ordinarily, the mere existence of a federal regulatory or enforcement scheme," even schemes far more "detailed" than Section 340B, "does not by itself imply pre-emption of state remedies." *English v. General Electric Co.*, 496 U.S. 72, 87 (1990). Nor are state remedies "pre-empted solely because they impose liability over and above that authorized by federal law." *Id.* at 89 (quoting *California v. ARC America Corp.,* 490 U.S. at 105 (1989)).

Nor may Novartis conjure up a conflict through its pearl-clutching prediction that proceedings to enforce Chapter 288 would "require Rhode Island decisionmakers to adjudicate multiple questions of federal law, opening the door to a multitude of conflicting opinions on whether a particular set of facts constitutes a violation." ECF 3-1 at 22. Yet again, that argument misrepresents the contents of Chapter 288 and rests on a profound misconception of how our federal system functions.

"Suppose[,]" as Novartis does, that "the Rhode Island Attorney General brought proceedings to enforce" Chapter 288, *id.* at 23, which contemplates enforcement through the state-law mechanism of the DTPA. *See* R.I. Gen. Laws § 5-19.3-8. Under the DTPA, the Attorney General would need to bring that enforcement proceeding, and any petition to obtain civil penalties

for violations, in Rhode Island Superior Court. *See* R.I. Gen. Laws §§ 6-13.1-5, -1.8. Because a potential violation of Chapter 288 could only occur if the manufacturer had engaged in prohibited conduct "[w]ith respect to reimbursement to a 340B covered entity for 340B drugs," R.I. Gen. Laws § 5-19.3-3(a), whether 340B covered entities and 340B drugs were involved would represent threshold issues for the Superior Court; however, those issues would be easily resolved by reference to the controlling federal law incorporated in Chapter 288, not as *de novo* "adjudications" of issues expressly reserved to HHS. Novartis's absurd prediction that Chapter 288 allows Rhode Island courts to "review and nullify" decisions by federal actors, ECF 3-1 at 23, is further refuted by the Act's provision that "[n]othing in this chapter is to be construed or applied to be in conflict with ... [a]pplicable federal law and related regulations[.]" R.I. Gen. Laws § 5-19.3-9(b). And Novartis's umbrage at the notion that state courts might consider questions of federal law at all is unavailing; "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990); *see Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149-50 (1988) ("[W]hen a state proceeding presents a federal issue, even a pre-emption issue, the proper course is to seek resolution of that issue by the state court.").[10]

---

[10] Through its conclusory assertion that "States cannot enforce federal law unless Congress specifically empowers them to do so[,]" ECF 3-1 at 22, Novartis once again has things precisely backwards: because "federal law is as much the law of the several States as are the laws passed by their legislatures[,]" the default presumption is that States *may* enforce federal law, a presumption "defeated only in two narrowly defined circumstances: first, when Congress expressly *ousts* state courts of jurisdiction, ... and second, [w]hen a state court refuses jurisdiction because of a neutral state rule regarding the administration of the courts[.]'" *Haywood v. Drown*, 556 U.S. 729, 734-35 (2009) (emphasis added).

As discussed, a similar presumption preserves States' powers to legislate in traditional areas involving health and safety; thus, in the absence of a clear and manifest Congressional intent to the contrary, States may incorporate federal standards into their own regulatory regimes. For example, in *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 442 (2005), after considering a federal pesticide law that expressly preempted certain state laws, the Supreme Court declined to expand

More importantly, after any such threshold issues are resolved, the Superior Court's substantive decision as to whether a manufacturer's conduct violated the specific provisions of Chapter 288 would ultimately represent a determination of *Rhode Island* law; conversely, any subsequent determination by HHS as to whether the same conduct by the manufacturer was also a violation of Section 340B's separate requirements would ultimately be a determination of a distinct *federal* question. The fact that the Attorney General would be enforcing state law, not federal law, distinguishes this case from *Astra*—which, as discussed, involved the lack of a private right of action under federal law and which did not address preemption or states' ability, through legislation, to create distinct but complementary regulatory regimes. Any so-called "inconsistency" between findings that the same conduct violated Chapter 288 but not Section 340B would stem from the fact that the Act, by design, regulates private conduct about which Congress was silent. And Novartis's argument that "a manufacturer could face steep fines ... despite complying with the federal obligation state law supposedly incorporates" is yet another meritless attempt to turn Congress's silence regarding delivery into an affirmative "obligation" that manufacturers impose artificial limitations on covered entities' ability to obtain 340B discounts.

In short, and notwithstanding its attempt to concoct a nightmare scenario out of the routine workings of our federal system, Novartis has failed to show that enforcement of the Act will create an insurmountable obstacle to Section 340B's separate enforcement scheme.

---

the limited reach of that exemption provision, holding that "[n]othing in the text of [the federal law] would prevent a State from making the violation of a federal labeling or packaging requirement a state offense, thereby imposing its own sanctions on pesticide manufacturers who violate federal law." 544 U.S. at 442; *see id.* ("The imposition of state sanctions for violating state rules that merely duplicate federal requirements is equally consistent with the text of [the federal law].").

c.    *No Frustration of Claims Data Collection*

Lastly, Novartis alleges that Chapter 288 "clashes" with Section 340B by prohibiting drug manufacturers from imposing the collection of "claims data" from covered entities as a condition for receiving 340B discounts. ECF 3-1 at 24; *see* R.I. Gen. Laws § 5-19.3-3(a)(5) (prohibiting drug manufacturers from "[r]equir[ing] submission of claims-level data or documentation that identifies 340B drugs as a condition of reimbursement or pricing, unless it is required by the Centers for Medicare and Medicaid Services"). According to Novartis, this restriction creates an insurmountable obstacle to its ability to effectively access HRSA's Administrative Dispute Resolution ("ADR") process and bring claims against covered entities for alleged violations of Section 340B's prohibitions on "duplicative discounts" and diversion. ECF 3-1 at 24.  Citing federal regulations requiring a manufacturer's "audit of a covered entity pursuant to section 340B(a)(5)(C)" as a precondition for bringing an ADR claim, and HRSA guidance requiring "sufficient facts and evidence in support" of the manufacturer's belief that the covered entity has violated Section 340B, Novartis concludes that it "cannot access any part of Congress's enforcement scheme unless it can collect claims data." *Id.* at 25 (citing 42 U.S.C. § 256b(a)(5)(C); 42 C.F.R. § 10.21(a)(2); Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996)).

