## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| *Plaintiff*, | Case No. 25-cv-387 |
| *v.* | Judge John J. McConnell, Jr. |
| PETER F. NERONHA, in his official capacity as ATTORNEY GENERAL OF RHODE ISLAND, | |
| *Defendant*. | |

## BRIEF OF *AMICI CURIAE* THE AMERICAN HOSPITAL ASSOCIATION, 340B HEALTH, THE HOSPITAL ASSOCIATION OF RHODE ISLAND, AND THE AMERICAN SOCIETY OF HEALTH-SYSTEM PHARMACISTS <u>IN SUPPORT OF DEFENDANT</u>

Nicholas J. Hemond, Esq. (8782)
DarrowEverett LLP
1 Turks Head Place, Suite 1200
Providence, RI 02903
Tel: (401) 453-1200
Fax: (401)453-1201
nhemond@darroweverett.com

William B. Schultz*
Margaret M. Dotzel*
Alyssa M. Howard*
Courtney Christensen*
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
wschultz@zuckerman.com
mdotzel@zuckerman.com
ahoward@zuckerman.com
cchristensen@zuckerman.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

INTEREST OF *AMICI CURIAE* ....................................................................................... 1

INTRODUCTION ................................................................................................................ 2

FACTUAL BACKGROUND ON THE IMPORTANCE OF CONTRACT PHARMACY
    ARRANGEMENTS IN RHODE ISLAND ................................................................. 5

ARGUMENT ....................................................................................................................... 8

I.     NOVARTIS IS NOT LIKELY TO SUCCEED ON THE MERITS. .................................... 8

    A.   Novartis's Supremacy Clause Claims Fail Because Chapter 288 Is Not Preempted.......... 8

        1.    Congress did not create or occupy a field when it established the
            340B program. ................................................................................................. 9

        2.    Chapter 288 does not conflict with the 340B statute. ...........................................11

            a.    Chapter 288 does not expand the scope of the 340B Program's f
                ederal requirements because it regulates delivery, not price. ...................... 12

            b.    Chapter 288 does not interfere with 340B's enforcement regime. .............. 16

            c.    Chapter 288 Does Not Interfere with ADR and Audit Processes. ............... 18

    B.   Chapter 288 Is Not an Impermissible Extraterritorial Regulation. .................................. 22

II.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT DENYING
     AN INJUNCTION. ........................................................................................................ 25

CONCLUSION.................................................................................................................... 26

## TABLE OF AUTHORITIES

**CASES**

*AbbVie Inc. v. Fitch*,
  No. 1:24-cv-184-HSO-BWR, 2024 WL WL 3503965 (S.D. Miss. July 22, 2024) ............. 4, 14

*AbbVie v. Fitch*,
  2025 WL 2630900 (5th Cir. September 12, 2025) ......................................................... *passim*

*Abbvie v. Skremetti*,
  2025 WL 1805271 (M.D. Tenn. June 30, 2025) ........................................................ 4

*Am. Hosp. Ass'n v. Becerra*,
  596 U.S. 724 (2022) .................................................................................... 5, 25

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................. 8

*Ass'n To Pres. & Protect Loc. Livelihoods v. Sidman*,
  2025 WL 2304915, Nos. 24-1317, 24-1318, 24-1385 (1st Cir. Aug. 11, 2025 ................. 22, 23

*Astra USA, Inc. v. Santa Clara County*,
  563 U.S. 110 (2011) .................................................................................. 10

*AstraZeneca Pharms. LP v. Bailey*,
  No. 2:24-cv-4143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) .................................... 4

*AstraZeneca Pharms. LP v. Fitch*,
  No. 1:24-cv-196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024) ....................... 4, 9

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
  520 U.S. 564 (1997) .................................................................................. 13

*Capron v. Office of Attorney General of Massachusetts*,
  944 F.3d 9 (1st Cir. 2019) ........................................................................ 9

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011) ..............................................................................11, 17

*Chinatown Neighborhood Ass'n v. Harris*,
  794 F.3d 1136 (9th Cir. 2015) .................................................................. 12

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992) .................................................................................. 8

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002) .................................................................................. 8

*Conway v. United States*,
    997 F.3d 1198 (Fed. Cir. 2021) ............................................. 12

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ............................................................ 8

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987) ............................................................ 12

*Dep't of Tax'n & Fin. of New York v. Milhelm Attea & Bros.*,
    512 U.S. 61 (1994) ............................................................ 21

*Ellenwood v. Exxon Shipping Co.*,
    984 F.2d 1270 (1st Cir. 1993 .............................................. 9

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ............................................................ 11

*Iowa, Chi. & E. R.R. Corp. v. Washington Cnty.*,
    384 F.3d 557 (8th Cir. 2004) ............................................. 12

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) .......................................................... 12

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ......................................................... 5, 8

*Murphy v. NCAA*,
    584 U.S. 453 (2018) .......................................................... 9

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
    413 U.S. 405 (1973) ......................................................... 9, 10

*National Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) .................................................... 22, 23, 24

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................... 25

*Novartis Pharms. Corp. v. Bailey*,
    No. 2:24-cv-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025)) ............. 4, 9

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) ..................................... 3, 10, 13

*Novartis v. Bailey*,
    2025 WL 595189 (Missouri) ................................................ 22

*Novartis Pharms. Corp. v. Fitch*,
   738 F. Supp. 3d 737 (S.D. Miss. 2024) ................................................................ 4, 9

*Novartis v. Kennedy*,
   25-5177 (D.C. Cir.) ...................................................................................................... 20

*Or. Health & Sci. Univ. v. Engels*,
   2025 WL 1707630 (D.D.C. June 17, 2025) .............................................................. 19

*Paul v. Monts*,
   906 F.2d 1468 (10th Cir. 1990) ................................................................................ 13

*Pharm. Rsch. & Mfrs. of Am. v. Concannon*,
   249 F.3d 66 (1st Cir. 2001) ....................................................................................... 17

*PhRMA v. Fitch*,
   No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024) .................... 14, 22

*PhRMA v. McClain*,
   95 F.4th 1136 (8th Cir.) ..................................................................................... *passim*

*PhRMA v. Murrill*,
   Nos. 6:23-cv-00997, 6:23-cv-01042, 6:23-cv-01307, 2024 WL 4361597
   (W.D. La. Sept. 30, 2024) ............................................................................. 4, 10, 11, 13

*PhRMA v. Walsh*,
   538 U.S. 644 (2003) ..................................................................................................... 8

*Pike v. Bruce*,
   397 U.S. 137 (1970) ................................................................................................... 24

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*,
   699 F.3d 962 (7th Cir. 2011) .................................................................................... 12

*R.J. Reynolds Tobacco Co. v. Durham County*,
   479 U.S. 130 (1986) ................................................................................................... 10

*Rice v. Norman Williams Co.*,
   458 U.S. 654 (1982) ................................................................................................... 21

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*,
   58 F.4th 696 (3d Cir. 2023) ......................................................................................... 3

*Schafer v. Am. Cyanamid Co.*,
   20 F.3d 1 (1st Cir. 1994) ............................................................................................ 12

*Tafflin v. Levitt*,
   493 U.S. 455 (1990) ................................................................................................... 17

