**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

NOVARTIS PHARMACEUTICALS
CORPORATION,

        *Plaintiff*,

        v.

PETER F. NERONHA, in his official
capacity as ATTORNEY GENERAL
OF RHODE ISLAND, *et al.*,

        *Defendants*.

Case No. 1:25-CV-387 (JJM/AEM)

**NOVARTIS PHARMACEUTICALS CORPORATION'S
REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Paul M. Kessimian (#7127)
Robert K. Taylor (#6514)
James P. McGlone (#10847)
PARTRIDGE SNOW & HAHN LLP
40 Westminster Street, Suite 1100,
Providence, RI 02903
Telephone: (401) 861-8200
Washington, D.C. 20004-1109
pkessimian@psh.com

Susan M. Cook*
Jessica L. Ellsworth*
Alexander V. Sverdlov*
Marlan Golden*
Jacob T. Young*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Novartis
Pharmaceuticals Corporation*

*\*Admitted pro hac vice*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 4

I.     NOVARTIS IS LIKELY TO PREVAIL ON THE MERITS. ...................................... 4

     A.     Chapter 288 Is Preempted by Federal Law. ................................................... 4

           1.     No Presumption Against Preemption Applies. ............................................ 4

           2.     Chapter 288 Is Field Preempted. ................................................................ 7

           3.     Chapter 288 Is Conflict Preempted. ......................................................... 10

     B.     Chapter 288 Violates the Dormant Commerce Clause. ................................. 18

           1.     Chapter 288 Is Unlawfully Extraterritorial. ............................................. 18

           2.     Chapter 288 Discriminates Against Out-of-State Commerce. .................. 20

           3.     Chapter 288 Excessively Burdens Interstate Commerce. ......................... 22

II.     NOVARTIS WILL SUFFER IRREPARABLE HARM ABSENT RELIEF. .................. 24

III.     THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION. ............ 26

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

CASES:

*AbbVie, Inc. v. Fitch,*
  No. 24-60375 (5th Cir. Sep. 12, 2025) ..................................................................5

*AbbVie, Inc. v. Skrmetti,*
  No. 3:25-CV-519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) ......................................19

*Acosta v. Pablo Restrepo,*
  470 F. Supp. 3d 161 (D.R.I. 2020)........................................................................29

*Algonquin LNG v. Loqa,*
  79 F. Supp. 2d 49 (D.R.I. 2000)...........................................................................8

*Arcadian Health Plan, Inc. v. Korfman,*
  No. 1:10-CV-322, 2010 WL 5173624 (D. Me. Dec. 14, 2010)............................................29
  No. 1:10-CV-322, 2011 WL 22974 (D. Me. Jan. 4, 2011)...................................................29

*Arizona v. United States,*
  567 U.S. 387 (2012)........................................................................................9

*Association for Accessible Meds. v. Ellison,*
  140 F.4th 957 (8th Cir. 2025) ............................................................................19

*Association for Accessible Meds. v. Frosh,*
  887 F.3d 664 (4th Cir. 2018) .............................................................................19

*Association to Preserve & Protect Local Livelihoods v. Sidman,*
  147 F.4th 40 (1st Cir. 2025)...............................................................................21

*Astra USA, Inc. v. Santa Clara County,*
  563 U.S. 110 (2011)........................................................................4, 7, 8, 9, 15, 17

*Bacchus Imports, Ltd. v. Dias,*
  468 U.S. 263 (1984)........................................................................................3

*Bates v. Dow Agrosciences LLC,*
  544 U.S. 431 (2005)........................................................................................14

*Bessette v. Avco Fin. Servs., Inc.,*
  230 F.3d 439 (1st Cir. 2000)................................................................................8

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001).........................................................................................6

*Capron v. Office of the Att'y Gen. of Mass.*,
   944 F.3d 9 (1st Cir. 2019) ............................................................................4–5

*Chick Kam Choo v. Exxon Corp.*,
   486 U.S. 140 (1988) ......................................................................................14

*Condon v. Andino, Inc.*,
   961 F. Supp. 323 (D. Me. 1997) ...................................................................25

*Crosby v. National Foreign Trade Council*,
   530 U.S. 363 (2000) ......................................................................................15

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   596 U.S. 212 (2022) ........................................................................................9

*De Jesus v. American Airlines, Inc.*,
   532 F. Supp. 2d 345 (D.P.R. 2007) .........................................................22–23

*DiBiase v. SPX Corp.*,
   872 F.3d 224 (4th Cir. 2017) .......................................................................24

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) ................................................................................19, 23

*Family Winemakers of Cal. v. Jenkins*,
   592 F.3d 1 (1st Cir. 2010) ............................................................................21

*Figueroa v. Foster*,
   864 F.3d 222 (2d Cir. 2017) ...........................................................................5

*French v. Pan Am Exp., Inc.*,
   869 F.2d 1 (1st Cir. 1989) ..............................................................4, 5, 7, 11

*Haywood v. Drown*,
   556 U.S. 729 (2009) ......................................................................................14

*Hillsborough County v. Automated Med. Lab'ys, Inc.*,
   471 U.S. 707 (1985) ........................................................................................6

*Hyde Park Partners, L.P. v. Connolly*,
   839 F.2d 837 (1st Cir. 1988) ..................................................................12, 22

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   582 F.3d 156 (1st Cir. 2009) ..........................................................................5

*Inmates of the R.I. Training Sch. v. Martinez*,
   465 F. Supp. 2d 131, 137 (D.R.I. 2006) ......................................................15

*Kroske v. U.S. Bank Corp.*,
 432 F.3d 976 (9th Cir. 2005) ............................................................................5

*Maine Forest Prods. Council v. Cormier*,
 51 F.4th 1 (1st Cir. 2022)..................................................................5, 7, 11, 16, 25
 586 F. Supp. 3d 22 (D. Me. 2022) ..................................................................25

*Massachusetts Med. Soc'y v. Dukakis*,
 815 F.2d 790 (1st Cir. 1987) ..........................................................................5–6

*Medtronic, Inc. v. Lohr*,
 518 U.S. 470 (1996)..........................................................................................5

*Morales v. Trans World Airlines, Inc.*,
 504 U.S. 374 (1992)........................................................................................25

*National Pork Producers Council v. Ross*,
 598 U.S. 356 (2023)................................................................................2, 19, 23

*National Revenue Corp. v. Violet*,
 807 F.2d 285 (1st Cir. 1986)............................................................................22

*Novartis Pharms. Corp. v. Johnson*,
 102 F.4th 452 (D.C. Cir. 2024).............................................1, 8, 11, 12, 16, 23

*Ocean State Tactical, LLC v. Rhode Island*,
 646 F. Supp. 3d 368, 391 (D.R.I. 2022)..........................................................24

*OfficeMax Inc. v. County Qwick Print, Inc.*,
 709 F. Supp. 2d 100 (D. Me. 2010) .................................................................24

*Oregon Waste Sys., Inc. v. Department of Env't Quality of the State of Or.*,
 511 U.S. 93 (1994)..........................................................................................20

*Ouellette v. Mills*,
 91 F. Supp. 3d 1 (D. Me. 2015) .........................................................................6

*Passamaquoddy Tribe v. Maine*,
 75 F.3d 784 (1st Cir. 1996)..............................................................................10

*Pharmaceutical Rsch. & Mfrs. of Am. v. Concannon*,
 249 F.3d 66 (1st Cir. 2001)................................................................................5

*Pharmaceutical Rsch. & Mfrs. of Am. v. McClain*,
 95 F.4th 1136 (8th Cir. 2024) ...........................................................................5

*Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*,
 760 F. Supp. 3d 439 (S.D. W. Va. 2024).........................................................15

*Public Serv. Co. of N.H. v. Town of W. Newbury*,
    835 F.2d 380 (1st Cir. 1987) ...........................................................................24, 25

*Rodriguez v. United States*,
    480 U.S. 522 (1987) (per curiam) ........................................................................29

*Rosario-Urdaz v. Rivera-Hernandez*,
    350 F.3d 219 (1st Cir. 2003) ................................................................................24

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) ..................................................................................24

*Sanofi Aventis U.S. LLC v. HHS*,
    58 F.4th 696 (3d Cir. 2023) .............................................................1, 8, 12, 16, 23

*Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Mgmt. Corp.*,
    770 F. Supp. 775 (D.R.I. 1991) ...........................................................................29

*Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*,
    989 F.2d 1266 (1st Cir. 1993) ................................................................................1

*Tafflin v. Levitt*,
    493 U.S. 455 (1990) .............................................................................................14

*Together Emps. v. Mass Gen. Brigham Inc.*,
    32 F.4th 82 (1st Cir. 2022) ..................................................................................24