That argument is pure sleight of hand. As another District Court recently held in denying a similar conflict preemption challenge, "nothing in the federal program has ever *required* covered entities to provide claims data (or 'clarification') or other documentation to drug manufacturers upon demand, yet the ADR system has nonetheless been in place and functioning adequately for many years in the absence of any such requirement."[11] *Skrmetti*, 2025 WL 1805271, at *16

---

[11] Indeed, by the terms of its own policy, Novartis only began requiring covered entities "to start submitting claims data by January 1, 2025." ECF 1-1 at 7. Evidently, Novartis either could

(emphasis in original). Just as in that case, Novartis has "not actually shown that [it] need[s] claims data and the other documentation they purport to need in order either to request an audit or to attempt to resolve a dispute in good faith before proceeding to ADR[,]" and has "presented no evidence that [it] or other drug manufacturers have ever been denied the ability to conduct an audit upon request or that they have been required to submit the kind of claims data they claim to need in order to substantiate a request for an audit." *Id.* "Rather, claims data is more likely to be precisely the documentation that would be reviewed *in the course of conducting an audit.*" *Id.* (emphasis in original).

Under federal law, "only 'reasonable cause' is required to support a manufacturer's request for an audit, to 'ensure that the audits are performed where there are valid business concerns.'" *Id.* (quoting 1996 Guidance at 65,406). "HRSA itself observed in April 2024 that the standards for initiating a manufacturer audit 'are *not overly burdensome* [and do not] present any barriers to a manufacturer's ability to perform an audit of a covered entity.'" *Id.* (quoting ADR Rule at 28,646) (emphasis in original). "Significant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." 1996 Guidance at 65,406. Chapter 288 also affirmatively provides for a further source of information through the detailed (and public) annual reports that covered entities must submit to Rhode Island's Auditor General regarding each "340B

---

not "access any part of Congress's enforcement scheme" throughout almost the entire lifetime of the 340B program, or else it did not actually need the claims data that it now claims is crucial. ECF 3-1 at 25. In either case, Novartis has not shown that a state law prohibition on extracting claims data from covered entities poses any obstacle to the functioning of the 340B Program or the ADR process. *See Skrmetti*, 2025 WL 1805271, at *16 ("Consequently, a state law that prohibits drug manufacturers from imposing upon covered entities a requirement that they submit claims data or other documentation as a precondition to allowing them to purchase drugs at the 340B discount price does not substantially alter the federal system.").

covered entity's participation in the program during the previous calendar year[.]" R.I. Gen. Laws § 5-19.3-6. And "a good faith request by the manufacturer for documents from a covered entity— again, so long as it has an articulable basis for believing that the entity is not in 'compliance with the prohibitions against drug diversion and the generation of duplicate drug rebates and discounts with respect to drugs of the manufacturer'—would satisfy its obligation to 'attempt in good faith to resolve the matter' before accessing the dispute resolution system." *Skrmetti*, 2025 WL 1805271, at \*16 (quoting 1996 Guidance at 65,406, 65,410).

As for its assertion that "federal law authorizes manufacturers to require basic claims data" from covered entities, Novartis (once again) improperly seeks to transmute Congressional silence into an affirmative intent to displace any state regulation. ECF 3-1 at 25 (citing *Johnson*, 102 F.4th at 463, and *Sanofi*, 58 F.4th at 701, 706). Nothing in the text of Section 340B affirmatively "authorizes" drug manufacturers to extract claims data from covered entities as a condition of providing 340B pricing. And as previously discussed, *Johnson* and *Sanofi*—which primarily addressed delivery and distribution conditions, rather than claims data requirements—only held that, because Section 340B is silent on the issue of whether drug manufacturers may impose contractual distribution conditions on covered entities, that practice was therefore not *prohibited* by that *federal* statute. *See Johnson*, 102 F.4th at 460. Those cases did not address states' ability to regulate in that space. Similarly, because nothing in the actual text of Section 340B addresses collection of claims data, in no sense did Congress's silence affirmatively authorize drug manufacturers to impose a claims data condition on covered entities—let alone render drug manufacturers' ability to impose such a condition on covered entities sacrosanct against any exercise of the States' traditional authority over medicine and pharmacy. *See Sanofi* 58 F.4th at 699 ("[C]ourts must resist the urge to fill in words that Congress left out.").

Novartis also points to HHS's "recently announced … pilot rebate program pursuant to which manufacturers (including Novartis) would be allowed to require claims data for certain drugs before providing 340B pricing in the form of a rebate" as evidence that the collection of claims data is authorized by federal law, to which Chapter 288 stands as an intractable obstacle. ECF 3-1 at 25 (citing 90 Fed. Reg. 36,163 (August 1, 2025)). That argument is a red herring.

For one thing, and despite Novartis's attempt to conflate the "rebate models" contemplated by HHS's pilot program (hereinafter, the "Rebate Pilot Program") with the replenishment model that (according to Novartis) covered entities and contract pharmacies currently use, HHS's notice announcing the Rebate Pilot Program plainly states that rebate models represent a material change to the way that the 340B Program has functioned since its inception. 90 Fed. Reg. 36,163. "Whereas the 340B program has traditionally operated as an upfront discount program" under which covered entities purchase covered drugs from manufacturers at the discounted 340B price, "under a rebate model, a covered entity would pay for the drug at a higher price upfront and then later receive a post-purchase rebate that reflects the difference between the higher initial price and the 340B price." *Id.* Because the adoption of rebate models requires "Secretarial approval" and "could fundamentally shift how the 340B Program has operated for over 30 years," HHS proposes to test a limited pilot program focused on a very narrow subset of 10 high-priced drugs in 2026 for which there may be novel discount-nonduplication considerations.[12] *Id.* at 36,163-64. Novartis cannot persuasively rely on the announcement of a fledgling pilot program, for which HHS has

---

[12] The scope of the pilot rebate program is limited to drugs appearing on CMS's Medicare Drug Price Negotiation Selected Drug List, which includes only one Novartis drug for 2026. *See* 90 Fed. Reg. 36164; CMS, Medicare Drug Price Negotiation Program: Manufacturer Agreements for Selected Drugs for Initial Price Applicability Year 2026, https://www.cms.gov/files/document/fact-sheet-manufacturer-agreements-selected-drugs-ipay-2026.pdf.

not yet authorized a single rebate pilot plan, as evidence that Novartis's own new, limited practice of requiring claims data from covered entities as a condition of receiving 340B discounts in the form of a rebate for *all* drugs is currently "authorized" by federal law. ECF 3-1 at 25.