*U.S. v. Salerno*,
  481 U.S. 739 (1987)...............................................................................21

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008)...............................................................................21

*Wyeth v. Levine*,
  555 U.S. 555 (2009).................................................................................8

**STATUTES**

R.I. Gen. Laws Ann. § 6-48.1-3.................................................................17

R.I. Gen. Laws Ann. § 16-8-10..................................................................17

42 U.S.C. § 256b................................................................................18, 19

**OTHER AUTHORITIES**

340B Health,
  *Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals: More Expected as
  Growing Number Impose or Tighten 340B Restrictions*.............................7

340B Health,
  *Restrictions on 340B Contract Pharmacy Increase Drug Company Profits but Lead
  to Lost Savings, Patient Harm, and Substantial Burden for Safety-Net Hospitals*.............6, 7

Adam J. Fein,
  Drug Channels Institute, *Insurers + PBMs + Specialty Pharmacies + Providers:
  Will Vertical Consolidation Disrupt Drug Channels in 2020?* (Dec. 12, 2019)...................7

Adam J. Fein,
  Drug Channels Institute, *The 2022 Economic Report on U.S. Pharmacies and
  Pharmacy Benefit Managers* (Mar. 2022).................................................7

Alexander Castro,
  *Rhode Island House lights up to protect federal drug discount program from
  Big Pharma,* Rhode Island Current (June 20, 2025, 5:45 AM).......................5

Alexander Castro,
  *Who's Afraid of Big Pharma? Not the R.I. House's lone independent – Rep. John
  D. Brien works both sides of the aisle to build support for bill to protect discount
  drug pricing program,* Rhode Island Current (May 1, 2025, 3:54 PM)....................5

Chapter 288......................................................................................*passim*

Christoper Shea,
*Behind the Ad Blitz to Get R.I. Lawmakers to Reject Bills Protecting Patient
Access to Discount meds*, Rhode Island Current (July 14, 2025 5:50 AM) ............................... 5

HRSA,
*HRSA Announces Application Process for the 340B Rebate Model Pilot Program
and Request for Public Comment* ..................................................................................... 20

Letter from Dep't of Health & Hum. Servs., Health Resources & Servs. Admin.
Administrator C. Johnson to AbbVie, Inc. Vice Pres., U.S. Market Access C.
Compisi (Oct. 17, 2022) ..................................................................................................... 2

Medicare Drug Price Negotiation Program: Final Guidance, Implementation of
Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Y
ear 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027 ......... 20

*Novartis Annual Report 2024*,
Novartis Global Communications (Jan. 31, 2024 .................................................................. 25

Specialty Drug Coverage and Reimbursement in Medicaid, HHS Office of
Inspector General ............................................................................................................. 7

U.S. Gov't Accountability Office, *Drug Pricing Program: HHS Uses Multiple
Mechanisms to Help Ensure Compliance With 340B Requirements* at 11 (Dec. 2020) ............ 20

**REGULATIONS**

HRSA,
*Final Rule, 340B Drug Pricing Program; ADR Regulation*,
89 Fed. Reg. 28,643 (Apr. 19, 2024) .......................................................................... 12, 18, 19

HRSA,
*Manufacturer Audit Guidelines and Dispute Resolution Process*,
61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996) ......................................................................... 19

## INTEREST OF *AMICI CURIAE*

The *amici curiae* filing this brief are: the American Hospital Association, 340B Health, the Hospital Association of Rhode Island, and the American Society of Health System Pharmacists (collectively, "*Amici*"). *Amici* and their members are committed to improving the health of the communities they serve through the delivery of high-quality, efficient, and accessible health care. The discounts provided by the 340B program are essential to achieving this goal. *Amici* therefore have a strong interest in the success of Rhode Island's legislative efforts to protect the 340B program.

The **American Hospital Association** (AHA) represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations nationwide. AHA members are committed to helping ensure that healthcare is available to and affordable for all Americans. AHA promotes the interests of its members by participating as *amicus curiae* in cases with important and far-ranging consequences, including cases related to the 340B program.

**340B Health** is a national, not-for-profit organization founded in 1993 to advocate for 340B hospitals—a vital part of the nation's healthcare safety net. 340B Health represents over 1,600 public and private nonprofit hospitals and health systems participating in the 340B program.

The **Hospital Association of Rhode Island** (**HARI**) is a statewide organization that assists member hospitals in effectively meeting the health care needs of Rhode Island through advocacy, representation, education, and services. HARI ensures that the needs and perspective of members are heard and addressed in state and national health policy development, legislative and regulatory debates, and system transformation matters. Together with its members, HARI works to ensure that all Rhode Islanders receive comprehensive, high-quality care.

The **American Society of Health-System Pharmacists** (ASHP) is the largest association of pharmacy professionals in the United States. ASHP advocates and supports the professional

1

practice of pharmacists in hospitals, health systems, ambulatory care clinics, and other settings spanning the full spectrum of medication use. For over 80 years, ASHP has championed innovation in pharmacy practice, advanced education, and professional development, and has served as a steadfast advocate for members and patients.

## INTRODUCTION

Five years ago, nearly 40 drug companies, including Plaintiff Novartis Pharmaceuticals Corporation ("Novartis"), broke with decades of precedent and suddenly refused to ship drugs purchased by 340B hospitals to contract pharmacies. The contract pharmacy arrangements that drug companies like Novartis honored for almost thirty years helped sustain hospitals and their patients. The federal government determined that this was unlawful and sought to require manufacturers to continue delivering these drugs to contract pharmacies on the same terms to which they delivered those drugs to 340B in-house hospital pharmacies.[1]

"Section 340B, 42 U.S.C. § 256b, requires pharmaceutical manufacturers to offer discounted drugs to covered entities for purchase. It is *silent* as to whether manufacturers must deliver those drugs to contract pharmacies." Br. for Appellee Novartis Pharms. Corp. at 4, *Novartis Pharms. Corp. v. Johnson*, No. 21-5299, 2022 WL 2072941 (D.C. Cir. June 8, 2022).[2] Novartis submitted these exact words to the United States Court of Appeals for the D.C. Circuit only three years ago when faced with the federal government's attempt to penalize the company's harsh

---

[1]    *See, e.g.*, Letter from Dep't of Health & Hum. Servs., Health Resources & Servs. Admin. Administrator C. Johnson to AbbVie, Inc. Vice Pres., U.S. Market Access C. Compisi (Oct. 17, 2022), https://www.hrsa.gov/sites/default/files/hrsa/opa/programintegrity/hrsa-letter-abbvie-covered-entities.pdf.

[2]    *E.g.*, AstraZeneca Opening Br. at 4, *AstraZeneca Pharms. L.P. v. U.S. Dep't of Health & Hum. Servs.*, No. 22-01676 (3d Cir. July 21, 2022) ("Section 340B is 'silent' on the role of contract pharmacies under the program. That silence means the statute does not impose contract pharmacy obligations on manufacturers.").

restrictions on contract pharmacy arrangements. In lawsuit after lawsuit, at no point did Novartis or its sister drug companies describe their contract pharmacy policies as price restrictions. Instead, they insisted that their policies were permissible because (1) they were *delivery* restrictions, and (2) the 340B statute had absolutely nothing to say about *delivery*. Novartis' arguments have carried the day. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024) (Section 340B is "silent about delivery conditions"); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 703 (3d Cir. 2023) (Section 340B's "text is silent about delivery").