*Trailer Marine Transp. Corp. v. Rivera Vasquez*,
    977 F.2d 1 (1st Cir. 1992) ....................................................................................21

*United States v. Locke*,
    529 U.S. 89 (2000) ................................................................................................6

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*,
    589 F.3d 458 (1st Cir. 2009) ................................................................................15

*West Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994) .............................................................................................21

*Wine & Spirits Retailers, Inc. v. State of R.I. & Providence Plantations*,
    364 F. Supp. 2d 172 (D.R.I. 2005) ......................................................................26

*Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
    475 U.S. 282 (1986) .............................................................................................15

*Wood v. General Motors Corp.*,
    865 F.2d 395 (1st Cir. 1988) ................................................................................14

STATUTES:

42 U.S.C. § 256b
    (a)(2) ................................................................................................................7
    (a)(4) ................................................................................................................7
    (a)(5) ................................................................................................................7
    (a)(8) .............................................................................................................7–8
    (d)(2)(B)(vi) ..................................................................................................7–8
    (d)(2)(B)(v) .......................................................................................................8

42 U.S.C. § 1396r-8(d)(1) ........................................................................................5

42 U.S.C. § 1988(b) ...............................................................................................15

R.I. Gen. Laws § 5-19.3
    -2(1) .................................................................................................................6
    -2(2) ...........................................................................................................4, 13
    -2(3) .........................................................................................2, 14–15, 20
    -3(a)(5) .......................................................................................................15, 17
    -5(a) ................................................................................6, 10, 18, 19, 20, 23
    -5(b) .........................................................................................................18, 19
    -5(c) ....................................................................................................6, 18, 19

REGULATIONS:

42 C.F.R. § 10.21(a)(1) ...........................................................................................13

LEGISLATIVE MATERIALS:

Patient Protection & Affordable Care Act, Pub. L. No. 111-148, § 7102(a),
    124 Stat. 119, 826–827 (Mar. 23, 2010) ....................................................16

EXECUTIVE MATERIALS:

HHS, *Pharmaceutical Pricing Agreement* .............................................................9

HRSA, 340B Program Notice: Application Process for the 340B Rebate Model
    Pilot Program, 90 Fed. Reg. 36,163 (Aug. 1, 2025) ...................................17

HRSA Office of Pharmacy Affairs, 340B OPAIS, *Search Contract Pharmacies* .................23, 27

HRSA Office of Pharmacy Affairs, 340B OPAIS,
    *CHC06666-00 Comprehensive Community Action, Inc.* .............................28

HRSA Office of Pharmacy Affairs, 340B OPAIS,
    *CH015160 EAST BAY COMMUNITY ACTION PROGRAM* .................................28

HRSA Office of Pharmacy Affairs, 340B OPAIS,
  *CH010580 PROVIDENCE COMMUNITY HEALTH CENTERS, INC., THE*........................28

HRSA Office of Pharmacy Affairs, 340B OPAIS,
  *CH011820 THUNDERMIST HEALTH CENTER*....................................................................28

**OTHER AUTHORITIES:**

Apexus, *About Apexus* ...............................................................................................8

Editorial, *A Good Idea to Cut Drug Costs*, WALL ST. J. (Sep. 21, 2025) ....................3, 26, 27, 28

Ellen Gabler, *How a Company Makes Millions off a Hospital Program Meant to
  Help the Poor*, N.Y. TIMES (Jan. 15, 2025) .........................................................3, 29

11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. updated June 10, 2025)............................................29

Katie Thomas & Jessica Silver-Greenberg, *How a Hospital Chain Used a Poor
  Neighborhood to Turn Huge Profits*, N.Y. TIMES (Sep. 24, 2022)................................3, 28–29

## INTRODUCTION

"In particular contexts," the First Circuit has explained, "a statute's silence can be informative." *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*, 989 F.2d 1266, 1270 (1993). The State's brief refers 25 times to the federal 340B statute's silence about whether manufacturers must recognize unlimited contract pharmacy arrangements. But not once does the Government acknowledge the unique backdrop for that silence: Congress created the 340B Program under the Spending Clause, and it spelled out in the statute all of the 340B conditions manufacturers must accept in order to participate in Medicaid and Medicare Part B. Every facet of 340B's operation embodies Congress's balance of benefits and burdens among participants in these three federal programs. In this context, silence speaks: What the federal 340B statute does *not* require is just as important as what it *does* require. Both equally reflect Congress's tradeoffs in crafting a single, integrated set of requirements under centralized federal oversight.

The Government likewise ignores the context supplied by the state law itself. Its brief analyzes Chapter 288 as if it were a law of general applicability with only incidental impacts on a federal program. But this state law does not purport to govern all (or even most) pharmacies, drugs, or hospitals. Instead, Chapter 288 attaches parasitically to federal law, expropriating the federal 340B's discounted pricing rules and applying them to a new set of transactions not mandated by federal law. Federal 340B law intentionally limits the circumstances that trigger manufacturers' obligation to offer the 340B discount. For that reason, the D.C. Circuit and Third Circuit have held that in enacting the federal 340B statute, Congress chose to allow Novartis to limit covered entities to a single contract pharmacy. Yet Chapter 288 purports to graft a contrary, state-specific burden onto manufacturers' obligations under this federal program, vastly expanding the

1

volume of 340B discounts Novartis must provide in Rhode Island. No single state can commandeer federal policy in this manner.

Attempting to evade these problems, the Government selectively insists that Chapter 288 is merely about drug delivery, not pricing. But its briefing on this point reflects a remarkable disconnect: In one breath, Rhode Island asserts (*e.g.*, at 47) that the state law will not change "the extent to which 340B discounts subsidize in-state covered entities," yet rejoices (*e.g.*, at 57) that Chapter 288 will also create anew "several millions of dollars a year in 340B discount pricing" for covered entities. Both of these things cannot be true. In fact, Chapter 288 is a pricing regulation for the simple reason that what it requires—in fact, all it requires—is for manufacturers to provide, on demand, a drug subject to "reduced prices." R.I. Gen. Laws § 5-19.3-2(3). So the state law would indeed bestow additional 340B revenue on covered entities and their for-profit partners in an expanded number of transactions. That is precisely why it is preempted: Congress chose not to require manufacturers to give these very same discounts. Even if the law *were* only about delivery (which it is not), it would matter little. The extent of manufacturers' 340B obligations is solely for Congress to decide—pricing, delivery, and otherwise.

The State also has no answer for Chapter 288's dormant Commerce Clause defects. It acknowledges the state law's extraterritorial control, but contends that Rhode Island may reach across its borders to set drug prices as long as the drug eventually ends up in in the State. Courts have repeatedly rejected that rationale, including after the Supreme Court's decision in *Pork Producers*—which did not go nearly so far as the State implies. The law's extraterritoriality is compounded by the statute's overt protectionism and excessive burden on interstate commerce, both of which the Government seeks to obscure by repeatedly emphasizing its desire to subsidize in-state companies. But that alone cannot save the law, because "the Commerce Clause stands as a

limitation on the means by which a State can constitutionally seek to achieve that goal." *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 271 (1984).

Favoring covered entities does not help the State on the non-merits *Winter* factors, either. The allegations of harm peppered throughout the Government's brief are based on fundamental factual errors. To be very clear: Novartis's contract pharmacy policy does not hurt Rhode Island patients, and Chapter 288 would not help them. This case is about only the business-to-business pricing of drugs that are already being delivered to pharmacies throughout the State. The same drugs at issue are already being dispensed to the same customers of Rhode Island pharmacies that the state statute purports to serve. And Chapter 288 will not reduce the prices patients pay. The patients at issue typically pay the same price regardless of whether the covered entity or contract pharmacy bought the drug at the 340B discounted price because 340B discounts are provided retroactively and only to covered entities. And finally, *four* of the five Rhode Island covered entities the State mentions are not even subject to Novartis's policy in the first place, because they are federal grantees. *See* ECF No. 1-1 at 1. Their allegations of harm are thus not relevant here.

The Government's public-interest argument ultimately amounts to the claim that some covered entities might choose to use extra 340B revenue to provide services for their patients. Then again, they might not. *See, e.g.*, Editorial, *A Good Idea to Cut Drug Costs*, Wall St. J. (Sep. 21, 2025), https://tinyurl.com/y3k63v3z; Katie Thomas & Jessica Silver-Greenberg, *How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, N.Y. Times (Sep. 24, 2022), https://tinyurl.com/4cxjukf4; Ellen Gabler, *How a Company Makes Millions off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://tinyurl.com/yv7akn6t.