The illusory nature of any purported conflict between Chapter 288 and the rebate models contemplated by the Rebate Pilot Program is further confirmed by two key facts. First, Novartis currently does not, and is currently not authorized to, employ a "rebate model" because it has not received approval from the Secretary to do so. *See Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630, at *11 (D.D.C. May 15, 2025) (rejecting APA challenge by Novartis and other drug makers regarding HRSA's non-approval of manufacturers' 340B rebate policies). If Novartis wishes to implement a new rebate model consistent with the Rebate Pilot Program, it must submit a satisfactory plan to HHS by the deadline of September 15, 2025; HHS would then make any approvals by October 15, 2025, "for a January 1, 2026 effective date." 90 Fed. Reg. at 36,164. Novartis can hardly show an imminent risk of conflict arising from its hypothetical participation in a pilot program that is not yet off the ground.

Second, and even more crucially, if Novartis *does* eventually participate in the Rebate Pilot Program, covered entities will then be *required* by HHS to submit a limited set of pharmacy claims data elements for certain drugs to Novartis to obtain 340B rebates. *See* 90 Fed. Reg. at 36,165 (requiring that any "data requested" as part of a proposed rebate model "be limited to only" certain specified "readily available pharmacy claim fields"). And importantly, Chapter 288's prohibition on requiring the submission of "claims-level data or documentation" expressly exempts "data or documentation" that covered entities are "required" to provide under federal law. R.I. Gen. Laws § 5-19.3-3(a)(5); *see id.* § 5-19.3-5(c) (prohibiting only the imposition of "additional terms or limitations not required by federal law"); *id.* § 5-19.3-9(b) ("Nothing in this chapter is to be

38

construed or applied to be in conflict with ... [a]pplicable federal law and related regulations[.]");
*see also AbbVie v. Fitch*, 2024 WL 3503965 at *13 ("[Mississippi's law] state's that it should not be construed to conflict with federal law, … and the Court must apply the presumption against preemption to construe state laws not to conflict with federal law when possible, … [and] will not read [Mississippi's law] to accidentally conflict with federal law.").  Accordingly, there is no current or even *potential* conflict between Chapter 288, and the conditions of any rebate model Novartis may adopt under the Rebate Pilot Program, and the announcement of that limited-scope program cuts against Novartis's claims about what conditions manufacturers are currently authorized to impose on covered entities under federal law.

The "teaching" of the Supreme Court's preemption decisions "enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists." *English,* 496 U.S. at 90 (quoting *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 446 (1960)). Although Novartis mechanically "chants the conventional 'obstacle to accomplishment' mantra, it does not point to the kind of clear conflict that would warrant such a finding," and accordingly has not shown a likelihood of success on its claim that Chapter 288 is preempted by federal law. *Grant's Dairy*, 232 F.3d at 18.

### B.  Chapter 288 Does Not Violate the Dormant Commerce Clause

Novartis' remaining claims based on the dormant Commerce Clause are also not likely to succeed on the merits. Novartis claims that Chapter 288 violates the dormant Commerce Clause for three reasons: (1) it is unlawfully extraterritorial because it purports to regulate conduct that takes place wholly outside Rhode Island (ECF 3-1 at 27); (2) it has both a discriminatory intent and effect in that it benefits in-state hospitals and pharmacies by burdening out-of-state drug manufacturers (*Id.* at 29); and (3) it excessively burdens interstate commerce (*Id.* at 32).

The Constitution grants Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. "Encompassed within that affirmative grant of power is, by negative implication, a concomitant command that 'prevents states from creating protectionist barriers to interstate trade.'" *Anvar v. Dwyer*, 82 F.4th 1, 8 (1st Cir. 2023) (quoting *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010)). Under this dormant Commerce Clause, "a state law that discriminates against either interstate goods or non-resident actors can be upheld only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id.* (citing *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). However, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of extreme delicacy, something courts should do only where the infraction is clear." *National Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023). Chapter 288 does not regulate transactions outside of Rhode Island, nor does it discriminate against out-of-state drug manufacturers or excessively burden them.

### 1.   *Chapter 288 Only Regulates the Delivery of 340B Drugs in Rhode Island*

Novartis climbs a steep ladder of inference to read extraterritorial burdens into Chapter 288 when the plain language of the Act is focused entirely on in-state activities. Novartis claims that, because distribution of its drugs "takes place through a complex series of interstate transactions," that are "mostly out-of state," Chapter 288 "applies to transactions between out-of-state manufacturers and wholesalers that take place entirely outside Rhode Island's borders." ECF 3-1 at 27. As a matter of law, statutes presumptively have no extraterritorial application. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013). Rhode Island's Supreme Court has long held that "extraterritorial force cannot be given to a statute of this state." *Farrell v. Employers' Liability Assur. Corp.*, 168 A. 911, 912 (R.I. 1933) (citing *Coderre v. Travelers' Ins. Co.*, 136 A.

305 (R.I. 1927); *Riding v. Travelers' Ins. Co.,* 138 A. 186 (R.I. 1927)). Indeed, "it would be beyond the constitutional power of a state Legislature to regulate the contracts of a foreign corporation made in another state with a citizen of such other state." *Coderre,* 136 A. at 306. Even if "a statute is ambiguous—that is, 'susceptible of more than one construction'—the Court will 'adopt the construction that comports with constitutional imperatives.'" *Rhode Island Truck Ctr., LLC v. Daimler Trucks N. Am., LLC,* 338 A.3d 1056, 1061 (R.I. 2025) (citing *In re Kyle S.,* 692 A.2d 329, 334 (R.I. 1997)).