Like many other states, Rhode Island has filled the federal statutory gap that Novartis spent years fighting for by requiring drug companies to ship drugs to 340B entities' contract pharmacies on the same terms as they ship those drugs to 340B entities' in-house pharmacies. Faced with the drug industry's unprecedented assault on Rhode Island's health care safety net and the acknowledged gap in federal law, the Rhode Island legislature enacted Chapter 288 of the 2025 Public Laws with tri-partisan support. Chapter 288 does only what Novartis and the federal courts said the *federal* law did not do: regulate the delivery of 340B drugs. Chapter 288 § 5-19.3-5(a) states that "[a] manufacturer. . . shall not deny, restrict, prohibit, or otherwise interfere with . . . the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B covered entity, and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by [HHS]." Essentially, this provision prohibits manufacturers from preventing covered entities in Rhode Island from being able to contract with outside pharmacies to provide their patients 340B discounted drugs.

Now comes the whiplash. Banking its prior win, Novartis claims in its Complaint that Chapter 288 "is a state drug-pricing statute" whose enforceability "is solely an issue of price, not delivery." Compl., ECF No. 1 ¶ 13. Even though Rhode Island has legislated in precisely the area

that Novartis successfully insisted was *not* addressed under federal law—the delivery of 340B drugs—the company has reversed course in this litigation to claim that Chapter 288 is preempted by federal law. And as part of that about-face, Novartis now insists that states cannot fill the federal statutory gap that drug companies (including Novartis) spent years fighting for.

This history is important—and not just because it exposes the hypocrisy in Novartis's legal position. It also serves as a reminder of *why* Rhode Island chose to step into the federal statutory void. Put simply, Rhode Island acted because Novartis, its sister drug companies, and the federal courts all but invited it to do so.

The primary issue here is whether Rhode Island, exercising its historic police power over health and safety, can fill the gap in the federal 340B statute and regulate the delivery of 340B drugs (purchased by 340B hospitals) to contract pharmacies. It can. Numerous district courts have said so,[3] as has the Eighth and Fifth Circuits (the only Court of Appeals decision to date addressing a drug industry challenge to a state contract pharmacy statute). *See PhRMA v. McClain*, 95 F.4th 1136, 1143–45 (8th Cir.), *cert. denied*, 145 S. Ct. 768 (2024); *AbbVie v. Fitch*, 2025 WL 2630900 at *6-7 (5th Cir. September 12, 2025); *Abbvie v. Skremetti*, 2025 WL 1805271 at *13 (M.D. Tenn. June 30, 2025) (collecting cases).

At bottom, Novartis's attack on Chapter 288 is really an attack on federalism itself. Novartis tries to transform an acknowledged federal statutory silence into a reason to displace "the historic primacy of state regulation of matters of health and safety." *Medtronic, Inc. v. Lohr*, 518

---

[3]    *See Abbvie v. Skremetti*, 2025 WL 1805271, at *16 (M.D. Tenn. June 30, 2025); *AstraZeneca Pharms. LP v. Bailey*, No. 2:24-cv-4143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025); *Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025); *AstraZeneca Pharms. LP v. Fitch*, No. 1:24-cv-196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024); *PhRMA v. Murrill*, No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024); *AbbVie Inc. v. Fitch*, No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024).

U.S. 470, 485 (1996). That is not the law, and each of Novartis's claims seeking to undermine Rhode Island's lawful exercise of traditional state authority should be rejected.

## FACTUAL BACKGROUND ON THE IMPORTANCE OF CONTRACT PHARMACY ARRANGEMENTS IN RHODE ISLAND

Novartis spends page after page maligning the 340B program and the covered entities that rely on it. Needless to say, it is in its financial interest to do so.[4] For Novartis, every 340B drug it refuses to deliver to a Rhode Island contract pharmacy is an additional profit line on its balance sheets.

But this is not how the Supreme Court has viewed the program. As Justice Kavanaugh wrote for a unanimous Supreme Court just a few years ago: "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022). And more significant here, the Rhode Island legislature, with an unbiased interest in protecting its citizens, hospitals, and pharmacies, shares the Supreme Court's view of the Program.[5] When enacting Chapter 288, the Rhode Island legislature rejected the drug companies' efforts to denigrate the 340B program and those who rely on it.

---

[4]    Christoper Shea, *Behind the Ad Blitz to Get R.I. Lawmakers to Reject Bills Protecting Patient Access to Discount meds*, Rhode Island Current (July 14, 2025 5:50 AM) https://rhodeislandcurrent.com/2025/07/14/behind-ad-blitz-to-get-r-i-lawmakers-to-reject-bills-protecting-patient-access-to-discount-meds/

[5]    Alexander Castro, *Who's Afraid of Big Pharma? Not the R.I. House's lone independent – Rep. John D. Brien works both sides of the aisle to build support for bill to protect discount drug pricing program,* Rhode Island Current (May 1, 2025, 3:54 PM), https://rhodeislandcurrent.com/2025/05/01/whos-afraid-of-big-pharma-not-the-r-i-houses-lone-independent/; Alexander Castro, *Rhode Island House lights up to protect federal drug discount program from Big Pharma,* Rhode Island Current (June 20, 2025, 5:45 AM), https://rhodeislandcurrent.com/2025/06/20/rhode-island-house-lights-up-to-protect-federal-drug-discount-program-from-big-pharma/.

For good reason. The contract pharmacy arrangements that Novartis honored for almost thirty years helped sustain hospitals and their patients. Nationwide, a quarter of hospitals' 340B benefit comes from drugs dispensed at contract pharmacies.[6] The drug industry's efforts to stop 340B hospitals from relying on contract pharmacies has hurt 340B hospitals and adversely affected their ability to serve Rhode Island's most vulnerable patients.

For example, Rhode Island Hospital (RIH) uses its 340B savings to provide free naloxone to patients for opioid overdose management and to operate The Burn Center at RIH, which is the only verified and accredited burn center in the state. It further uses its 340B savings to deliver comprehensive mental health and wellness care for adults, adolescents, and pediatric patients, provide oncology care at five locations throughout the state, allowing patients to receive care closer to home, and offer advanced care services as the only Joint Commission certified Advanced Comprehensive Stroke Cetner in the state. Furthermore, in 2023, RIH provided $77 million in uncompensated medical care and $216 million in charity care and community benefits.

Care New England Health System uses its 340B savings to provide care for low-income and otherwise vulnerable patients. For instance, Care New England provides uninsured and low-income patients with prescriptions and medical services free of charge or at a significantly reduced price. 340B savings are also used to offer a range of services provided by Kent Hospital and Women and Infants Hospital, including emergency room services, intensive care units, and general medicine services. On average, it provides $13.3 million in uncompensated care and $5.2 million in charity care annually.

---

[6]    340B Health, *Restrictions on 340B Contract Pharmacy Increase Drug Company Profits but Lead to Lost Savings, Patient Harm, and Substantial Burden for Safety-Net Hospitals* 8, https://www.340bhealth.org/files/Contract_Pharmacy_Survey_Report_March_2 023.pdf.