In any event, Novartis uses the contested funds to expand healthcare access, too: It devotes inordinate resources to researching and developing innovative new therapies that extend and

improve patients' lives.  Thankfully, the Court need not decide where or by whom those funds are best spent—Congress already did, and the Supremacy Clause requires deference to its judgment.

## ARGUMENT

## I.    NOVARTIS IS LIKELY TO PREVAIL ON THE MERITS.

### A.    Chapter 288 Is Preempted by Federal Law.

The State begins with the observation that preemption is a question of congressional intent. State Br. at 16.  Just so.  *French v. Pan Am Exp., Inc.*, 869 F.2d 1, 2 (1st Cir. 1989).  But in this case, there can be no doubt about what Congress intended, for the Supreme Court has already answered that question directly:  Congress intended to create a "unitary administrative and enforcement scheme" within HHS to ensure that "both Medicaid and § 340B" would be administered "harmoniously and on a uniform, nationwide basis."  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119–120 (2011).  The desire to create "a single uniform system of regulation" is precisely the kind of intent from which courts infer preemption.  *French*, 869 F.2d at 5.  Chapter 288 is antithetical to that design, and this Court "need go no further."  *Id.* at 7.

### 1.    No Presumption Against Preemption Applies.

The State's attempt to cloak Chapter 288 in a presumption against preemption fails for three reasons.  First, the State's argument depends on the faulty premise that Chapter 288 is a law of general applicability.  But it does not purport to regulate the "practice of pharmacy" or even "medicine and its associated costs" writ large.  State Br. at 16 (quotations omitted).  Chapter 288 applies only to a specific sliver of pharmaceutical transactions: drugs "subject to any offer for reduced prices . . . pursuant to 42 U.S.C. § 256b," and available for purchase by an "entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 U.S.C. § 256b."  R.I. Gen. Laws §§ 5-19.3-2(2)–(3).  The Government relies (at 17) on *Capron v. Office of the Attorney General of Massachusetts*, but that case distinguished this precise

4

situation—Chapter 288 is not "generally applicable," but instead "predicated on the existence of the federal . . . program regulations." 944 F.3d 9, 23 (1st Cir. 2019).

Chapter 288's dependence on federal law distinguishes this case from the State's citations. In *Capron*, for example, the state laws and regulations at issue applied equally to all domestic workers, and the plaintiffs merely challenged incidental applications of those laws to workers who happened to be present in the state because of a federal program. 944 F.3d at 18–19. Most of Rhode Island's remaining cases are of a piece. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 172–173 (1st Cir. 2009) ("state consumer protection statutes"); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 489 (1996) ("application of general rules of common law by judges and juries"); *Figueroa v. Foster*, 864 F.3d 222, 225 (2d Cir. 2017) (state antidiscrimination law); *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 978–979 (9th Cir. 2005) (state antidiscrimination law). The one in-circuit exception,[1] *Massachusetts Medical Society v. Dukakis*, concerned a state law that applied only *outside* of a federal program—it regulated what a physician could charge a patient *after* receiving reimbursement from Medicaid.[2] 815 F.2d 790, 791 (1st Cir. 1987). Chapter 288,

---

[1] The State also relies heavily on the Eighth Circuit's decision in *Pharmaceutical Research & Manufacturers of America v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024). But that case is thinly reasoned and irreconcilable with the First Circuit's reasoning in cases like *French*, 869 F.2d at 3–7, and *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8–11 (1st Cir. 2022), among other cases. The same is true of the Fifth Circuit's recent, record-specific decision in *AbbVie, Inc. v. Fitch*, No. 24-60375 (5th Cir. Sep. 12, 2025), ECF No. 85-1, which addressed a conflict-preemption argument tied to diversion (and not presented by Novartis here). Other challenges to the same statute (including Novartis's) remain pending before the Fifth Circuit.

[2] Further distinguishing *Massachusetts Medical Society*, Medicaid differs fundamentally from the 340B Program because the statute expressly invites (and requires) state involvement. *E.g.*, 42 U.S.C. § 1396r-8(d)(1) (establishing "[p]ermissible restrictions" states may place on drug coverage). As the State notes, this is an example of "cooperative federalism"—Congress has carved out part of its program for state control. State Br. at 18 (quoting *Pharmaceutical Rsch & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001)). 340B is the opposite. The State fails to identify any similar invitation in the federal 340B statute because none exists.

by contrast, applies only *inside* the 340B Program, and it directly controls the volume of 340B discounts that participating manufacturers must provide.  R.I. Gen. Laws §§ 5-19.3-5(a), (c).

Second, the 340B Program is an area with a "history of significant federal presence"—to say the least—because federal law created it from scratch.  *United States v. Locke*, 529 U.S. 89, 108 (2000).  The State (at 18) calls this point "myopic," but it fails to recognize how different this context is from cases in which courts apply the presumption.  Chapter 288 does not regulate a preexisting activity that could, in theory, be regulated by either states or the federal government. *Contra, e.g.*, *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 710 (1985) (discussing physical inspections, access fees, patient testing, and recordkeeping requirements governing local blood-plasma donation centers); *Massachusetts Med. Soc'y*, 815 F.2d at 791 (discussing payments from patients to physicians).  There would *be* no "340B drug[s]," no "340B covered entit[ies]," no "340B contract pharmac[ies]"—and no Chapter 288—without federal law.  R.I. Gen. Laws §§ 5-19.3-2(1)–(3).  No presumption protects state attempts to regulate "inherently federal" relationships that "originate[ ] from, [are] governed by, and terminate[ ] according to federal law."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

Third, Chapter 288 is not a "health and safety regulation."  *Contra* State Br. at 18.  The State does not explain why this characterization is supposedly appropriate, but the argument appears to rest on a misconception that Chapter 288 would help Rhode Island patients access discounted drugs.  Not so; the same drugs are already being provided to Rhode Island patients at the same pharmacies, and at the same prices patients would pay under the new law.  Verified Compl. ¶¶ 37–39, 43, 52–53, 72, 96, 133.  This is not a case like *Ouellette v. Mills*, where a state attempted to bring *new* drugs into the state (although this effort was preempted anyway).  91 F. Supp. 3d 1, 4–5 (D. Me. 2015).  Chapter 288 is nothing more than an attempted wealth transfer from one group

of healthcare companies to another. This purely economic effect on corporate interests cannot be recast as an exercise of Rhode Island's police power. *Cf. Goya de P.R. Inc. v. Santiago*, 59 F. Supp. 2d 274, 278–280 (D.P.R. 1999) (finding a food-labeling law preempted despite Puerto Rico's unsubstantiated claims about "health and safety").

Finally, even if some presumption against preemption applied, it would be only a starting point. A presumption can be overcome where Congress's intent is sufficiently clear, as is true here. *E.g.*, *Maine Forest Prods.*, 51 F.4th at 11.

### 2.    Chapter 288 Is Field Preempted.

Congress occupies a field when it creates "a single uniform system of regulation." *French*, 869 F.2d at 5. In such circumstances, parochial interference "would make impossible the attainment of . . . centralized control and uniformity of design," leading inevitably to "a patchwork of state laws." *Id.* at 5–6. The question at hand for field preemption is whether Congress wished to avoid competing regulatory schemes. *Maine Forest Prods.*, 51 F.4th at 8. *Astra* answers this question directly, using language that could have been pulled straight from *French*: Congress wanted the 340B Program to be administered "on a uniform, nationwide basis." 563 U.S. at 120. In complaining (at 21) that *Astra* was not a preemption case, the State disregards its connection with *French*. In fact, the State ignores *French* entirely, citing out-of-circuit decisions instead. State Br. at 18–21. But *Astra* plus *French* leaves no doubt that field preemption applies here.

Even if this Court needed to assess congressional intent afresh, the federal 340B statute has all the standard hallmarks of field preemption. It contains an "intricate web of statutory provisions." *French*, 869 F.2d at 4. The federal statute addresses everything from the price of drugs, 42 U.S.C. § 256b(a)(2), to the entities entitled to receive those prices, *id.* § 256b(a)(4), to the compliance obligations those entities accept, *id.* § 256b(a)(5), to the "distribution" and "delivery" of

340B-priced drugs, *id.* §§ 256b(a)(8), (d)(2)(B)(iv).[3]  That is, federal law already "governs virtually every aspect" of the 340B Program.  *See Algonquin LNG v. Loqa*, 79 F. Supp. 2d 49, 51 (D.R.I. 2000).  Perhaps most significantly, the federal statute confers "broad enforcement power" on HHS to adjudicate the metes and bounds of 340B obligations.  *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447 (1st Cir. 2000); *see also* 42 U.S.C. §§ 256b(d)(2)(B)(v) (directing HHS to assess sanctions against both covered entities and manufacturers "in appropriate cases as determined by the Secretary"), (d)(3)(A) (requiring HHS to create an administrative dispute resolution (ADR) process to hear both "claims by covered entities" and "claims by manufacturers").  The Government does not analyze the statutory text or address any of these cases—all of which Novartis cited in its opening brief.