While Chapter 288 prevents Novartis from interfering with contract pharmacy arrangements made by covered entities in Rhode Island, nothing in Chapter 288 "purports to 'control' what Novartis can charge *wholesalers*" outside the state. ECF 3-1 at 27 (emphasis in original). Novartis would have this Court read that additional requirement in the margins, but as the Supreme Court has asked, "shouldn't we limit ourselves to trying to glean legislative purposes from the statutory text where we began?" *Virginia Uranium, Inc,* 587 U.S. at 777. As Novartis admits, the ability for a covered entity in Rhode Island to claim a 340B discount is not at all affected by its sophisticated supply chain. As Novartis states "the 340B discount later gets billed back to Novartis through a new transaction chain" (ECF 3-1 at 27) which, common sense would dictate, requires a covered 340B entity in Rhode Island as its first link. While Chapter 288 might incidentally affect Novartis's wholesaler contracts that purposely limit delivery of 340B eligible drugs to multiple contract pharmacies on behalf of a Rhode Island covered entity, such a result does not violate the dormant Commerce Clause, because Novartis's goal in such a transaction is to impact covered entities *inside* Rhode Island.

Addressing a similar allegation that Tennessee's analogous S.B. 1414 was unlawfully extraterritorial, the District Court for the Middle District of Tennessee held that "the dormant

Commerce Clause does not prohibit laws solely because they have extraterritorial reach, absent protectionist intent or effect." *Skrmetti,* 2025 WL 1805271, at *23 (citing *National Pork Producers,* 598 U.S. at 373). There, the plaintiff argued that, since Tennessee's law contained no language limiting its extraterritorial application, it must be construed "broadly to include covered entities and contract pharmacies without any geographic limitation." *Id.* at *24. The court declined to construe the statute that way, holding that "[t]o read it thus would contravene both Tennessee's presumption against extraterritoriality and the 'well established' canon of construction 'that statutes should be construed to avoid constitutional questions if such a construction is fairly possible.'" *Id.* (citing *Boos v. Barry,* 485 U.S. 312, 333, (1988)). The same result applies here because Rhode Island recognizes the same presumption against extraterritoriality and preference for adopting the construction of a law that avoids constitutional conflict. *Coderre,* 136 A. at 306.

Nor can Novartis' dormant Commerce Clause claim succeed on the theory that Chapter 288 has the practical effect of controlling commerce outside Rhode Island. The Supreme Court majority in *National Pork Producers* held that there is no *per se* rule forbidding enforcement of state laws that have the practical effect of controlling commerce outside of a state. 598 U.S. at 373-75. The six justices in *National Pork Producers* who believed that *Pike v. Bruce Church Inc.* was still good law, characterized "substantial burden" as whether the law would force compliance on persons who did not want to access the market in the state with the law. 598 U.S. at 400 (Roberts, C.J. and Alito, Kavanaugh, and Jackson, J.J., concurring in part and dissenting in part) (stating that a court must "consider whether, by effectively requiring compliance by [out-of-state persons] who do not even wish to ship their product into [the state with the challenged law], [the challenged law] has a 'nationwide reach'"). Here Novartis does not allege that it wants to *avoid* the Rhode Island market; it explicitly wants to participate, just on its own terms.

If accepted, Novartis's argument would lead to "strange places," since "many (maybe most) state laws have the practical effect of controlling extraterritorial behavior." *Id.* at 374. (internal quotation marks omitted). Any number of state laws affect the decisions of out of state commercial actors. For instance, "[s]tate income tax laws lead some individuals and companies to relocate to other jurisdictions," and "[e]nvironmental laws often prove decisive when businesses choose where to manufacture their goods," not to mention "the extraterritorial-effects [of] all manner of libel laws, securities requirements, charitable registration requirements, franchise laws, tort laws," "[i]nspection laws, quarantine laws, [and] health laws of every description" that have a "considerable influence on commerce" outside their borders. *Id.* at 374-75 (internal quotation marks omitted, brackets accepted). Thus, the rule Novartis would have this Court adopt was directly addressed and rejected by the majority in *National Pork Producers* because it "would cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers." *Id.* at 375.

This case also is distinguishable from *Association for Accessible Meds. v. Frosh,* 887 F.3d 664, 666 (4th Cir. 2018) and *Association for Accessible Meds. v. Ellison,* 2023 WL 8374586, at *2-4 (D. Minn.) on which Novartis mistakenly relies because, unlike the statutes in those cases, Chapter 288 does not regulate price and does not affect transactions that occur wholly outside of Rhode Island and involve individuals having no connection to Rhode Island. Chapter 288 merely prohibits "pharmaceutical manufacturers" that manufacture or sell drugs "in this state," § 5-19.3-2(5), from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with" the "acquisition" or "delivery" of a 340B drug to an authorized contract pharmacy. § 5-19.3-5(a). The 340B discounts themselves are already agreed to by drug manufacturers under federal law and PPAs in exchange for Medicare and Medicaid eligibility.

### 2. *Chapter 288 does not discriminate against Out-of-State Drug Manufacturers*

Novartis fares no better in showing that Chapter 288 reflects both a discriminatory intent and effect that benefits in-state hospitals and pharmacies at the expense of out-of-state manufacturers. Chapter 288 does no such thing.

Novartis claims that Chapter 288 is discriminatory because it "exists to benefit in-state hospitals and pharmacies by forcing out-of-state manufacturers to give them steep discounts far beyond what federal law requires." ECF 3-1 at 29. Under modern dormant Commerce Clause precedents, "one of the key constraints is that a local measure 'may not discriminate against interstate commerce[.]'" *Association to Pres. & Protect Loc. Livelihoods v. Sidman,* 147 F.4th 40, 57 (1st Cir. 2025) (citing *South Dakota v. Wayfair,* 585 U.S. 162, 173, (2018)). (internal citations omitted, brackets accepted). Novartis "must first show that the measure does discriminate," and in doing so, "must do more than show that the measure burdens out-of-state entities more than local ones[;]" Novartis must show that it *actually competes* with allegedly favored in-state entities. *Id.* at 59-60 (citing *Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979); *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 125-26 (1978)). Even so, "it may not be enough to show the existence of such competition," because "'any notion of discrimination assumes a comparison of substantially similar entities.'" *Id.* at 60 (citing *General Motors Corp. v. Tracy,* 519 U.S. 278 298 (1997)). To satisfy its burden, Novartis claims it "compete[s] vertically for a share of the profit" with 340B covered entities, and Chapter 288 "purports to 'alter conditions of competition to favor in-state interests' at Novartis's and other drug manufacturers' expense." ECF 3-1 at 30-31 (citing *Fam. Winemakers,* 592 F.3d at 10-11).