Contract pharmacy arrangements are especially important because fewer than half of 340B hospitals operate in-house pharmacies.[7] Even fewer—only one in five 340B hospitals—have in-house "specialty" pharmacies, which many insurers require for the dispensing of "specialty" drugs. These drugs are typically used to treat chronic, serious, or life-threatening conditions, and are generally priced much higher than non-specialty drugs.[8] Thus, 340B hospitals typically *must* contract with at least one specialty pharmacy outside of its in-house pharmacy.[9] Denied these and other 340B savings associated with contract pharmacies, 340B hospitals have been forced to cut critical programs and services.[10]

The drug companies' assault on contract pharmacy relationships drastically reduces the savings that Rhode Island's 340B hospitals rely on and jeopardizes the hospitals' ability to provide valuable services to their patients.

---

[7]    340B Health, *Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals: More Expected as Growing Number Impose or Tighten 340B Restrictions* 2, https://www.340bhealth.org/files/Contract_Pharmacy_Financial_Impact_Report_July_2023.pdf.

[8]    Adam J. Fein, Drug Channels Institute, *Insurers + PBMs + Specialty Pharmacies + Providers: Will Vertical Consolidation Disrupt Drug Channels in 2020?* (Dec. 12, 2019), https://www.drugchannels.net/2019/12/insurers-pbms-specialty-pharmacies.html; Specialty Drug Coverage and Reimbursement in Medicaid, HHS Office of Inspector General, https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000255.asp.

[9]    340B Health, *supra* note 6, at 7 (citing Adam J. Fein, Drug Channels Institute, *The 2022 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers* (Mar. 2022). https://drugchannelsinstitute.com/files/2022-PharmacyPBM-DCI-Overview.pdf.

[10]    *Id.*, 340B Health at 2, 5.

## ARGUMENT

## I.    NOVARTIS IS NOT LIKELY TO SUCCEED ON THE MERITS.

### A.    Novartis's Supremacy Clause Claims Fail Because Chapter 288 Is Not Preempted.

"The purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks and citation omitted). In every preemption case, "and particularly in those in which Congress has 'legislated in a field which the States have traditionally occupied,'" *Lohr*, 518 U.S. at 485, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 432 (2002); *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). That is "particularly" true in "matters of health," given "the historic primacy of state regulation" in that area. *Lohr*, 518 U.S. at 485.

Novartis has the burden to show that Congress intended to preempt Chapter 288. *See PhRMA v. Walsh*, 538 U.S. 644, 661–62 (2003). Unlike state laws that intrude into uniquely federal areas such as immigration and foreign relations,[11] Chapter 288 is presumptively *not* preempted. Novartis therefore must demonstrate Congress's "clear and manifest purpose" to supersede Rhode Island's historic authority to regulate in the public health arena, *Lohr*, 518 U.S. at 485, which it cannot do. This Court should reject both of Novartis's preemption theories—just as the Eighth and

---

[11]    *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

Fifth Circuits and numerous district courts have done with preemption challenges to substantially similar state contract pharmacy statutes.[12]

### 1. *Congress did not create or occupy a field when it established the 340B program.*

Novartis's field-preemption theory, *see* Pl.'s Brief In Support of Mot. for Prelim. Inj. ("Pl.'s MPI"), ECF No. 3-1, at 13-17, both misapplies the relevant standard and mischaracterizes the 340B statute. Field preemption occurs only in narrow circumstances, "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (citation omitted). Indeed, "[t]he subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973). Thus, both the Supreme Court and the Frist Circuit have "reject[ed] . . . the contention that pre-emption is to be inferred merely from the comprehensive character" of a federal statute. *Id.; see Capron v. Office of Attorney General of Massachusetts,* 944 F.3d 9, 24 (1st Cir. 2019) ("The plaintiffs emphasize that the DOS regulations that establish the Au Pair Program are detailed and comprehensive. But, we do not see why, especially in light of the reasoning in *DeCanas*, that fact alone justifies the inference that the federal government intended the Au Pair Program to preempt a field that would encompass the state law measures at issue."); *Ellenwood v. Exxon Shipping Co*., 984 F.2d 1270, 1275 (1st Cir. 1993) ("The fact that Congress has implemented an extensive regulatory scheme in a particular area does not lead necessarily to the

---

[12]  *See PhRMA v. McClain*, 95 F.4th at 1143–45; *AbbVie v. Fitch*, 2025 WL 2630900 at *6-7 (5th Cir. September 12, 2025); *see also, e.g.*, *Novartis v. Fitch*, 738 F. Supp. 3d at 747; *AstraZeneca v. Fitch*, 2024 WL 5345507, at *4–9; *Novartis v. Bailey*, 2025 WL 489881, at *2–4.

conclusion that it intended to displace parallel state remedies."); *see also AbbVie v. Fitch*, 2025 WL 2630900 at *6 (5th Cir. September 12, 2025) ("Field preemption 'should not be inferred, however, merely because the agency's regulations are comprehensive.'" (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149 (1986)) (upholding analogous state statute against a preemption challenge). If it did, every time Congress created a federal program, it would create an exclusively federal field into which states cannot intrude. But that is not the law. *Dublino*, 413 U.S. at 415. And with the 340B program, "a detailed statutory scheme was both likely and appropriate, completely apart from any questions of pre-emptive intent." *Id.*

Novartis's field-preemption theory relies entirely on the (supposed) comprehensiveness of the 340B statute and its dispute-resolution system.[13] *See* Pl.'s MPI at 13-17; Compl. ¶ 87 (alleging that the "340B statute sets up a pervasive and carefully integrated pricing scheme"). But Novartis is wrong to characterize regulation of the 340B statute as "pervasive." Pl.'s MPI at 16. "Section 340B does not 'provide a full set of standards governing' discounted drugs for needy patients… Notably, it regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution." *AbbVie v. Fitch*, 2025 WL 2630900 at *6 (5th Cir. September 12, 2025) (collecting sources). Novartis should know this: Novartis and many other drug companies vehemently argued, and convinced federal courts, that the 340B statute is "silent about delivery conditions." *Novartis v. Johnson*, 102 F.4th at 460. And for precisely that reason, the Eighth Circuit and several district

---

[13]  Novartis relies on *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), which does not address preemption. The Western District of Louisiana has persuasively explained why *Astra* is inapposite. *PhRMA v. Murrill*, Nos. 6:23-cv-00997, 6:23-cv-01042, 6:23-cv-01307, 2024 WL 4361597, at *7 (W.D. La. Sept. 30, 2024). Put simply, the *Astra* Court's hesitance to allow "potentially thousands of" private parties to sue to correct "errors in manufacturers' price calculations" has no bearing on whether *States* can fill gaps in federal law about the delivery of 340B drugs. *Astra*, 563 U.S. at 114. Indeed, the only mention of preemption in *Astra* is in a footnote concerning a different federal program, the Medicaid Drug Rebate Program. *Id.* at 120 n.5.

courts have rejected field preemption challenges to a state contract pharmacy statute substantially similar to Chapter 288. *See, e.g., PhRMA v. McClain*, 95 F.4th at 1143 ("Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field."); *AbbVie v. Fitch*, 2025 WL 2630900 at *6-7 (5th Cir. September 12, 2025); *PhRMA v. Murrill*, Nos. 6:23-CV-00997, 6:23-CV-01042, 6:23-CV-01307, 2024 WL 4361597, at *8 (W.D. La. Sept. 30, 2024) ("Section 340B is silent with respect to contract pharmacies, and Plaintiffs have not pointed to any provisions in the statutes governing the Medicare or Medicaid programs that address [contract] pharmacies"). This Court should follow the Eighth and Fifth Circuits' reasoning and reject Novartis's field preemption theory.