The State instead seeks refuge in the federal statute's silence about whether manufacturers must provide 340B discounts on unlimited contract pharmacy transactions.  State Br. at 20.  But the statute is *intentionally* silent because Congress chose not to impose this burden on manufacturers.  That is what the Third Circuit concluded after thoroughly analyzing the legislative history and surrounding statutory context.  *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704–706 (3d Cir. 2023).  That is also why the D.C. Circuit explained that Congress's "silence *preserves*—rather than abrogates—the ability of sellers to impose at least some delivery conditions." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024) (emphasis added).  By conflating statutory silence with congressional indifference, Rhode Island has abrogated the flexibility

---

[3]  Under these delivery provisions, HRSA has established the Prime Vendor Program.  Consistent with *Astra*, that is intended to be a "central source overseeing distribution" under HRSA's ultimate oversight.  Apexus, *About Apexus* (last visited Sep. 22, 2025), https://tinyurl.com/yck4v9aj.  Rhode Island is therefore mistaken when it claims (at 19) that the federal statute does not address drug delivery.

Congress purposefully gave manufacturers under federal law, leading to the very result Congress sought to avoid.

This is especially clear given that the 340B statute was enacted under Congress's Spending Clause powers.  The State recognizes (at 43) that the 340B Program is unique because Novartis has agreed to provide the federally required discounts "in exchange for Medicare [Part B] and Medicaid eligibility."  Spending Clause programs like these operate on "consent" by regulated entities to terms clearly defined in advance.  *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022).  That is why manufacturers wishing to participate in 340B sign a 10-page, single-spaced agreement with the federal government laying out the specific obligations imposed on them in exchange for access to Medicaid and Medicare Part B.[4]  Yet the State openly admits (at 56–57) that Chapter 288 would increase manufacturers' 340B obligations to the tune of "millions of dollars a year."  Chapter 288, in other words, is a blatant, after-the-fact attempt to renegotiate an agreement to which Rhode Island was not—and could never be—a party.

The 340B Program's interdependence with other drug-pricing programs makes Congress's silence even more important.  Every drug sold at the 340B price cannot also be subject to a Medicaid rebate or subject to discounted pricing under the Medicare Part D Drug Price Negotiation Program.  And an increased burden on manufacturers under 340B disincentivizes their participation in Medicaid and Medicare Part B.  That is why Congress vested oversight power in one federal agency to "administer both Medicaid and § 340B harmoniously."  *Astra*, 563 U.S. at 120.  The Supreme Court has found field preemption based on exactly this kind of integrated statutory design.  *E.g.*, *Arizona v. United States*, 567 U.S. 387, 401 (2012) (noting that a statutory scheme was

---

[4]  HHS, *Pharmaceutical Pricing Agreement* § II(a)–(g) (listing seven discrete "Manufacturer's Responsibilities") (last accessed Sep. 22, 2025), https://tinyurl.com/4nshe96y.

"designed as a harmonious whole" (quotation omitted)). In this context, "the sound of silence . . . is pregnant with meaning." *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 794 n.6 (1st Cir. 1996). It represents a burden not imposed, and a bargain not struck.

### 3. Chapter 288 Is Conflict Preempted.

Conflict-preemption principles likewise show that Chapter 288's enforcement should be enjoined. The Government's contrary arguments depend on misconceptions about both federal and state law. Once these are swept aside, fatal conflicts between federal and state law emerge.

***Expanding the Transactions Triggering 340B Pricing***

At times, the State seems to agree that Chapter 288 cannot lawfully require additional 340B discounts. That is evidently why it spends considerable effort trying to explain (at 24–26) why the state law supposedly does not affect "predetermined prices." This claim is not only incorrect, but also irreconcilable with the State's other arguments. How Chapter 288 could paradoxically help covered entities derive an additional "several millions of dollars a year in 340B discount pricing," State Br. at 57, without "requiring that manufacturers provide 340B pricing in situations where the federal statute does not," *id.* at 24 (quotation omitted), the State does not say.

The answer to this riddle is that *of course* Chapter 288 would increase the volume of 340B discounts; that is its core purpose. Suppose that a customer who once visited a Rhode Island covered entity later fills an unrelated prescription for a Novartis product at a CVS pharmacy that is not the one designated pharmacy for that entity. Under Novartis's current policy, the transaction will remain very simple: The pharmacy pays the commercial price for the drug; the customer pays the co-pay set by her insurer; and the covered entity pays nothing, because it has no role in the transaction. But if Novartis is forbidden by Chapter 288 to "restrict . . . the acquisition of a 340B drug by, or delivery of a 340B drug to" that CVS, R.I. Gen. Laws § 5-19.3-5(a), the covered entity could use the replenishment model to retroactively transmogrify the same transaction into a

fictional 340B-priced sale: The covered entity may demand a 340B-priced "replenishment" unit be shipped to the pharmacy, which then would pay the covered entity for the drug (minus a finder's fee). Verified Compl. ¶¶ 37–39. The pharmacy customer would, of course, have paid the same co-pay. But the manufacturer would have been forced to give a 340B discount not required under federal law, and the covered entity and its middlemen could then "divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Novartis*, 102 F.4th at 457.

Chapter 288 is designed to prevent manufacturers like Novartis from enforcing the guardrails that federal law allows them to place around the use of contract pharmacies. For all of its gesticulating (*e.g.*, at 27–29, 52–53) about the supposedly uncertain effects of Chapter 288, the State never denies that Novartis's current contract pharmacy policy—containing terms expressly blessed by multiple courts under federal law—would immediately become unlawful if the state law were to take effect. Rhode Island's argument boils down to a semantic (and legally irrelevant) distinction between changing the number of drug dispenses that trigger federal pricing rules and changing the pricing rules themselves. Chapter 288 is a pricing regulation by any reasonable definition because it would force manufacturers to give discounted prices on vastly more sales.

In any event, Chapter 288's core conflict-preemption problem does not depend on the outcome of the pricing-delivery debate. The bottom line is that federal law deliberately allows Novartis to maintain its contract pharmacy policy, while Chapter 288 would forbid it. This is exactly the type of conflict recently recognized by the First Circuit as impermissible: "Congress conferred a right, at least implicitly" on Novartis, and Chapter 288 "purports to forbid" Novartis to exercise it. *Maine Forest Prods.*, 51 F.4th at 9–10. That amounts to an attempted "veto power over the federal program," and it is "difficult to envision a more perfect collision of purposes." *Id.* at 10–11. Perhaps for that reason, the State (as with *French*) does not even cite *Maine Forest Products*.

Instead, the Government repeats its denial that Congress "intended to affirmatively author-ize" manufacturers to impose reasonable restrictions on contract pharmacy usage. State Br. at 27. But in doing so, it misreads the *Novartis* and *Sanofi* decisions. *Sanofi*'s conclusion was expressly based on both the "text [and] history of Section 340B." *Id.* The court observed, for example, that a related drug-pricing statute "expressly contemplates drug makers selling discounted drugs through contract pharmacies," which shows that Congress left that requirement out of Section 340B "intentionally." *Sanofi*, 58 F.4th at 705. Congress also considered—but rejected—"a bill that would have required discounts on drugs" dispensed at contract pharmacies. *Id.* These points and more persuaded the Third Circuit that Congress meant to give "drug makers discretion on delivery" of 340B-priced drugs. *Id.* That perfectly matches what the D.C. Circuit concluded: "silence preserves" manufacturers' discretion in this context. *Novartis*, 102 F.4th at 460.

The State's references (at 28) to regulatory "floors" and "ceilings" highlight its conceptual error. The federal 340B statute is not a free-floating list of "dos" and "don'ts" that could arguably be supplemented without altering its core objectives. The limits of manufacturers' 340B obliga-tions are intrinsically *part* of Congress's policy objectives because they ensure that the price of participating in Medicaid and Medicare Part B does not grow prohibitively large. It is therefore fundamentally misguided to interpret statutory silence to mean that Congress does not care how heavy 340B burdens become. Chapter 288 is not filling any "gaps in the 340B statute" by making those burdens heavier; it is speaking over congressional restraint. *Contra* State Br. at 8. Rhode Island has erred by assuming statutory tradeoffs were "randomly or uncarefully chosen by Con-gress." *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 852 (1st Cir. 1988).