The notion that Novartis is a substantially similar entity in competition for profits with covered entities is absurd. Novartis sells its drugs to covered entities at a discount it has already

agreed to under federal law in exchange for its drugs to be covered by Medicaid and Medicare Part B. *See Johnson,* 102 F. 4th at 455. This voluntarily accepted federal obligation does not convert the DSH hospitals, community health centers, and other specialized clinics eligible for 340B discounts into competitors with drug manufacturers. In addition, Chapter 288 does not discriminate against out-of-state *manufacturers* in favor of in-state manufacturers. If Novartis moved its headquarters to Providence, it would still be prohibited from interfering with contract pharmacy arrangements entered into by Rhode Island covered entities. Because Chapter 288 treats in-state manufacturers and out-of-state manufacturers the same, there is no dormant Commerce Clause violation under a theory of discrimination.

The only purported evidence of discrimination Novartis identifies are statements of Rhode Island legislators, who described Chapter 288 as "a choice between big pharma and community health centers," argue that it would "reinvigorate" funding for community health centers, and claim it will "get[] big pharma to subsidize [Rhode Island's] community health centers." ECF 3-1 at 30 (citing Statements of Reps. Place, Hopkins and Tanzi Before the H.R. on June 18, 2025). Novartis argues "[t]hat discriminatory motive is unlawful." ECF 3-1 at 30-31 But these legislative statements are not discriminatory; they reflect the practical reality of Novartis's contract pharmacy restrictions on covered entities in Rhode Island. If Novartis had its way, entities with an in-house pharmacy would not be able to claim its discounts through a contract pharmacy at all, and those without an in-house pharmacy would be limited to a single contract pharmacy, not a chain of pharmacies, and not a central fill pharmacy. *See* Declaration of Shannon McCrudden, ECF 3-2 at ¶¶ 7, 8. Novartis may still deliver all the 340B eligible drugs a covered entity purchases, to any pharmacy that entity chooses, but Novartis will only honor the 340B discount if the drug is dispensed at a single pre-designated location. This restriction on drug delivery puts Rhode Island

covered entities between a rock and a hard place: either force all patients, regardless of where they live and regardless of any physical limitations they may have, to travel to a single pharmacy to pick up their 340B eligible prescriptions or forfeit the "savings" Section 340B is meant to make available to covered entities for reinvestment in Rhode Island's health care safety net. Novartis's policy therefore diminishes the 340B savings a covered entity may recoup for reinvestment in the health care safety net, while maximizing Novartis' profits.

Furthermore, even if the legislators' comments somehow harbored a discriminatory motive, "[t]he Supreme Court has . . . warned that the Commerce Clause primarily 'regulates effects, not motives.'" *American Trucking Ass'ns, Inc.,* 123 F.4th at 36 (citing *Comptroller of the Treasury of Md. v. Wynne,* 575 U.S. 542, 561 n.4, (2015)). The Supreme Court itself has said that "State legislatures are composed of individuals who often pursue legislation for multiple and unexpressed purposes," and "trying to peer inside legislators' skulls is too fraught an enterprise." *Virginia Uranium, Inc.* 587 U.S. at 776–77. "What motivates one legislator to vote for a statute is not necessarily what motivates scores of others to enact it." *Id.* at 777 (citing *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 215–16, (1983)). Novartis does not identify any text in Chapter 288 that has the *effect* of compelling additional discounts or discriminating against out-of-state manufacturers in favor of in-state manufacturers. It simply prohibits drug manufacturers from interfering with in-state contract pharmacy arrangements "without regard to whether [the drug manufacturers] are local or out-of-state." *Sidman*, 147 F.4th at 59.

### 3.  *Chapter 288 does not excessively burden Interstate Commerce*

Novartis's final dormant Commerce Clause argument based on *Pike v. Bruce Church Inc.* is likewise unlikely to succeed on the merits. In *Pike,* the Supreme Court held that if a local measure "regulates even-handedly to effectuate a legitimate local public interest, and its effects on

interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. 137, 142 (1970) (citing *Huron Portland Cement Co.* 362 U.S. at 440).

It is Novartis's burden to show that a measure's adverse impact on interstate commerce is "clearly excessive." *See New Hampshire Motor Transp. Ass'n v. Flynn,* 751 F.2d 43, 48 (1st Cir. 1984) ("[T]he burden of proving 'excessiveness' falls upon the [plaintiff], not the state." (emphasis omitted)). Novartis comes nowhere close to meeting this burden. At best, Novartis claims that Chapter 288 (1) shifts the bargaining power to in-state covered entities; (2) causes Novartis to face financial costs of compliance, and those costs will increase as more states pass similar laws; and (3) Novartis will have to comply with all of those laws when restocking drugs that should have initially sold under 340B discounts. ECF 3-1 at 32.

First, as explained above, Novartis voluntarily discounts its drugs under the 340B program in exchange for its drugs to be covered by Medicare and Medicaid. *See McClain,* 95 F.4th at 1139 ("Section 340B incentivizes pharmaceutical manufacturers to provide qualified health care providers, referred to as 'covered entities,' with pricing discounts on certain drugs prescribed to individuals and families whose incomes fall below the federal poverty level."). The extent to which 340B discounts subsidize in-state covered entities is a function of the federal 340B program itself, not Chapter 288. Even if it did, the Supreme Court in *Pike* "recognized the legitimate interest of a State in maximizing the financial return to an industry within it." *Pike,* 397 U.S. at 143 (citing *Parker v. Brown,* 317 U.S. 341 (1943)).