In addition, and as detailed below, HRSA's exclusive authority to resolve certain disputes arising under the 340B statute itself is no reason to doubt Rhode Island's authority to impose and enforce *its own* requirements—which, as Novartis repeatedly emphasizes, are *different* from the requirements of the 340B statute. *See, e.g.*, Pl.'s MPI at 21-24.

### 2. *Chapter 288 does not conflict with the 340B statute.*

A proper conflict preemption analysis requires parties to demonstrate that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). This is a "high threshold," *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011), and Novartis comes nowhere close to meeting it. Although framed as a separate cause of action, "[i]n arguing conflict preemption, [Novartis] re-urge[s] many of the same arguments [it] urge[d] with respect to [its] field preemption claims." *PhRMA v. Murrill*, 2024 WL 4361597, at *8. The Court should also follow the Eighth and Fifth Circuits and a growing chorus of district courts in rejecting Novartis's conflict preemption theories. *See, e.g., PhRMA v. McClain*, 95 F.4th at 1144–45; *AbbVie v. Fitch*, 2025 WL 2630900 at *7-8 (5th Cir. September 12, 2025).

The 340B statute was passed to help covered healthcare providers "reach[] more eligible patients and provid[e] more comprehensive services." HRSA, *Final Rule, 340B Drug Pricing Program; ADR Regulation*, 89 Fed. Reg. 28,643, 28,643 (Apr. 19, 2024) (hereinafter, "ADR Rule"). Rhode Island's Chapter 288, in turn, enables 340B providers to continue to benefit from contract pharmacy arrangements and thereby offer expanded healthcare to their patients. Thus, not only does Chapter 288 not stand as an obstacle to the purposes of the 340B statute, "it does the opposite: [Chapter 288] assists in fulfilling the purpose of 340B." *PhRMA v. McClain*, 95 F.4th at 1144–45; *see also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 83 (1987) (rejecting conflict preemption challenge because the state's additional requirements "further[ed] the federal policy" embodied by the federal statute).

### a. Chapter 288 does not expand the scope of the 340B Program's federal requirements because it regulates delivery, not price.

Novartis tries to transform the federal statute's silence about delivery into an intentional congressional decision to preempt state regulation. That is not the law in this Circuit. *Schafer v. Am. Cyanamid Co.,* 20 F.3d 1, 6 (1st Cir. 1994) ("Pre-emption law, for example, cautions us against finding that a congressional act pre-empts a state law through silence." (citing *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)). Nor is it the law elsewhere.[14]

---

[14]    *See, e.g., Conway v. United States*, 997 F.3d 1198, 1211 (Fed. Cir. 2021) ("Congress' silence is powerful evidence that Congress did not intend to preempt state law fixing creditors' rights during insolvency." (citation and internal quotation marks omitted)); *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1143 (9th Cir. 2015) ("Silence, without more, does not preempt— 'a clear and manifest purpose of pre-emption is always required.'"); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 985 (7th Cir. 2011) ("As we have noted, congressional and regulatory silence usually *defeats* a claim of preemption, not the other way around.") (emphasis in the original); *Iowa, Chi. & E. R.R. Corp. v. Washington Cnty.*, 384 F.3d 557, 561 (8th Cir. 2004) ("ICCTA did not address these problems. Its silence cannot reflect the requisite clear and manifest purpose of Congress to preempt traditional state regulation of public roads and bridges that Congress has encouraged in numerous other statutes. (quotation marks omitted)); *Paul v. Monts,* 906 F.2d 1468, 1475 n.8 (10th Cir. 1990) ("Congressional silence will not be presumed to mandate preemption. On the contrary, it will not be presumed that a federal

The crux of Novartis's attack on Chapter 288 is that it expands the scope of the federal 340B Drug Pricing Program by allegedly requiring Novartis to offer "discounted pricing in situations where the federal 340B statue does not" thus purportedly imposing more onerous conditions than required by federal law. Comp. ¶ 158; *see* Pl's MPI at 1, 18-19. However, this argument is "simply incorrect." *AbbVie v. Fitch*, 24-60375 at \*7 (5th Cir. September 12, 2025) (rejecting the same argument against an analogous state law).

Chapter 288 does not expand *federal* requirements; it sets forth Rhode Island's own requirements regarding drug delivery, with their own consequences. There are no federal requirements regarding delivery. *Novartis*, 102 F.4th at 461.The federal 340B statute dictates what price manufacturers must offer (the "ceiling price") and to whom (340B "covered entities"). Chapter 288 does not alter either requirement. As the Fifth Circuit correctly realized when addressing an analogous state law:

> By its plain text, H.B. 728 requires drug manufacturers to give custody of discounted drugs to contract pharmacies only insofar as they have partnered with covered entities to distribute the drugs to patients. It does not compel manufacturers to "offer" discounted drugs to contact pharmacies in the way that Section 340B compels them to "offer" these drugs to covered entities."

*AbbVie v. Fitch*, 24-60375 at \*7 (5th Cir. September 12, 2025). Simply put: "[Chapter 288] does not set or enforce discount pricing." *PhRMA v. McClain*, 95 F.4th at 1145; *see also PhRMA v. Murrill*, 2024 WL 4361597, at \*9 ("[D]iscounts are set by the federal government, not the State of Louisiana or Act 358. Act 358 addresses only contract pharmacies, a matter that is not addressed in Section 340B.").

---

statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intent to do so.") (quotation marks omitted); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 616 (1997) (Thomas, J., dissenting) ("Even where Congress has legislated in an area subject to its authority, our pre-emption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as preempting state law.").

Rather, Chapter 288 bars drug companies from discriminating against Rhode Island 340B hospitals based on their chosen delivery location. The *only* thing that Chapter 288 does is let 340B hospitals within Rhode Island's borders determine the shipping address for drugs they have purchased. In so doing, it simply requires drug companies to allow covered entities to be treated like any other purchaser of those drugs, with the same freedom to select where their drugs will be delivered. *See, e.g.*, *PhRMA v. Fitch*, No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365, at *11 (S.D. Miss. July 1, 2024) ("While federal law comprehensively regulates the determination of ceiling prices on Section 340B drugs . . . , Congress has not precluded Mississippi from enacting its own policy governing delivery of Section 340B drugs.").