*Conflicting Enforcement Procedures and Remedies*

The Government also fails to establish that Chapter 288's enforcement could be either "separate" from or "complementary" to HRSA's enforcement. It begins (at 30) with the mistaken premise that federal 340B enforcement is all about pricing, while enforcement of Chapter 288 would be all about delivery. For one, federal law *does* regulate delivery. *Supra* pp.7–8 & n.3. But this is beside the point here. HRSA's ADR regulation is far broader than the State recognizes. It funnels in all "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). The State uses almost exactly the same language to describe what Chapter 288 does. State Br. at 33 (outlawing manufacturers' "limitations on covered entities' ability to obtain 340B discounts").

Not only do disputes about contract pharmacy limitations belong in the federal ADR process, but the outcomes of such proceedings will be inconsistent with the outcomes under state law. HRSA has rejected ADR claims challenging manufacturers' contract pharmacy policies, adopting the understanding of federal law espoused by *Novartis* and *Sanofi*. PI Mot. at 21 n.9. Chapter 288 is engineered to reverse those decisions, making it difficult to understand why the State mocks the idea of conflicting adjudications as a "pearl-clutching prediction." State Br. at 31. Penalizing manufacturers for conduct that does not trigger sanctions in HRSA's ADR proceedings is the whole point of Chapter 288.

This is but one example of the kind of conflicting enforcement Chapter 288 invites. Nuanced federal questions are spliced into the state law's DNA through its repeated incorporation of federal standards. *E.g.*, R.I. Gen. Laws §§ 5-19.3-2(2)–(3). The State is thus forced to admit that Rhode Island law cannot be enforced until questions of "controlling federal law" are resolved first. State Br. at 32. But it has no answer for how the Government will ensure it answers those questions

consistently with HRSA's (conceded) power to determine which drugs must receive 340B pricing in the first place. As Novartis has already explained, that is a complex and multifaceted question involving, among other things, deciding who counts as a "patient" of a covered entity. PI Mot. at 22–23; Verified Compl. ¶ 106. How long ago can the pharmacy customer have visited the covered entity? Does the hospital visit have to be for the same disease? Does it count if the customer is also the patient of a different covered entity? Federal law is still emerging on these issues, and federal and state decisionmakers may reach different conclusions because of the inherent subjectivity of the standard. One centralized enforcer can ensure that each transaction receives consistent treatment.[5] Overlapping decisions would inevitably "destroy the uniformity of the federal standard." *Wood v. General Motors Corp.*, 865 F.2d 395, 412 (1st Cir. 1988).

The State also pays no heed to the practical implications of its position. Although federal ADR proceedings and state enforcement of Chapter 288 may involve exactly the same drugs, the Government admits it would not bother to await the resolution of such ADR proceedings before levying sanctions under state law. It even acknowledges that HRSA may make a "subsequent determination" about the application of federal 340B requirements to the same conduct. State Br. at 33. But what if Rhode Island assesses sanctions based on a drug that HRSA later determines was not dispensed to a patient of the covered entity? By definition, that drug cannot have been a

---

[5] The State cites an irrelevant line of cases (at 32 & n.10) for the principle that states can enforce federal law. Those cases are about state courts' *jurisdiction* to hear claims from private plaintiffs that *arise under* or *implicate* federal law. *Viz. Tafflin v. Levitt*, 493 U.S. 455, 460 (1990) ("civil claims arising under RICO"); *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149 (1988) (considering an attempt to enjoin a hypothetical "state *forum non conveniens* determination" in tort litigation); *Haywood v. Drown*, 556 U.S. 729, 733–734 (2009) (considering whether a state can withdraw jurisdiction over a subset of Section 1983 claims); *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 435–436 (2005) (state consumer-protection claims). A state attorney general's attempt to directly enforce a federal law that is entrusted to a single federal agency's oversight is a different situation entirely.

"340B drug."  R.I. Gen. Laws § 5-19.3-2(3).  Yet the State seems to contend (at 33) that this con-flicting adjudication is acceptable because it somehow becomes an issue of "state law, not federal law," when Rhode Island contradicts HRSA.  Another district court has found a fatal preemption problem even where a state promised to await HRSA's answer to such questions before attempting to enforce its own contract pharmacy law.  *Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 458 (S.D. W. Va. 2024).  Rhode Island instead openly asserts the supposed right to a "two bites at the apple approach" to 340B enforcement.  *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 474 (1st Cir. 2009).

All this confirms the wisdom of what the Supreme Court has repeatedly said:  "[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity."  *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (quotation omitted); *see also Crosby v. National Foreign Trade Council*, 530 U.S. 363, 380 (2000).  There is only one way to avoid this problem: create a "unitary administrative and enforcement scheme" to leave decisions about the scope of 340B obligations to one decisionmaker.  *Astra*, 563 U.S. at 120.  That is exactly what Congress did, and the Supremacy Clause does not permit any state to undo it.

### Frustration of Claims Data Collection

The Government's attempt (at 34–36) to dispute that Novartis truly needs claims data dances around the heart of the issue:  Federal law allows Novartis to condition 340B pricing on the receipt of claims data.  Chapter 288 forbids this precise practice.  5 R.I. Gen. Laws § 19.3-3 (a)(5).  That is alone enough to find a conflict between the two regimes.  *E.g.*, *Inmates of the R.I. Training Sch. v. Martinez*, 465 F. Supp. 2d 131, 137, 140–141 (D.R.I. 2006) (invalidating "Rhode Island prohibitions against fee-sharing" where federal law merely "permits" courts to disburse attorney's fees); *see also* 42 U.S.C. § 1988(b) (giving courts "discretion" over this issue).

In response, Rhode Island attempts to sow doubt about what the Third and D.C. Circuits held regarding claims data, suggesting there is some difference between a so-called primary and secondary holding. *See* State Br. at 36. There can be no doubt that both courts expressly considered the exact type of claims-data requirement Novartis now enforces. *Novartis*, 102 F.4th at 463 (concluding, based partly on a HRSA guidance document, that "drug manufacturers may require 'standard information' from covered entities" (quotation omitted)); *Sanofi*, 58 F.4th at 701 (noting that one of the approved contract pharmacy policies included a condition of "provid[ing] claims data"). It is irrelevant that *Novartis* and *Sanofi* did not consider contrary state law (almost none of which existed when these cases were decided) because federal authorization is enough to preempt a state prohibition. *E.g.*, *Maine Forest Prods.*, 51 F.4th at 9–10.

The 340B statute and regulatory scheme also contemplate a role for claims data: Without it, manufacturers cannot satisfy the good cause requirement to initiate an audit—a prerequisite to initiate an ADR proceeding. PI Mot. at 25. In response, the Government tries to paint a rosy portrait of HRSA's "reasonable cause" standard. It questions (at 35 n.11) how Novartis has accessed the federal enforcement scheme during "the entire lifetime of the 340B program" without getting claims data. But the ADR scheme—and its prerequisite audit requirement—were not part of the program until the passage of the Affordable Care Act in 2010. Pub. L. No. 111-148, § 7102(a), 124 Stat. 119, 826–827 (Mar. 23, 2010). HRSA did not implement regulations laying out the ADR process until just the past few years. And it is notoriously difficult for manufacturers to complete an audit. HRSA said publicly in December 2024 that there were only "18 manufacturer-conducted audits over the last decade-plus,"[6] and only two between November 2022 and

---

[6] *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (D.D.C. Dec. 20, 2024), ECF No. 22-1 ¶ 15 (declaration of HRSA's Director of the Office of Pharmacy Affairs).

April 2024.[7]  Even where manufacturers persuade HRSA to authorize an audit, covered entities often still sue to challenge HRSA's determination of reasonable cause.[8]

The State's answer to HRSA's new rebate pilot program also fails to persuade.  The Government asserts (at 38) that Chapter 288 exempts claims data that covered entities are "required" to give manufacturers.  But even if that is an accurate characterization of what will occur when manufacturers provide 340B pricing in the form of a rebate, that is not what the statute says.  The state law forbids a claims-data condition on 340B pricing "unless it is required by the *Centers for Medicare and Medicaid Services*."  R.I. Gen. Laws § 5-19.3-3(a)(5) (emphasis added).  That is a different component of HHS; the rebate pilot will be administered by HRSA (as the whole 340B Program currently is).  HRSA, 340B Program Notice: Application Process for the 340B Rebate Model Pilot Program, 90 Fed. Reg. 36,163 (Aug. 1, 2025).  And the point here is that HRSA is using the pilot program as part of its contemplation of a broader rebate program.  The state law frustrates federal objectives in this space.