Second, the "high administrative costs" associated with complying with Chapter 288 and similar laws in other states does not create a substantial burden on interstate commerce. While Novartis alleges it faces high costs in making state-specific exceptions (ECF 3-1 at 32-33), their

own evidence betrays them. From November 2020 until April 2023, Novartis "recognized all contract pharmacies within 40 miles of a covered entity—an area of more than 5,000 square miles." Declaration of Shannon McCrudden, ECF 3-2 at ¶ 6. This Court can "take judicial notice of the fact that the State of Rhode Island is only 37 miles wide," *Rhode Island Truck Ctr., LLC* 338 A.3d at 1061, so Novartis presumably would have had no problem complying with Chapter 288 under its previous policy in effect until April of 2023. Novartis cites no case suggesting that a law that increases administrative costs results in a dormant Commerce Clause violation, especially where the challenging party had voluntarily borne those very costs until relatively recently. Because, for years, Novartis was clearly capable of handling the logistics of the 340B Program in compliance with the principles that Chapter 288 now enshrines, its claim of substantial burden rings hollow.

Third, Novartis's "patchwork-of-laws" argument similarly fails to move the needle. Patchwork-of-laws cases that violate the dormant Commerce Clause are typically "state laws that impose burdens on the arteries of commerce, on trucks, trains, and the like." *National Pork Producers,* 598 U.S. at 392 (Sotomayor and Kagan, J.J., concurring in part); *see also id.* at 397-398 (Roberts, C.J., and Alito, Kavanaugh, and Jackson, J.J., concurring in part). This is not one of those cases. Chapter 288 does not regulate the arteries of commerce; it restricts drug manufacturers' ability to interfere with in-state contract pharmacy arrangements. Novartis does not explain why it cannot honor 340B discounts with respect to covered entities just because the drug is acquired, delivered or dispensed through a contract pharmacy. Furthermore, Novartis's new policy notice, implemented in January 2025, delineates exceptions it has readily made for ten other states, all of which have similar laws to Rhode Island. *See* ECF 1-1 at Attachment A ("To ensure compliance with the state-imposed requirements under Arkansas Act 1103, Mississippi SB 2145, Minnesota HF 4991, Louisiana Act 348, Maryland HB 1056, Missouri S.B. 751, Nebraska L.B.

48

168, Vermont H.266, South Dakota S.B.154, and Hawaii H.B.712 we have decided to adjust our 340B Contract Pharmacy Policy for covered entities and their contract pharmacies."). This is not without considerable effort by Novartis and other drug manufacturers to, unsuccessfully, challenge these laws on the same or similar grounds as Novartis does here. *See* cases cited *supra* note 1. At most, Novartis will have to add Rhode Island to the growing list of states that have resisted its attempts to interfere with contract pharmacy arrangements. Because Novartis does not plausibly allege a substantial burden, its patchwork-of-laws theory fails.

Finally, even if Novartis could demonstrate a substantial burden on interstate commerce, such a burden does not outweigh the local benefit. *See Pike,* 397 U.S. at 142. The local benefit of Chapter 288 is obvious: covered entities—which the federal 340B program exists to assist— have the freedom to contract with as many pharmacies they need to so they can serve their patients without forfeiting the monetary savings of the 340B Program, as Novartis's policy would compel them to do. The costs of compliance are minimal, considering that Novartis is clearly capable of complying with state laws as it has done with the exemptions crafted for other state laws prohibiting similar restrictions on the use of contract pharmacies to dispense drugs prescribed by Section 340B covered entities.

### III.    Novartis Fails to Demonstrate the Remaining Preliminary Injunction Factors

Novartis's failure to show a likelihood of success on the merits of its federal preemption and dormant Commerce Clause claims dooms its request for a preliminary injunction. *Ryan,* 974 F.3d at 18.  Even apart from that, Novartis' motion should be denied because (1) it fails to demonstrate any risk of irreparable injury and (2) the public interest weighs heavily in favor of allowing Chapter 288 to take effect without delay to avoid further harm to the health care safety net that the 340B program was intended to strengthen.

## A.  No Irreparable Injury

Novartis fails to show that it will suffer an irreparable injury without the requested relief. Although Novartis invokes the looming specter of Supremacy and Commerce Clause violations arising from Defendants' enforcement of Chapter 288, Novartis cannot make "a sufficient showing of irreparable harm" by simply "alleging a deprivation of constitutional right[s]" without demonstrating why that allegedly imminent harm is in fact irreparable. *Public Service Co. of N.H. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987).  "Courts have largely rejected presumptions of irreparable harm except in the very narrow context of first amendment challenges." 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.); *see id.* ("An exception is that when there is an alleged deprivation of a constitutional right to free speech or freedom of religion, many courts find that no further showing of irreparable injury is necessary. This principle has not (for the most part) and ought not be extended beyond the first amendment context."). Indeed, even "the fact that [a plaintiff] is asserting First Amendment rights does not automatically require a finding of irreparable injury." *Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983).

Novartis has not adequately shown how its constitutional claims translate into real-world irreparable harm. Nor can it; "the essence of the injury here is clearly economic." *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 399 (D.R.I. 2022), *affirmed*, 95 F.4th 38 (1st Cir. 2024). "It is a longstanding axiom that 'economic harm in and of itself is not sufficient to constitute irreparable injury.'" *OfficeMax Inc. v. County Qwick Print, Inc.*, 709 F. Supp. 2d 100, 113 (D. Me. 2010) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 74 (D. Me. 1993)).

No matter how many examples Novartis provides of preferred uses for its cash flow that it may need to forego, *see* ECF 3-1 at 34, that supposed injury boils down to a prediction of "lost

profits" and is thus an "entirely economic" harm that cannot support a finding of irreparable injury. *Ocean State Tactical, LLC*, 646 F. Supp. 3d 368, at 399; *see id.* at 400 (discussing "retail plaintiff['s]" predictions of the "loss of business revenue" and other "economic injuries" from being unable to sell large-capacity magazines and holding that "[n]one of [those] feared consequences constitutes irreparable harm"); *see also Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 86 (1st Cir. 2022) (Appellants attempt to classify their injuries as irreparable by reframing the harm they suffer as the loss of things they can no longer afford. But artful pleading cannot not transform ordinary harm into the basis for an injunction.").