Nor should the Court be persuaded by Novartis's mischaracterization of the "replenishment model." *See* Pl's MPI at 19. The "replenishment model" is an inventory management system that tracks patient and drug data to ensure that 340B hospitals only pay the 340B price for drugs received by their eligible patients. *See, e.g.*, *AbbVie Inc. v. Fitch*, No. 1:24-cv-184-HSO-BWR, 2024 WL WL 3503965, at *14 (S.D. Miss. July 22, 2024) (the replenishment model merely "relies on pharmaceuticals' fungibility to facilitate efficiency").

In the context of contract pharmacies, replenishment works as follows: The contract pharmacy buys drugs in bulk from a drug company at market price. Then, the hospital identifies the patients who received drugs that are eligible for the 340B discount. Once the pharmacy has dispensed a full package of the drug to patients who have been identified as patients of that covered entity (say, a 340B hospital), back-end software determines that the 340B hospital should pay the 340B discounted price from that portion of the contract pharmacy's general supply. By contrast, if a contract pharmacy dispenses a drug to a patient of a non-340B hospital, then the back-end inventory system will not charge the discounted price. But because these drugs are fungible, the

14

bulk supply is replenished without distinguishing between patients of covered entities and non-covered entities until the backend accounting takes place. If it worked any other way, the pharmacy would have to keep separate stocks of drugs: one for the covered entity and one for non-covered entities. It is more efficiently handled by treating the drugs as they are—fungible commodities that can be replenished in bulk—and handling the discount pricing on the back-end, not the front-end.

Most hospitals use the same type of inventory control method in their in-house pharmacies. 340B providers make an initial purchase of a drug at its full price and add that to their single inventory. Some of the purchased drugs may be used for patients of 340B entities and some for patients of non-340B entities. After the pharmacy has dispensed a full package of that drug to 340B patients, it replenishes (or re-stocks) the supply of that drug by purchasing a package of that drug at the 340B-discounted price.

Thus, replenishment almost always happens whether the 340B drug is delivered to the hospital's pharmacy *or* the hospital's contract pharmacy. Indeed, by regulating the delivery of 340B drugs, Rhode Island is not "requiring that manufacturers provide 340B pricing in situations where the federal statute does not." Pl's MPI at 19. Nothing about that law alters the fact that the hospital is the only purchaser of 340B drugs. The contract pharmacy itself *never* purchases 340B discounted drugs, and so is never a "covered entity" entitled to receive a discount under 340B. Again, the law simply permits the purchaser—the 340B hospital—choose where the drugs it will be delivered—its own in-house pharmacy or a contract pharmacy.

Operating within the precise metes and bounds of the 340B statute—which is silent as to delivery—Rhode Island is protecting its in-state hospitals' flexibility to decide *where* they want drugs that they have purchased to be delivered. If a Rhode Island hospital wants to buy a particular medication, the drug companies do not contest their obligation to ship that drug to the hospital's

in-house pharmacy. Chapter 288 simply mandates that those companies *also deliver* that drug to the pharmacies with which its in-state hospitals have contracts. Nothing in federal law forbids Rhode Island from making that policy decision.

> **b.     Chapter 288 does not interfere with 340B's enforcement regime.**

Furthermore, "[Act 143]'s enforcement scheme does not conflict with Section 340B's enforcement scheme." *AbbVie v. Fitch*, 24-60375 at *8 (5th Cir. September 12, 2025). Novartis contends that Chapter 288 attempts to "supplement the federal enforcement process with an enforcement scheme all its own." Pl.'s MPI at 21. But contrary to Novartis's assertion, Chapter 288 does not authorize the state of Rhode Island to enforce the federal 340B Program. Instead, Chapter 288 strictly provides for the enforcement of *its own* requirements. *See* Chapter 288 § 5-19.3-7; Chapter 13.1 title 6 (setting civil fines for violations of Chapter 288); *AbbVie v. Fitch*, 24-60375 at *8 (5th Cir. September 12, 2025).

As the Eighth Circuit explained with respect to a similar Arkansas statute:

> Act 1103 ensures that covered entities can utilize contract pharmacies for their distribution needs and authorizes the Arkansas Insurance Division to exact penalties and equitable relief if manufacturers deny 340B drugs to covered entities' contract pharmacies. Ark. Code Ann. § 23-92-604(c). The 340B Program, on the other hand, addresses discount pricing. ***Therefore, HHS has jurisdiction over different disputes***: disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs.

*PhRMA v. McClain*, 95 F.4th at 1144 (emphasis added). Because the requirements that can be enforced under Chapter 288 (like the statute in *PhRMA v. McClain*) are different from the 340B program requirements, it does not conflict with the 340B program's enforcement regime.

Novartis argues that "[e]nforcement of Chapter 288 would also require Rhode Island decisionmakers to adjudicate multiple questions of federal law," such as whether a drug is a "340B drug." Pl's MPI at 22-23. Not so. The Rhode Island statute regulates the delivery of a 340B drug

that has been purchased by a 340B hospital. The question in any state action to enforce Chapter 288 would be whether the manufacturer refused to deliver a drug purchased by a 340B hospital to a contract pharmacy. To the extent hypothetical questions about whether a drug is a 340B drug arise, those are easily answered by reference to the federal 340B statute, which states are perfectly capable of reviewing. *Tafflin v. Levitt*, 493 U.S. 455, 467 (1990). And there is nothing improper or unusual about a state statute defining its reach by reference to federal law or incorporating the federal government's definition of a term into the state statue (and then imposing its own requirements). *See, e.g.*, *Chamber of Com.*, 563 U.S. at 611; R.I. Gen. Laws Ann. § 16-8-10 (West) (requiring elementary and secondary schools to make federally reimbursable lunches available to students in accordance with federal regulations as well as any state regulation); R.I. Gen. Laws Ann. § 6-48.1-3(e) (defining limitation of state regulation requiring notice of data collection by references to various federal statutes and regulations); *see also Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001), *aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 249 F.3d 66 (2003) (finding that a state statute that incorporates Medicaid requirements is not preempted). Nor is there anything improper about a state statute whose "regulatory object" is a federal program. *See, e.g.*, *Chamber of Com.*, 563 U.S. at 607–08 (rejecting preemption challenge to a state statute under which employers had to check their employees' *federal* immigration status using a specified *federal* database).

Novartis's mentions of diversion of drugs to non-eligible patients is also irrelevant to its challenge to Chapter 288. As discussed, the question in any state action arising under the Rhode Island statute is whether the manufacturer refused to deliver a drug purchased by a 340B hospital to a contract pharmacy. So the issue of diversion, which relates to dispensing drugs to a non-340B

patient, is outside the scope of the Rhode Island law.[15] And this makes sense because if diversion were an issue, the federal 340B statute requires that HRSA determine whether the 340B drug purchase complied with federal law *after the fact* either through an audit or in the *post hoc* Alternative Dispute Resolution process. 42 U.S.C. §§ 256b(d)(2)(B)(iv) & (3). As such, Chapter 288 and the federal 340B statute enforce different things and therefore do not raise the possibility of conflicting enforcement decisions.

### c.      Chapter 288 Does Not Interfere with ADR and Audit Processes.

Novartis' complaint that Chapter 288 poses an obstacle to the Federal ADR and audit process relies on a misleading description of the process. According to Novartis, Chapter 288's prohibition on the collection of claims data means that "Novartis cannot access any part of Congress's enforcement scheme." Pl.'s MPI at 25. Not so.