HRSA's pilot program also highlights an issue that goes deeper than rebates.  By endorsing a new way to offer 340B pricing, HRSA is exercising its power as "administrator of . . . the 340B Program."  *Astra*, 563 U.S. at 120.  What this really shows is that state attempts to control 340B operations may obstruct federal initiatives in ways that even the General Assembly may not have

---

[7]  HRSA, 340B Drug Pricing Program: Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024) (noting "[t]he infrequency of finalized manufacturer audit reports").

[8]  *E.g.*, *Oregon Health & Sci. Univ. v. Engels*, 24-CV-2184 (D.D.C. filed July 24, 2024); *Maine General Med. Ctr. v. Engels*, 24-CV-2187 (D.D.C. filed July 24, 2024); *University of Rochester v. Engels*, 24-CV-2268 (D.D.C. filed Aug. 1, 2024); *Children's Nat'l Med. Ctr. v. Engels*, 24-CV-2563 (D.D.C. filed Sept. 6, 2024); *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (D.D.C. filed Oct. 22, 2024); *University of Kan. Hosp. Auth. v. Kennedy*, No. 25-CV-549 (D.D.C. filed Feb. 24, 2025).

foreseen when it passed Chapter 288. That is because 340B pricing, delivery, claims data, and more are all inextricably bound together to form the sum total of manufacturers' obligations under the 340B Program. Congress has therefore instructed one federal agency to "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* In that ecosystem, all state interference is an invasive species.

### B.    Chapter 288 Violates the Dormant Commerce Clause.

Novartis is also likely to succeed on its dormant Commerce Clause claim. Here, too, the Government's arguments misconstrue the nature of the new state law.

### 1.    Chapter 288 Is Unlawfully Extraterritorial.

Recognizing Chapter 288's impermissible extraterritorial control does not require any inferential steps, *contra* State Br. at 40—just a basic understanding of how drug distribution works. The State is flat wrong that "the ability for a covered entity in Rhode Island to claim a 340B discount is not at all affected" by the national pharmaceutical distribution chain. State Br. at 41. That distribution chain is the *only* way a Rhode Island covered entity can claim 340B pricing. Remember: Manufacturers and covered entities generally do not deal directly with each other— either during the initial sale of the drug, or the retroactive request for a 340B discount. The discount goes back up the same chain that the initial sale followed: The covered entity (or one of its for-profit partners) demands 340B pricing from the wholesaler, who then asks Novartis for reimbursement to be made whole on the back end. Verified Compl. ¶ 123.

Chapter 288 applies directly to "manufacturers." R.I. Gen. Laws §§ 5-19.3-5(a)–(c). That means the State is reaching to regulate the transaction between manufacturers and their wholesalers—because that is the only transaction that manufacturers enter into. The Government seems to recognize this problem; it eventually concedes that the state law will "affect Novartis's wholesaler contracts." State Br. at 41. But it dismisses this extraterritorial control on the theory that

18

Novartis's "goal . . . is to impact covered entities inside Rhode Island." *Id.* (emphasis omitted). This argument amounts to identifying some attenuated nexus with Rhode Island, which is not enough. The fact that some "drugs must eventually end up in [the state] for a manufacturer to be subject to liability" does not overcome "the specific extraterritorial effect of controlling the price of wholly out-of-state transactions." *Association for Accessible Meds. v. Ellison*, 140 F.4th 957, 960–961 (8th Cir. 2025). The Supreme Court, after all, recently reaffirmed the rule against "*directly* regulat[ing] out-of-state transactions by those with *no* connection to the State." *National Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar v. MITE Corp.*, 457 U.S. 624 (1982) (invalidating an Illinois law governing out-of-state transactions even though they affected corporations with specific connections to Illinois)); *see also Association for Accessible Meds. v. Frosh*, 887 F.3d 664, 672 (4th Cir. 2018).

No interpretive presumption against extraterritorial application can solve this problem. *Contra* State Br. at 40–41.[9] Chapter 288's contract-pharmacy rules apply only to manufacturers, and therefore only to out-of-state conduct. R.I. Gen. Laws §§ 5-19.3-5(a)–(c). To read Chapter 288 not to reach Novartis's interactions with out-of-state wholesalers is to read the statute to have no effect at all.

---

[9] The State misunderstands (at 41–42) the claim at issue in *AbbVie, Inc. v. Skrmetti*, No. 3:25-CV-519 (M.D. Tenn.). AbbVie argued that Tennessee law "prohibits **any** manufacturer across the country from imposing conditions on transactions between itself and **any** covered entity, pharmacy, or 'other location' authorized by a covered entity across the country, regardless of that manufacturer's or entity's connections to Tennessee." *Id.*, ECF No. 18 at 22 (M.D. Tenn. filed May 9, 2025). In other words, the argument was that the Tennessee law applied by its terms to *covered entities and contract pharmacies* outside the state. The district court adopted a limiting construction of the law, holding that it applies only to Tennessee covered entities and contract pharmacies. *Id.*, 2025 WL 1805271, at *23–24 (M.D. Tenn. June 30, 2025). This has little to do with the argument Novartis advances here. Even if Chapter 288 protects only Rhode Island covered entities and contract pharmacies, it still targets purely out-of-state conduct by Novartis.

Finally, it is not true that Chapter 288 involves only discounts that Novartis "has already agreed" to provide. State Br. at 43. As Novartis explained above, this state law purports to mandate 340B pricing in situations where federal law does not. *Supra* pp.10–11. There is no way to escape the conclusion that Chapter 288 orders Novartis to provide its product at "reduced prices" on a greater volume of transactions. R.I. Gen. Laws § 5-19.3-2(3). The State itself repeatedly celebrates this aspect of the law. *E.g.*, State Br. at 12–15, 56–57.

## 2.    Chapter 288 Discriminates Against Out-of-State Commerce.

Chapter 288 also discriminates against out-of-state commerce in both effect and intent. The drugs at issue are already being delivered to the same pharmacies and dispensed to their customers at market prices. Verified Compl. ¶¶ 37–39, 43, 72, 96, 133. The only thing Chapter 288 would change is requiring Novartis to provide more of those drugs at "reduced prices" to covered entities and their for-profit partners, allowing them in turn to extract more profit from those sales to customers. R.I. Gen. Laws §§ 5-19.3-2(3), 5-19.3-5(a). The law requires, in other words, a forced subsidy: a transfer of wealth from out-of-state manufacturers to in-state covered entities. The state law's predominant effect is thus to move money across state borders—for the purpose of benefiting in-state interests. In quoting the proponents of Chapter 288, the State omits (at 45) the parts of those same statements where the legislators highlighted this effect: moving money into their "districts" and boosting entities run by their "constituents." PI Mot. at 29–30 (quotations omitted). That is a recognition of "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Department of Env't Quality of the State of Or.*, 511 U.S. 93, 99 (1994).

The covered entities that stand to benefit from Chapter 288 are similarly situated to Novartis, despite the State's cursory attempt (at 44) to dismiss this idea out of hand. Chapter 288 allocates a fixed financial benefit among corporate interests, as the Government (selectively)

20

acknowledges. *See, e.g.*, State Br. at 46 (pointing out that the policy Chapter 288 seeks to outlaw "diminishes" the 340B revenue covered entities extract "while maximizing" Novartis's revenue). It is no answer that Novartis and covered entities are not "direct business rivals," *Trailer Marine Transp. Corp. v. Rivera Vasquez*, 977 F.2d 1, 11 (1st Cir. 1992), or that they are part of the same distribution chain that produces drugs and gets them to patients. "[A] differential burden on any part of the stream of commerce—from wholesaler to retailer to consumer—is invalid." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 202–203 (1994).

The "similarly situated" test serves to ensure there is no "salient difference between the alleged competitors that weakens any inference that the challenged measure was the product of simple economic protectionism." *Association to Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 64 (1st Cir. 2025) (quotation omitted). For example, in the case on which the State relies (at 44), the law targeted "externalities" created by the out-of-state cruise ships "by virtue of their specific product" that had nothing to do with the in-state "hotels and inns." *Id.* But there is no analogous difference here between manufacturers and covered entities because Chapter 288 does not regulate anything other than the extent of manufacturers' obligation to subsidize a group of in-state companies. Besides, there *is* "evidence that the local measure here was enacted on the understanding that it favored in-state competitors over out-of-state ones." *Id.*

The State also fails (at 45–46) to discredit the use of "statements of Rhode Island legislators" to support a finding of discrimination. The First Circuit, for instance, has analyzed "floor debates" in which legislators acknowledged a state law's discriminatory effects. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 7 (1st Cir. 2010). Particularly when combined with evidence of a law's discriminatory effects, such statements help show that the State "intended to benefit its local . . . industry." *Id.* at 14. That is the case here.