While "even economic harm may be irreparable when it looms so large as to create a credible threat to the existence of the moving party's business[,]" *Semaphore Entertainment Group Sports Corp. v. Gonzalez*, 919 F. Supp. 543, 550 (D.P.R. 1996), that is not the case here; Novartis cleared "USD 11.9 billion" in net income in 2024 and "USD 7.6 billion" in net income in the first half of 2025 alone. https://www.novartis.com/sites/novartis_com/files/q4-2024-media-release-en.pdf; https://www.novartis.com/sites/novartis_com/files/q2-2025-media-release-en.pdf. The sheer scale of these profits eclipses any lost revenue, or any potential penalty Novartis speculates may befall it should it be held liable for any violation of Chapter 288. *See* ECF 3.2 at ¶ 17 ("Novartis will face the threat of millions of dollars lost annually in forced unnecessary discounts as a result of Rhode Island's law."); ECF 3.2 at ¶ 21 ("Rhode Island's law exposes Novartis to ... severe penalties ... of up to $10,000 for each violation under the act. ... Such fines would amount to a staggering loss."). Nor can Novartis establish irreparable harm through the alleged financial or administrative costs of complying with the Act, which are likely to be minimal—and especially given that Novartis has not provided any detail whatsoever as to what those "compliance burdens" would entail. ECF 3-2 at ¶ 17; *see also DiBiase v. SPX Corp*, 872 F.3d 224, 230 (4th Cir. 2017)

("[M]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.").

As for the claim that it will suffer irreparable harm through future proceedings to enforce Chapter 288, Novartis has not shown a concrete risk that such proceedings are imminent. "It is not enough for a plaintiff to assert that [it] 'could be' subjected in the future to the effects of an unlawful policy or illegal conduct by a defendant—the prospect of harm must have an 'immediacy and reality.'" *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004) (quoting *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992) ("In suits such as this one, which the plaintiff intends as a 'first strike' to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury. ... *Ex parte Young* thus speaks of enjoining state officers '*who threaten and are about to commence proceedings*[.]'") (quoting *Ex parte Young*, 209 U.S. 123, 156 (1908)) (emphasis in original).

As previously discussed; to enforce Chapter 288 against a pharmaceutical manufacturer, the Attorney General would first need to file suit in Rhode Island Superior Court. To even bring such proceedings, the Attorney General would first need to have "reason to believe" that the pharmaceutical manufacturer has violated or is about to violate the Act, which does not go into effect until October 1, 2025. R.I. Gen. Laws § 6-13.1-5(a). The DTPA further contemplates that, to obtain concrete evidence to substantiate that reasonable belief, the Attorney General would first issue a civil investigative demand "to ascertain whether" Novartis had committed or was about to commit such a violation. R.I. Gen. Laws § 6-13.1-7(a). Similarly, the Affidavit of Auditor General David Bergantino makes it plain that neither compliance audits nor rulemaking will be immediately forthcoming. Indeed, the annual reports on which an audit would be based are not

due until April next year and no rulemaking process has yet begun. *See* Ex. 1 (Bergantino Aff.) at ¶¶ 4-6.  Accordingly, Novartis can hardly show that state "enforcement actions are imminent[.]" *Morales*, 504 U.S. at 381. And although the burden of defending against state enforcement proceedings or "a state prosecution may sound like serious injury to the ordinary ear, it does not normally in and of itself constitute 'irreparable injury' as a matter of law." *Rushia*, 701 F.2d at 10; *see Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."). Furthermore, federal courts should avoid "determin[ing] the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable." *See Morales*, 504 U.S. at 382.

Novartis also was presumably aware of Chapter 288, which was introduced in January 2025, long before it was signed into law on June 27, 2025.  *See* https://status.rilegislature.gov/. Yet, Novartis inexplicably waited until August 12, 2025—well over a month later—to file its request for injunctive relief. Novartis' lackadaisical approach to seeking injunctive relief "'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Wine & Spirits Retailers, Inc. v. Rhode Island & Providence Plantations*, 364 F. Supp.2d 172, 182 (D.R.I. 2005) (quoting *Jordache Enters., Inc. v. Levi Strauss & Co.,* 841 F. Supp. 506, 521 (S.D.N.Y. 1993)).

### B.  The Balance of the Equities and the Public Interest Heavily Favor Defendants

Finally, the balance of the equities and the public interest weigh heavily in favor of the Defendants and the State of Rhode Island. In this inquiry, the Court must consider the "risk of irreparable harm to the party seeking the injunction, as balanced against the harm to the party

opposing it, and the public policy interests implicated by the issuance (or not) of an injunction." *Harris v. Wall*, 217 F. Supp. 3d 541, 560 (D.R.I. 2016).

As previously discussed, Novartis has failed to show that it would suffer irreparable harm if enforcement of Chapter 288 is not enjoined; conversely, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Col. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). And again, the "mere fact" that Novartis seeks an injunction "on constitutional grounds does not decide [the] balance-of-the-equities inquiry." *Hanson v. D.C.*, 120 F.4th 223, 247 (D.C. Cir. 2024), cert. denied, No. 24-936, 2025 WL 1603612 (U.S. June 6, 2025); *see id.* ("To the contrary, this court must balance the equities of the parties and the public even when a party seeks to restrain the enforcement of an allegedly unconstitutional law.").

Nor is an injunction appropriate in this case to preserve the status quo, which is properly defined as "the last *uncontested* status which preceded the pending controversy." *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893 (1st Cir. 1988) (emphasis in original); *see id.* ("In any event, the status quo doctrine is one of equity, discretion, and common sense, not woodenly to be followed."). For approximately a decade following HRSA's 2010 Guidance, Novartis and other drug manufacturers did not interfere with covered entities' use of multiple contract pharmacies; only in July 2020 (in the midst of the COVID-19 pandemic) did they abruptly change course, spawning the contests and controversies that followed: HRSA's enforcement measures against manufacturers, the *Sanofi* and *Johnsons* cases challenging HRSA's actions, and state legislatures' actions in response to *Sanofi* and *Johnson*'s recognition of the statutory silence in Section 340B. *See McClain*, 95 F.4th at 1139. As such, the Act simply implements the last uncontested status quo.