Under the 340B statute, a manufacturer must audit a covered entity before initiating the statute's administrative dispute resolution ("ADR") process. 42 U.S.C. § 256b(d)(3)(B)(iv). As HRSA has explicitly stated, the threshold that a drug manufacturer must meet when seeking approval to audit a 340B entity is "*not overly burdensome*" and does not "present *any barriers* to a manufacturer's ability to perform an audit of a covered entity." ADR Rule, 89 Fed. Reg. at 28,646 (emphasis added). The standard for audit approval—"reasonable cause"—is satisfied whenever "a reasonable person *could* believe that a covered entity *may have* violated [certain provisions of the 340B statute]." HRSA, *Manufacturer Audit Guidelines and Dispute Resolution Process*, 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). This standard can be met in various ways that do not require claims data. For example, it can be met by pointing to "[s]ignificant changes in quantities of

---

[15]   For that same reason, it does not matter that Chapter 288 imposes different penalties than the 340B statute because Chapter 288 and the 340B statute regulate different conduct.

specific drugs ordered by a covered entity," or by citing "complaints from patients/other manufacturers about activities of a covered entity[.]" *Id.* at 65,406; *Or. Health & Sci. Univ. v. Engels*, 2025 WL 1707630, at *5 (D.D.C. June 17, 2025); *see, e.g.*, Ex. A, Decl. of Chantelle V. Britton, HRSA Office of Pharmacy Affairs, at ¶ 9 (Dec. 19, 2024) (noting HRSA's approval of a manufacturer's audit request that was "based on a stark increase in [a provider's] utilization of the 340B program," not any data suggesting issues with specific claims).[16]

In addition, the 340B statute contemplates that manufacturers will collect specific evidence of covered entities' potential statutory violations *through an audit*—not as a prerequisite to conducting one. The statute expressly addresses a manufacturer's access to "the records of [a 340B] entity that directly pertain to the entity's compliance with [the 340B statute] with respect to the drugs of the manufacturer." 42 U.S.C. § 256b(a)(5)(C). It provides that a manufacturer can access those records *via an* "*audit*." *Id.* (emphasis added). HRSA guidance similarly explains that, in the ADR process, manufacturers can establish covered entity violations because they "have the ability to gather needed information *through the audits*." ADR Rule, 89 Fed. Reg. at 28,652 (emphasis added). Novartis' concern that it needs claims data *before* any audit relies on a basic misunderstanding of the statutory scheme.

In fact, manufacturers seldom ask to conduct audits, and even when they do, manufacturers frequently fail to follow through with them. *See* Ex. A, Decl. of Chantelle Britton at ¶ 15 (noting that, "over the past decade-plus," HRSA approved 37 manufacturer audit requests, but only 18

---

[16]    As the Director of HRSA's Office of Pharmacy Affairs ("OPA"), Ms. Britton "oversee[s] the OPA staff that reviews requests by drugmakers that participate in the 340B Program to audit covered entities." Ex. A at ¶ 2. HRSA submitted Ms. Britton's declaration in *University of Washington Med. Ctr. v. Becerra,* Case No. 1:24-cv-2998-RC (D.D.C) which is associated connection with *Or. Health & Sci. Univ. v. Engels*, Case No. 1:24-cv-2184-RC (D.D.C.).

audits were conducted).[17] And more fundamentally, *amici* are not aware of a single instance when HRSA has *ever* required, as a condition of authorizing a manufacturer audit, the sort of data that PhRMA now claims its members must be allowed to demand from covered entities.

HRSA's recently approved Rebate Pilot Program also does not alter the preemption analysis. Under that pilot program, manufacturers of ten drugs subject to the Medicare Drug Price Negotiation Program[18] would be permitted, for one year, to provide 340B discounts in the form of rebates. This, in turn, will require 340B covered entities to provide manufacturers with a limited amount of claims data, some of which would overlap with what the drug companies have sought under their contract pharmacy restrictions. The Pilot was introduced as only a "test" to better understand how a rebate model would operate,[19] and to date, HRSA has not approved a single application for a drug manufacturer to participate in the Pilot.

Furthermore, the question of whether the 340B statute even permits HRSA to authorize manufacturers to effectuate 340B pricing through rebates is still being contested; in fact, the D.C. Circuit is currently considering this statutory question. *Novartis v. Kennedy*, 25-5177 (D.C. Cir.). As such, any preemption claim based on the Pilot is premature. It is black-letter law that "[t]he

---

[17]    In contrast, HRSA itself audits approximately 200 covered entities each year for compliance with their 340B obligations. *See* U.S. Gov't Accountability Office, *Drug Pricing Program: HHS Uses Multiple Mechanisms to Help Ensure Compliance With 340B Requirements* at 11 (Dec. 2020), https://www.gao.gov/assets/gao-21-107.pdf. This includes "targeted" audits of covered entities when HRSA receives "information from stakeholders such as drug manufacturers about potential noncompliance." *Id.* at 11 n.22.

[18]    Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027 (CMS DPNP Guidance), 1 at https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.

[19]    HRSA, *HRSA Announces Application Process for the 340B Rebate Model Pilot Program and Request for Public Comment*, https://www.hrsa.gov/about/news/press-releases/rebate-model-pilot-program (last visited August 27, 2025).

existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982); *see Dep't of Tax'n & Fin. of New York v. Milhelm Attea & Bros.*, 512 U.S. 61, 69 (1994).

And, even if there were a potential conflict, Chapter 288 specifically permits manufacturers to collect claims data if it is required by the Centers for Medicare and Medicaid Services. § 5-19.3-3(a)(5). Though the Rebate Pilot Program is administered by HRSA, it is designed to work in tandem with the obligations set upon certain manufacturers by CMS. As such, Chapter 288 should be interpreted to permit the collection of claims data for drugs that are subject to the Rebate Pilot Program.

In any event, Chapter 288 dictates that nothing in this chapter is to be construed or applied to be in conflict with applicable federal law and related regulations. § 5-19.3-9(a). As such, should HRSA's Pilot Program continue, and should a manufacturer be granted permission to apply a rebate for one of the ten eligible drugs, this Court should construe any alleged conflict between Chapter 288 and the Pilot as inapplicable for that one drug. And, if any such potential conflict did arise as to those specific drugs; that limited conflict cannot justify striking down an entire state law. *E.g.*, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) ("[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is unconstitutional in all of its applications.") (quoting *U.S. v. Salerno*, 481 U.S. 739 (1987)).

Put simply, Chapter 288 is not an obstacle to pursuing the audit and ADR process under the 340B statute, and the Court should reject Novartis' claims data-based preemption theory.

### B.    Chapter 288 Is Not an Impermissible Extraterritorial Regulation.

Novartis also claims that Chapter 288 violates the dormant Commerce Clause, but Novartis's claim is squarely foreclosed by the Supreme Court's decision in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), and has been rejected by several district courts evaluating similar efforts to enjoin state contract-pharmacy statutes. *See PhRMA v. Fitch*, 2024 WL 3277365, at *12–13 (Mississippi); *Novartis v. Bailey*, 2025 WL 595189, at *3–5 (Missouri) (denying motion for preliminary injunction on commerce clause challenge to an analogous state law).