21

### 3.    Chapter 288 Excessively Burdens Interstate Commerce.

Chapter 288 likewise flunks the *Pike* balancing test because it is a protectionist law bereft of legitimate local benefit. *E.g.*, *National Revenue Corp. v. Violet*, 807 F.2d 285, 289–290 & n.5 (1st Cir. 1986). The State attempts (at 49) to justify the law by pointing to covered entities' increased "monetary savings"—that is, the additional discounts they will be able to force manufacturers to provide. But that is merely a restatement of the law's protectionist agenda, not a justification for it. And even if transferring more wealth to covered entities were a permissible goal in this context, the State does not even address whether that goal could be achieved with a lower burden on interstate commerce. *Hyde Park Partners*, 839 F.2d at 847–848. Of course it could: The Government could subsidize those entities directly.

The State also misunderstands the nature of the burden Chapter 288 creates. The problem is not simply that Novartis must recognize additional 340B discounts—although that *is* a significant burden that weighs against the law. *Contra* State Br. at 47–48.[10] Novartis's contract pharmacy policy operates as a nationwide set of instructions to its wholesalers about the circumstances under which wholesalers should provide the discount. Verified Compl. ¶¶ 122–123, 135. Exempting a state from that policy is not a matter of flipping a switch; each wholesaler must reprogram its software to ensure that restrictions on 340B pricing apply to the correct set of covered entities and pharmacies, a task that grows in complexity with each state that tinkers with 340B requirements. That process costs time and money that are better spent on developing therapies for patients. McCrudden Decl. ¶¶ 18–19, 23. This is the quintessential problem that arises when

---

[10]  Once more, the State repeats (at 47) the falsehood that Chapter 288 will not force manufacturers to provide additional 340B discounts. For the reasons already explained, that claim is neither correct nor consistent with the Government's positions elsewhere. *Supra* pp.10–11, 20.

multiple states simultaneously attempt to "eliminate the uniformity" formerly provided by federal law.  *See De Jesus v. American Airlines, Inc.*, 532 F. Supp. 2d 345, 353 (D.P.R. 2007).

The Government errs further by contending (at 47–48) that Novartis's prior contract pharmacy policy is somehow equivalent to Chapter 288.  For starters, a nationwide policy does not create the same logistical burden as one riddled with state-specific exceptions.  But more fundamentally, the Government appears not to realize that Chapter 288 imposes discounting requirements vastly exceeding those associated with recognizing all contract pharmacies within a 40-mile radius of the covered entity.  Rhode Island covered entities collectively purport to have 437 active contract pharmacies outside the State.[11]  On its face, Chapter 288 orders manufacturers not to "deny, restrict, prohibit, or otherwise interfere with" the acquisition of 340B-priced drugs by those pharmacies, too.  R.I. Gen. Laws § 5-19.3-5(a).  In any event, Novartis has since changed its policy, as federal law gives it the right to do.  *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703–706.

Finally, it matters little that this case is not about the "arteries of commerce."  State Br. at 48 (quotation omitted).  The concurring opinion on which the Government relies explicitly recognized that *Pike* is not limited to this context, citing *Edgar* as an example.  *Pork Producers*, 598 U.S. at 392 (Sotomayor, J., concurring in part).  And not only did *Edgar* have nothing to do with trucks or trains, but it also highlighted the state law's purported "nationwide reach" as its most "obvious burden."  457 U.S. at 643.  That is Chapter 288's biggest Commerce Clause problem, too:  It "purports to give [Rhode Island] the power to determine whether" a drug dispensed at a pharmacy "anywhere" must receive 340B pricing.  *See id.*  A jumble of inconsistent state

---

[11]  HRSA Office of Pharmacy Affairs, 340B OPAIS, *Search Contract Pharmacies* (last visited Sep. 22, 2025) (limit covered entities to Rhode Island and filter out in-state pharmacies and terminated pharmacy contracts), https://340bopais.hrsa.gov/SearchCp.

requirements on that score is exactly the opposite of what Congress intended for the 340B Program, and it creates a burden that far exceeds Chapter 288's nonexistent public benefits.

## II.    NOVARTIS WILL SUFFER IRREPARABLE HARM ABSENT RELIEF.

The Government entirely ignores (at 50–53) the primary basis of Novartis's showing of irreparable injury:  The additional 340B discounts Chapter 288 would force Novartis to provide are not recoverable, even if the law is later enjoined.  Verified Compl. ¶ 141–142; McCrudden Decl. ¶ 17.  As Novartis explained in its opening brief (at 34), even an economic injury is irreparable "[w]here a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages."  *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) (noting "the many potential obstacles to such a damage award," including official immunity).  And contrary to the State's claim (at 51) that Novartis must identify an existential financial harm, "a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business."  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996).  The Government addresses neither these principles nor these cases, instead citing cases where monetary damages or other redress was available.[12]

Nor does Novartis need to show that it will imminently face enforcement proceedings under Chapter 288.  *Contra* State Br. at 52.  The State's argument leaves out half the story:  Novartis

---

[12]  *Viz. Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (claims brought under Title VII and the ADA); *Public Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 381 (1st Cir. 1987) ("[I]f the Company were eventually to prevail, the permit could be reinstated and the poles reinstalled."); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 391, 399–400 (D.R.I. 2022) (explaining that "plaintiffs virtually concede that there exists 'just compensation' for their [injury]," and noting the statutory scheme allowed plaintiffs to sell their property); *OfficeMax Inc. v. County Qwick Print, Inc.*, 709 F. Supp. 2d 100, 114 (D. Me. 2010) (identifying "direct economic damage" that could "more readily be compensated by a monetary award"); *see also DiBiase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) ("[T]he moving parties have not shown that they availed themselves of opportunities to avoid the injuries of which they now complain.").

must *either* provide the additional discounts demanded by Chapter 288 *or* face the state law's draconian sanctions for the time period where it is out of compliance.  PI Mot. at 33–34.  In other words, Novartis is "faced with a Hobson's choice: continually violate the [Rhode Island] law and expose [itself] to potentially huge liability; or . . . suffer the injury of obeying the law during the pendency of the proceedings and any further review."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  The Government's attempt (at 53) to paint enforcement of Chapter 288 against Novartis as "hypothetical" is belied by its repeated acknowledgement that the state law was designed precisely to outlaw contract pharmacy policies like Novartis's.  *E.g.*, State Br. at 10–11, 13, 45–46, 55.

The State also fails (at 50) to grapple with the constitutional harms created by Chapter 288. It notes that this type of irreparable harm is limited to constitutional issues "of such qualitative importance as to be irremediable by any subsequent relief."  *Public Serv. Co.*, 835 F.2d at 382. But courts have not hesitated to put the Supremacy Clause and the dormant Commerce Clause in that category.  *Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 63 (D. Me. 2022) (Supremacy Clause), *aff'd*, 51 F.4th 1 (1st Cir. 2022); *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) (dormant Commerce Clause).  The Government cites no contrary authority.

The brief period between Chapter 288's passage and the filing of Novartis's challenge does not somehow nullify all of this irreparable harm.  *Contra* State Br. at 53.  This state law intrudes on a complex federal scheme, requiring a detailed factual and legal analysis of nuanced constitutional issues.  *See generally* Verified Compl. ¶¶ 25–137.  Novartis sought a preliminary injunction *seven weeks* before Chapter 288's effective date, and the State itself requested nearly a month to *respond* to Novartis's motion.  *See* ECF Nos. 3, 22.  By attempting to portray Novartis as "lackadaisical" for taking the time to explain to the Court the various ways in which Chapter 288 would

25

upend the federal 340B Program, the Government implies that Novartis must be prepared with a thorough demonstration of each inchoate state bill's unconstitutionality on a dime in case it passes. It cites no authority for this dubious claim—only a case in which the plaintiff waited more than *six months* to request a preliminary injunction. *Wine & Spirits Retailers, Inc. v. State of R.I. & Providence Plantations*, 364 F. Supp. 2d 172, 182 (D.R.I. 2005). Even there, the court acknowledged that the plaintiff's actions "certainly cannot be characterized as dilatory." *Id.* Much less so here.

## III.    THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

The Government's public interest arguments suggesting this dispute is a matter of "life and death" are unwarranted. State Br. at 53–57. This case is about the price of drugs in transactions between manufacturers, hospitals, for-profit pharmacies, and various corporate middlemen—long *after* Rhode Island pharmacy customers have received those drugs. The record is quite clear: Chapter 288 would not change patients' ability to access drugs or reduce the prices patients pay for them. Verified Compl. ¶¶ 37–39, 43, 52–53, 72, 96, 133. In fact, expanding the 340B Program may have the *opposite* effect—encouraging hospitals to "prescribe higher-priced drugs" in order to "reap bigger discounts on them." Editorial, *A Good Idea to Cut Drug Costs*, WALL ST. J. (Sep. 21, 2025), https://tinyurl.com/y3k63v3z. The State does not attempt to rebut this evidence.