The public policy interests at stake also heavily favor the State. Rhode Island's General Assembly passed Chapter 288 "to protect a critical discount pharmaceutical program that enables safety-net hospitals, clinics and other health care agencies to provide care to the most vulnerable Rhode Islanders." *Assembly protects 340B discount prescription program* (June 20, 2025), https://www.rilegislature.gov/pressrelease/_layouts/15/ril.pressrelease.inputform/DisplayForm.aspx?List=c8baae31-3c10-431c-8dcd-9dbbe21ce3e9&ID=375735. In the public interest calculus, Rhode Island's "interest in safeguarding its residents is paramount." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). Novartis has not shown—and cannot show—that the public interest would be advanced by an injunction allowing Novartis to continue to engage in the same harmful conduct that both Chapter 288 *and* the 340B program were intended to address.

Despite the glib lip service Novartis pays in its 340B policy to "continu[ing] to support the core mission of the 340B program[,]" the actions that it and other drug manufacturers have taken to throttle covered entities' ability to effectively utilize the 340B program have already had a materially detrimental impact Rhode Island's covered entities and their patients. ECF 1-1 at 2. For example, and as the General Assembly noted after it passed Chapter 288, "Providence Community Health Centers, the state's largest community health center, announced in May [2025] it would lay off 70 staff members due to low Medicaid reimbursements and a $9 million loss in 340B funding over the last three years." *Assembly protects 340B discount prescription program* (June 20, 2025); *see* Ex. 4 (Letter from Merrill Thomas, President & CEO of Providence Community Health Centers) ("Another effect of [drug manufacturers'] restrictions has been the reduction of free medication access for our most at-risk patients, a consequence that directly affects the health and well-being of our community. If these restrictions persist, we will be left with no choice but to make further painful reductions to both staffing and critical services.").

Another Rhode Island covered entity, Comprehensive Community Action Program, Inc., ("CCAP") has suffered ongoing financial harm that "directly affects [its] capacity to provide comprehensive care to underserved patients[;] ... [a]s an example, many patients refuse referrals or testing due to transportation issues and [340B] revenue allows CCAP to offer ride share options to eliminate this barrier and connect these patients to necessary care and potential life saving testing." Ex. 6 (Letter from Chris Mansfield, President & CEO, CCAP); *contra* ECF 3-1 at 35 (arguing that an injunction "would not cause patients to lose access to any drugs or to travel farther to receive their medications; the vast majority of patients do not care—or ever even know—that they 'participate' in the 340B Program"). Due to drug manufacturers' recent, "coordinated effort[s] to restrict" covered entities' ability to participate in the 340B program, many other covered entities in the State faced similar predicaments. Ex. 3 (Letter from Rilwan K. Feyisitan, Jr., President & CEO, EBCAP); *see, e.g.*, Ex. 7 (Letter from Chuck Jones, President and CEO of Thundermist Health Center) ("Thundermist lost more than $7 million in 2024 which contributed to the fiscal crisis we experienced at the end of 2024 and led to 125 people in Rhode Island losing their jobs. … Thundermist and our patients cannot wait. … [I]f [the Act] does not pass, we will continue to struggle to meet the needs of the most vulnerable residents of the State."); Ex. 1 (Letter from Christine Collins, SVP, Pharmacy and PeriOp Services, Brown University Health) ("[P]harmaceutical manufacturers have imposed unlawful restrictions in the contract pharmacy space … caus[ing] increased financial losses to a degree that safety-net providers are simply not positioned to continue absorbing without risking negative impacts on patient care and services. Current restrictions result in approximately an immediate $20 million loss annually to Brown University Health[.] … All of these losses result in direct adverse impacts to patient care.").

The General Assembly passed Chapter 288 as a direct response to the damage that drug manufacturers' recent 340B policies have already inflicted on Rhode Island; as a result, Novartis— which, in its Motion, has hardly troubled to address the real-world circumstances facing Rhode Island's covered entities—cannot seriously represent to this Court that an injunction against Chapter 288's enforcement would serve the public interest and cause "no harm to Defendant[s]" and the Rhode Islanders they represent. ECF 3-1 at 35; *see id.* ("Nor will injunctive relief cause any harm to patients, who do not typically benefit from 340B discounts.").  For covered entities, and thus for the disadvantaged patients and communities those safety-net hospitals serve, the loss of several millions of dollars a year in 340B discount pricing can quite literally mean the difference between life and death; for a Fortune 500 pharmaceutical company like Novartis, sums like that amount to rounding errors on its balance sheet. *See* https://www.novartis.com/sites/novartis_com/files/q2-2025-media-release-en.pdf ("Basel, July 17, 2025 – Commenting on Q2 2025 results, Vas Narasimhan, CEO of Novartis, said: 'Novartis delivered another strong quarter, with double-digit sales and core operating income growth. … Our robust balance sheet and confidence in our mid and long-term growth enable us to initiate an up-to USD 10 billion share buyback as part of our commitment to balanced capital allocation.'").

## CONCLUSION

For all these reasons, Novartis fails to establish that the "extraordinary and drastic remedy" of enjoining enforcement of a newly enacted state law aimed at protecting public health and safety is warranted. *See Peoples Fed. Sav. Bank*, 672 F.3d at 8–9. Consistent with the reasoning of multiple other federal courts that have rejected substantively identical challenges to similar state laws, the Court should deny Novartis's motion for a preliminary injunction.

Respectfully Submitted,

Defendants,

**PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island; DAVID A. BERGANTINO, in his official capacity as Auditor General of the State of Rhode Island**

**By:**

**PETER F. NERONHA**
**ATTORNEY GENERAL**

*/s/ Lionel Dutreix*
Lionel Dutreix (#10728)
James J. Arguin (#10972)
Jeff Kidd (#10416)
Lee Staley (#11049)
R.I. Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Facsimile: (401) 222-3016
ldutreix@riag.ri.gov

## **CERTIFICATION**

I, the undersigned, hereby certify that I have filed the *Objection to Plaintiff's Motion for Preliminary Injunction* within via the ECF System and that it is available for viewing and downloading on this 9th day of September, 2025.

*/s/Abigail Clark*