*National Pork Producers* flatly rejected the "almost *per se*" extraterritoriality rule that Novartis seeks, holding that the dormant Commerce Clause does *not* forbid "enforcement of state laws that have the 'practical effect of controlling commerce outside the State[.]" *Nat'l Pork Producers*, 598 U.S. at 371. And Novartis offers no coherent argument that Chapter 288 violates the "antidiscrimination principle" that "lies at the 'very core'" of the Supreme Court's dormant Commerce Clause cases. *Nat'l Pork Producers Council*, 598 U.S. at 369. That principle is implicated only by state laws that privilege "in-state economic interests" over "out-of-state *competitors*." *Id.* (emphasis added). Therefore, "there is a threshold question whether the companies are indeed similarly situated for constitutional purposes" before determining whether a regulation impermissibly violates the antidiscrimination principle of the dormant Commerce Clause. *Ass'n To Pres. & Protect Loc. Livelihoods v. Sidman*, 2025 WL 2304915, Nos. 24-1317, 24-1318, 24-1385, at *14 (1st Cir. Aug. 11, 2025).

Although Novartis alleges that "Chapter 288 [] intentionally discriminates against interstate commerce," it gives away the game by complaining of discrimination between "in-state healthcare providers and pharmacies" and "out-of-state *manufacturers*." Compl. ¶ 164 (emphasis added). Novartis does not purport to argue, nor could it, that healthcare providers and drug

22

manufacturers are "similarly situated" for purposes of the dormant Commerce Clause. *See also* Pl.'s MPI at 29-31. Nonetheless, Novartis feebly alleges that it competes with "in-state contract pharmacies and covered entities" because it "operate[s] within the same chain of distribution" and "sell[s] the same products to a single market of healthcare consumers." Pl.'s MPI at 30. But even assuming that is true, competition between entities does not mean that they are "similarly situated." *Ass'n To Pres. & Protect Loc. Livelihoods*, 2025 WL 2304915, at *14-19.

Without any colorable claim of discrimination, Novartis is left to repeatedly contend that Chapter 288 "regulate[s] wholly out-of-state transactions between drug manufacturers . . . and out-of-state wholesalers." Compl. ¶ 163. Novartis points again to the replenishment model to suggest that Chapter 288 protections for 340B covered entities somehow extends to "control" the price of these transactions between manufacturers and wholesalers. Pl.'s MPI at 27-28. But again, Chapter 288 does not directly regulate drug purchases by distributors or wholesalers—it regulates the "acquisition of a 340B drug by, or delivery of a 340B drug to a pharmacy that is under contract with a 340B covered entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity," § 5-19.3-5(a) and forbids manufacturers from "interfer[ing] with a 340B contract pharmacy that is actively contracted with a 340B entity," *id.* § § 5-19.3-5(b). Whatever out-of-state effects Novartis may experience are not the result of Chapter 288 directly regulating transactions with no connection to Rhode Island.

Like "many (maybe most) state laws," Chapter 288 may indirectly impact "extraterritorial behavior" for drug companies that are headquartered outside of Rhode Island. *Nat'l Pork Producers*, 598 U.S. at 374. But the statute does not *target* extraterritorial activity or privilege in-state actors over their out-of-state competitors; its prohibitions apply equally to drug manufacturers

both in and out of state. This Court should reject Novartis's attempt to revive the "extraterritoriality doctrine" so shortly after the Supreme Court rejected it. *See id.* at 371.

Finally, Novartis asserts that Chapter 288 fails the balancing test set out by the Supreme Court in *Pike v. Bruce*, 397 U.S. 137 (1970), which requires that the local benefits of a law be balanced against the burdens placed on out of state entities. In *National Pork Producers*, the Court clarified that it would be an "overstate[ment]" to argue that "*Pike* and its progeny depart from the antidiscrimination rule that lies at the core of our dormant Commerce Clause jurisprudence." 598 U.S. at 377. Moreover, even under the test in *Pike*, the test invalidates a law only if the out of state burden is "clearly excessive in relation to the putative local benefits." *Nat'l Pork Producers*, 598 U.S. at 377 (quoting *Pike*, 397 U.S. at 142). Novartis hasn't proven this to be the case. At most, Novartis points to certain "administrative burdens" associated with "state-specific exceptions to formerly national contract pharmacy policies." Pl.s' MPI at 32. Neither its Verified Complaint nor its Memorandum puts a number on these costs. But as a multi-national company with $50 billion in revenue in 2024, it is hard to imagine that Novartis is unable to easily comply with laws that vary across jurisdictions.

It is even harder to imagine these compliance costs outweigh the benefits of Chapter 288. Novartis completely ignores those local benefits. But those benefits to 340B hospitals and their patients are legion. And these benefits are enhanced by the fact that, for decades, Novartis and the other drug companies provided 340B discounts to hospitals that contracted with pharmacies outside the hospital. Given this history of 340B discounts and contract pharmacies, it is difficult to characterize the statute as imposing any meaningful burden on Novartis, and any burden certainly cannot be characterized as "clearly excessive in relation to the putative local benefits." *Nat'l Pork Producers*, 598 U.S. at 377.

II.    **THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT DENYING AN INJUNCTION.**

In cases in which the government is party, the balance of equities and public interest are considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, where the health of the underserved and vulnerable populations is at risk, these factors heavily weigh against an injunction. Specifically, the balance of equities clearly falls in favor of 340B hospitals, which operate on razor-thin margins, and their patients who may otherwise not have access to healthcare, and not in favor of a drug company that reported $11.9 billion in net income in 2024.[20] Novartis' assertion that patients generally do not gain any benefit from the 340B discount, Pl.'s MPI at 35, is false and has been completely refuted by a unanimous Supreme Court which noted, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022). As discussed above, the 340B program provides many benefits to Rhode Island communities and hospitals. For these reasons, the public interest is better served by ensuring that 340B hospitals continue to serve at-risk populations than by further padding the pockets of an already profitable drug company.

---

[20]    *See Novartis Annual Report 2024* at 42, Novartis Global Communications (Jan. 31, 2024), https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2024.pdf.

## **CONCLUSION**

For the foregoing reasons, Novartis's Motion for a Preliminary Injunction should be denied.

Respectfully submitted,

/s/Nicholas J. Hemond
Nicholas J. Hemond, (#8782)
*as Local Counsel for Amici Curiae*
DarrowEverett LLP
1 Turks Head Place, Suite 1200
Providence, RI 02903
Tel: (401) 453-1200
Fax: (401)453-1201
nhemond@darroweverett.com


*Counsel for Amici Curiae*


William B. Schultz*
Margaret M. Dotzel*
Alyssa M. Howard
Courtney Christensen*
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
wschultz@zuckerman.com
mdotzel@zuckerman.com
ahoward@zuckerman.com
cchristensen@zuckerman.com

*\* pro hac vice motion filed contemporaneously*

## <u>CERTIFICATE OF SERVICE</u>

I, Nicholas J. Hemond, do hereby certify that on September 16, 2025, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, is available for viewing and downloading from ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing.

<u>*/s/ Nicholas J. Hemond*</u>
*Local Counsel for Amici Curiae*