Instead, the State curiously claims (at 55) that drug manufacturers are somehow nullifying "covered entities' ability to effectively utilize the 340B program." The 340B Program is larger today than it has ever been. In 2023 (the last year of data currently available from HRSA), total 340B sales reached over $66 billion—measured by the heavily *discounted* price of those drugs— which is *ten times larger* than the program's size in 2010. Verified Compl. ¶ 45. Access to Medicaid and Medicare Part B is supposed to be the incentive for 340B participation, but the 340B Program is now larger than both. *Id.* That was not remotely foreseeable when Congress created the program in 1992. *See id.* ¶¶ 25–26. Novartis's contract pharmacy policy merely restores the

26

way the 340B Program operated for almost two decades. *Id.* ¶¶ 35, 45, 59. And even under that policy, 340B utilization remains historically high.

The State's public-interest argument, then, boils down to the claim that some covered entities would extract even more 340B dollars under Chapter 288's regime. For example, the State points to legislative testimony explaining that Brown University Health stands to gain revenue if Chapter 288 were to take effect. State Br. at 13–14, 56. But this windfall would have little to do with providing care to Rhode Island patients. One Brown-affiliated provider—Rhode Island Hospital—purports to have 43 active contract pharmacies outside the state, including in Alabama, Arizona, California, Florida, Illinois, Indiana, Kansas, Michigan, Minnesota, Nevada, North Carolina, South Carolina, and Tennessee.[13] Even as to its contract pharmacies within the State, forcing manufacturers to recognize 340B pricing on additional transactions will not help patients, who get no discount and will receive the same unit of drug either way.[14] Verified Compl. ¶¶ 37–39, 43, 52–53. If Chapter 288 is enjoined, these same pharmacies will continue dispensing drugs to the same customers at the same prices; the transactions simply will not be retroactively deemed to be affiliated with Brown, and the pharmacies will continue to buy drugs at commercial prices.

The remaining covered entities mentioned by the State are not subject to Novartis's policy in the first place. Novartis does not restrict contract-pharmacy usage by federal grantee covered

---

[13] HRSA Office of Pharmacy Affairs, 340B OPAIS, *Search Contract Pharmacies* (last visited Sep. 22, 2025) (search Covered Entity Name "Rhode Island Hospital" and filter out terminated pharmacy contracts), https://340bopais.hrsa.gov/SearchCp.

[14] The Government (and Brown) implicitly acknowledge this fact (at 13–14) by emphasizing that Brown purports to use additional 340B revenue to fund various programs unrelated to its reasons for claiming the discount. This claim reflects nothing more than the fact that money is fungible; additional revenue can be deemed to "support" anything Brown chooses to do. But there is also reason for skepticism: A recent study "estimated that a third of the [340B] discount dollars are directed to hospitals' financial portfolios—bonds, stocks, etc." *A Good Idea to Cut Drug Costs*, *supra* pp.3, 26.

entities or condition their access to 340B pricing on receipt of claims data. ECF No. 1-1 at 1. That is partly because federal grantees often *do* pass on 340B discounts to their patients.[15] Thundermist Health Center, East Bay Community Action Program, the Providence Community Health Centers, and Comprehensive Community Action, Inc. are all federal grantees and therefore exempt from Novartis's contract pharmacy policy.[16] That means Novartis does not restrict these entities' ability to use multiple contract pharmacies. The State's implication (at 2, 56) that Novartis has contributed to any federal grantee's reported financial difficulties is thus flatly incorrect.

Even for the Rhode Island covered entities that would gain revenue under Chapter 288, the Court need not make a freeform policy judgment about the likelihood that they will use these funds to help the public. For one thing, this is far from clear. There is much evidence documenting the misuse of 340B dollars. *E.g.*, *A Good Idea to Cut Drug Costs*, *supra* pp.3, 26 (identifying "deals with minor-league and college sports teams for naming rights," the launch of "a film company," and industry "consolidation" that "has increased prices and insurance premiums," and noting that physicians at 340B hospitals are incentivized to write prescriptions for more expensive drugs, ultimately costing insurers and states more in healthcare costs); Katie Thomas & Jessica Silver-Greenberg, *How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, N.Y. TIMES (Sep. 24, 2022) (explaining that a hospital chain "has been slashing services" at a 340B covered

---

[15] Senate Health, Educ., Lab. & Pensions Comm., *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Reform* 2 (Apr. 2025), https://tinyurl.com/bdd24yd4.

[16] *E.g.*, HRSA Office of Pharmacy Affairs, 340B OPAIS, *CH011820 THUNDERMIST HEALTH CENTER* (last visited Sep. 22, 2025), https://340bopais.hrsa.gov/CeDetails/9680; HRSA Office of Pharmacy Affairs, 340B OPAIS, *CH015160 EAST BAY COMMUNITY ACTION PROGRAM* (last visited Sep. 22, 2025), https://340bopais.hrsa.gov/CeDetails/13005; HRSA Office of Pharmacy Affairs, 340B OPAIS, *CH010580 PROVIDENCE COMMUNITY HEALTH CENTERS, INC., THE* (last visited Sep. 22, 2025), https://340bopais.hrsa.gov/CeDetails/1402; HRSA Office of Pharmacy Affairs, 340B OPAIS, *CHC06666-00 Comprehensive Community Action, Inc.* (last visited Sep. 22, 2025), https://340bopais.hrsa.gov/CeDetails/29430.

entity location "while investing in the city's wealthier, white neighborhoods" and "building a luxury apartment and office complex"), https://tinyurl.com/4cxjukf4.  And that is not to mention the potential harms to patients and payors.  *See, e.g.*, Ellen Gabler, *How a Company Makes Millions off a Hospital Program Meant to Help the Poor*, N.Y. TIMES (Jan. 15, 2025) (noting that 340B hospitals "billed the state health plan far more than [non-340B] hospitals," and that "[i]n some cases, costs are passed along to patients"), https://tinyurl.com/yv7akn6t.

More importantly, this debate is beside the point here:  *Congress* already made a policy judgment about the appropriate scope of the 340B Program, which is a determination of where the public interest lies.  *Arcadian Health Plan, Inc. v. Korfman*, No. 1:10-CV-322, 2010 WL 5173624, at *9 (D. Me. Dec. 14, 2010), *aff'd*, 2011 WL 22974 (D. Me. Jan. 4, 2011).  The overriding public interest here is in upholding the Constitution—including its deference to Congress's policy judgment.  *Acosta v. Pablo Restrepo*, 470 F. Supp. 3d 161, 168 (D.R.I. 2020); *Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Mgmt. Corp.*, 770 F. Supp. 775, 779 (D.R.I. 1991).  That means accepting the 340B Program's limits, for "no legislation pursues its purposes at all costs."  *Rodriguez v. United States*, 480 U.S. 522, 525–526 (1987) (per curiam).

Lastly, the Government's unusual claim (at 54) that the true status quo here ended over five years ago is easily rejected.  The status quo to be preserved by a preliminary injunction is "the last peaceable relationship *between the parties*."  11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. updated June 10, 2025) (emphasis added).  Rhode Island cannot possibly claim to have "contested" Novartis's contract pharmacy policies *before enacting Chapter 288*.  Novartis's policy is inarguably lawful until October 1, 2025—as a matter of both federal law and Rhode Island law—and the Court should preserve that status quo pending a decision on the merits.

Despite its lack of relevance to the *Winter* factors, though, this argument is deeply telling. The Government admits that Chapter 288 seeks to wind back the clock on the federal 340B Program to "July 2020." State Br. at 54. Put differently, this state law asserts direct control over a federal Spending Clause program for the simple reason that the State does not agree with the limitations Congress placed on it, as interpreted by numerous federal courts. That is beyond any state's power, and it confirms that Chapter 288's enforcement should be preliminarily enjoined.

## CONCLUSION

For the above reasons and those stated in Novartis's opening brief, the Court should grant Novartis's motion for a preliminary injunction.

Dated: September 22, 2025

Respectfully submitted,

*/s/ Paul M. Kessimian*
Paul M. Kessimian (#7127)
Robert K. Taylor (#6514)
James P. McGlone (#10847)
PARTRIDGE SNOW & HAHN LLP
40 Westminster Street, Suite 1100,
Providence, RI 02903
Telephone: (401) 861-8200
pkessimian@psh.com

Susan M. Cook*
Jessica L. Ellsworth*
Alexander V. Sverdlov*
Marlan Golden*
Jacob T. Young*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Novartis Pharmaceuticals Corporation*

*\*Admitted pro hac vice*